# United States Court of Appeals for the Third Circuit

FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.,

*Plaintiff-Appellant,*

v.

MATTHEW PLATKIN, in his official capacity as Attorney General of the State of New Jersey,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of New Jersey
Case No.: 3:23-cv-23076

## JOINT APPENDIX
## VOLUME II

ERIN M. HAWLEY
LINCOLN DAVIS WILSON
TIMOTHY A. GARRISON
GABRIELLA M. MCINTYRE
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
ehawley@ADFlegal.org
lwilson@ADFlegal.org
tgarrison@ADFlegal.org
gmcintyre@ADFlegal.org

*Counsel for Plaintiff-Appellant*

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

DAVID LEIT
*Assistant Attorney General*

LIZA B. FLEMING
SAMUEL L. RUBINSTEIN
LAUREN E. VAN DRIESEN
*Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
973-648-2935
Samuel.rubinstein@law.njoag.gov

*Counsel for Defendant-Appellee*

# APPENDIX TABLE OF CONTENTS
## VOLUME II

| ECF No. | Document Description | Page No. |
|---------|---------------------|----------|
|         | District Court Docket Entries | App.015 |
| 1       | Complaint | App.019 |
| 5-2     | Exhibit 1 to [Proposed] Order to Show Cause | App.054 |
| 5-3     | Exhibit 2 to [Proposed] Order to Show Cause | App.059 |
| 5-4     | Exhibit 3 to [Proposed] Order to Show Cause | App.063 |
| 5-5     | Exhibit 4 to [Proposed] Order to Show Cause | App.068 |
| 5-6     | Exhibit 5 to [Proposed] Order to Show Cause | App.073 |
| 5-7     | Exhibit 6 to [Proposed] Order to Show Cause | App.078 |
| 5-8     | Exhibit 7 to [Proposed] Order to Show Cause | App.082 |
| 5-9     | Exhibit 8 to [Proposed] Order to Show Cause | App.085 |
| 15      | Minutes of Proceedings – December 19, 2023 | App.109 |
| 17      | December 20, 2023 Letter to Court from State of New Jersey requesting Briefing Schedule for Plaintiff's Motion for Preliminary Injunction | App.110 |
| 24-1    | Exhibit A to Defendant's Brief in Opposition to Plaintiff's Motion for a Temporary Restraining Order | App.119 |
| 24-2    | Exhibit B to Defendant's Brief in Opposition to Plaintiff's Motion for a Temporary Restraining Order | App.122 |
| 24-3    | Exhibit C to Defendant's Brief in Opposition to Plaintiff's Motion for a Temporary Restraining Order | App.160 |
| 33      | Text Order Denying Plaintiff's Emergency Motion for Injunction Pending Appeal | App.193 |

# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
## CIVIL DOCKET FOR CASE #: 3:23-cv-23076-MAS-TJB

FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC. v. PLATKIN
Assigned to: Judge Michael A. Shipp
Referred to: Magistrate Judge Tonianne J. Bongiovanni
Case in other court: Third Circuit, 24-01111
Cause: 42:1983 Civil Rights Act

Date Filed: 12/13/2023
Date Terminated: 01/12/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2023 | 1 | COMPLAINT against J. MATTHEW PLATKIN ( Filing and Admin fee $ 405 receipt number ANJDC-14939864), filed by First Choice Women's Resource Centers, Inc.. (Attachments: # 1 Summons, # 2 Civil Cover Sheet)(WILSON, LINCOLN) (Entered: 12/13/2023) |
| 12/13/2023 | 2 | Corporate Disclosure Statement by First Choice Women's Resource Centers, Inc.. (WILSON, LINCOLN) (Entered: 12/13/2023) |
| 12/13/2023 | 3 | Certification on behalf of First Choice Women's Resource Centers, Inc. Re 1 Complaint. (WILSON, LINCOLN) (Entered: 12/13/2023) |
| 12/13/2023 | 4 | NOTICE of Appearance by LINCOLN DAVIS WILSON on behalf of First Choice Women's Resource Centers, Inc. (WILSON, LINCOLN) (Entered: 12/13/2023) |
| 12/13/2023 | 5 | Proposed Order *TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION* by First Choice Women's Resource Centers, Inc.. (Attachments: # 1 Brief MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS PROPOSED ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Declaration)(WILSON, LINCOLN) (Entered: 12/13/2023) |
| 12/14/2023 | 6 | AMENDED DOCUMENT by First Choice Women's Resource Centers, Inc.. Amendment to 5 Proposed Pretrial Order, *Corrected Memorandum of Law*. (WILSON, LINCOLN) (Entered: 12/14/2023) |
| 12/14/2023 | 7 | MOTION for Leave to Appear Pro Hac Vice *Gabriella M. McIntyre* by First Choice Women's Resource Centers, Inc.. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(WILSON, LINCOLN) (Entered: 12/14/2023) |
| 12/14/2023 | 8 | MOTION for Leave to Appear Pro Hac Vice *Mercer Martion* by First Choice Women's Resource Centers, Inc.. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (WILSON, LINCOLN) (Entered: 12/14/2023) |
| 12/14/2023 | 9 | MOTION for Leave to Appear Pro Hac Vice *Timothy A. Garrison* by First Choice Women's Resource Centers, Inc.. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(WILSON, LINCOLN) (Entered: 12/14/2023) |
| 12/14/2023 | 10 | CERTIFICATE OF SERVICE by First Choice Women's Resource Centers, Inc. re 6 Amended Document, 8 MOTION for Leave to Appear Pro Hac Vice *Mercer Martion*, 2 |

| | | |
|---|---|---|
| | | Corporate Disclosure Statement (aty), 3 Certification, 9 MOTION for Leave to Appear Pro Hac Vice *Timothy A. Garrison*, 7 MOTION for Leave to Appear Pro Hac Vice *Gabriella M. McIntyre*, 1 Complaint, 5 Proposed Pretrial Order, (WILSON, LINCOLN) (Entered: 12/14/2023) |
| 12/15/2023 | | Judge Michael A. Shipp and Magistrate Judge Tonianne J. Bongiovanni added. (jdg) (Entered: 12/15/2023) |
| 12/15/2023 | | Set Deadlines as to 7 MOTION for Leave to Appear Pro Hac Vice *Gabriella M. McIntyre*, 8 MOTION for Leave to Appear Pro Hac Vice *Mercer Martion*, 9 MOTION for Leave to Appear Pro Hac Vice *Timothy A. Garrison*. Motion set for 1/16/2024 before Magistrate Judge Tonianne J. Bongiovanni. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg, ) (Entered: 12/15/2023) |
| 12/15/2023 | 11 | SUMMONS ISSUED as to J. MATTHEW PLATKIN. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (jdg, ) (Entered: 12/15/2023) |
| 12/15/2023 | 12 | Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* by FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.. (Attachments: # 1 Text of Proposed Order to Show Cause Granting Temporary Restraining Order)(WILSON, LINCOLN) (Entered: 12/15/2023) |
| 12/18/2023 | 13 | Minute Entry for proceedings held before Judge Michael A. Shipp: Telephone Status Conference held on 12/18/2023. Order to issue. (Court Reporter: Shannan Gagliardi (609-815-2750)) (jdb) (Entered: 12/18/2023) |
| 12/18/2023 | 14 | ORDER staying subpoena response deadline until such time counsel for Defendant appears before the Court to present its position on Plaintiff's Emergency Motion for Temporary Restraining Order (ECF No. 12). Signed by Judge Michael A. Shipp on 12/18/2023. (jdb) (Entered: 12/18/2023) |
| 12/18/2023 | | Set Hearings: Telephone Status Conference set for 12/19/2023 at 11:30 AM before Judge Michael A. Shipp. (jdb) (Entered: 12/18/2023) |
| 12/19/2023 | 15 | Minute Entry for proceedings held before Judge Michael A. Shipp: Telephone Status Conference held on 12/19/2023. ORDERED that the parties are directed to meet and confer and shall provide the Court with a joint proposed briefing schedule by no later than close of business on December 20, 2023. (Court Reporter: Shannan Gagliardi (609-815-2750)) (jdb) (Entered: 12/19/2023) |
| 12/20/2023 | 16 | NOTICE of Appearance by ANGELA CAI on behalf of All Defendants (CAI, ANGELA) (Entered: 12/20/2023) |
| 12/20/2023 | 17 | Letter from All Parties. (CAI, ANGELA) (Entered: 12/20/2023) |
| 12/21/2023 | 18 | NOTICE of Appearance by LAUREN ELIZABETH VAN DRIESEN on behalf of J. MATTHEW PLATKIN (VAN DRIESEN, LAUREN) (Entered: 12/21/2023) |
| 12/21/2023 | 19 | NOTICE of Appearance by JESSICA L. PALMER on behalf of J. MATTHEW PLATKIN (PALMER, JESSICA) (Entered: 12/21/2023) |
| 12/22/2023 | 20 | ORDER that the State's Opposition Brief to Plaintiff's 12 motion shall be filed no later than 2/2/2024. Signed by Judge Michael A. Shipp on 12/21/2023. (jal, ) (Entered: 12/22/2023) |
| 12/26/2023 | 21 | Letter from State Defendant. (CAI, ANGELA) (Entered: 12/26/2023) |

| 01/02/2024 | 22 | Minute Entry for proceedings held before Judge Michael A. Shipp: Telephone Conference Status held on 1/2/2024. (Court Reporter: Shannan Gagliardi (609-815-2750)) (jdb) (Entered: 01/02/2024) |
|---|---|---|

01/02/2024    23    TEXT ORDER: In light of the Court's January 2, 2024 hearing and the parties' inability to reach an agreement on the parameters of an order pending the Court's decision on Plaintiff's application, the Court finds good cause to amend the December 22, 2023 Order (ECF No. 20 ), enter an expedited briefing schedule on Plaintiff's application (ECF No. 12 ), and consider Plaintiff's application on an urgent basis. Accordingly, Defendant must submit its opposition brief by Friday, January 5, 2024 at 2:00 p.m. Plaintiff must submit its reply brief by Tuesday, January 9, 2024 at 4:00 p.m. So Ordered by Judge Michael A. Shipp on 1/2/2024. (jdb) (Entered: 01/02/2024)

01/05/2024    24    RESPONSE to Motion filed by All Defendants re 12 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction Opposition to TRO Motion* (Attachments: # 1 Text of Proposed Order, # 2 Certification, # 3 Exhibit)(CAI, ANGELA) (Entered: 01/05/2024)

01/09/2024    25    RESPONSE in Support filed by All Plaintiffs re 12 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* (WILSON, LINCOLN) (Entered: 01/09/2024)

01/11/2024    26    Letter from State Defendant re 12 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction*. (Attachments: # 1 Brief Proposed Sur-Reply, # 2 Certification Certificate of Service)(CAI, ANGELA) (Entered: 01/11/2024)

01/11/2024    27    Letter from Plaintiff in Reply to State Defendant's Letter to Court re 26 Letter. (WILSON, LINCOLN) (Entered: 01/11/2024)

01/12/2024    28    MEMORANDUM OPINION filed. Signed by Judge Michael A. Shipp on 1/12/2024. (kht) (Entered: 01/12/2024)

01/12/2024    29    ORDER that Plaintiff's 12 motion for a temporary restraining order and preliminary injunction is DENIED. Plaintiff's Complaint is DISMISSED WITHOUT PREJUDICE. Signed by Judge Michael A. Shipp on 1/12/2024. (kht) Modified on 1/12/2024 (kht). (Entered: 01/12/2024)

01/12/2024      ***Civil Case Terminated. (kht) (Entered: 01/12/2024)

01/16/2024    30    NOTICE OF APPEAL as to 29 Order on Motion for TRO, by FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.. Filing fee $ 605, receipt number ANJDC-15011979. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. Appeal Record due by 1/30/2024. (WILSON, LINCOLN) (Entered: 01/16/2024)

01/17/2024    31    Emergency MOTION for Preliminary Injunction *Pending Appeal* by FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.. (WILSON, LINCOLN) (Entered: 01/17/2024)

01/18/2024      Set Deadlines as to 31 Emergency MOTION for Preliminary Injunction *Pending Appeal*. Motion set for 2/20/2024 before Judge Michael A. Shipp. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 01/18/2024)

01/22/2024    32    USCA Case Number 24-1111 for 30 Notice of Appeal (USCA), filed by FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.. USCA Case Manager Laurie (Document Restricted - Court Only) (lr) (Entered: 01/22/2024)

| 01/22/2024 | 33 | TEXT ORDER: This matter comes before the Court upon Plaintiff's emergent motion for a preliminary injunction pending appeal. (ECF No. 31 .) In its recent Memorandum Opinion (ECF No. 28 ), this Court explained why it lacks subject-matter jurisdiction over this matter. Crucially, "[w]ithout jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). Therefore, for the same reasons outlined in the Court's recent Memorandum Opinion (ECF No. 28 ), Plaintiff's emergent motion for a preliminary injunction pending appeal (ECF No. 31 ) is **DENIED**. So Ordered by Judge Michael A. Shipp on 1/22/2024. (jdb) (Entered: 01/22/2024) |
|---|---|---|
| 03/01/2024 | 34 | Transcript of Status Conference held on 1/2/2024, before Judge Judge Michael A. Shipp. Court Reporter/Transcriber Shannan Gagliardi (609-815-2750). **NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 3/22/2024. Redacted Transcript Deadline set for 4/1/2024. Release of Transcript Restriction set for 5/30/2024. (jal, ) (Entered: 03/01/2024) |
| 03/01/2024 | 35 | Transcript of Temporary Restraining Order Hearing held on 12/18/2023, before Judge Judge Michael A. Shipp. Court Reporter/Transcriber Shannan Gagliardi (609-815-2750). **NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 3/22/2024. Redacted Transcript Deadline set for 4/1/2024. Release of Transcript Restriction set for 5/30/2024. (jal, ) Modified on 3/1/2024 (jal, ). (Entered: 03/01/2024) |
| 03/01/2024 | 36 | Transcript of Temporary Restraining Order Hearing held on 12/19/2023, before Judge Judge Michael A. Shipp. Court Reporter/Transcriber Shannan Gagliardi (609-815-2750). **NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 3/22/2024. Redacted Transcript Deadline set for 4/1/2024. Release of Transcript Restriction set for 5/30/2024. (jal, ) (Entered: 03/01/2024) |

App.018

Lincoln Davis Wilson (N.J. Bar No. 02011-2008)
Timothy A. Garrison (Mo. Bar No. 51033)*
Gabriella McIntyre (D.C. Bar No. 1672424)*
Mercer Martin (Ariz. Bar No. 038138)*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
lwilson@ADFLegal.org
tgarrison@ADFLegal.org
gmcintyre@ADFLegal.org
mmartin@ADFLegal.org

*Counsel for Plaintiff*
*Motion for pro hac vice admission filed concurrently*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| **FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.** | |
| *Plaintiff,* | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | **Civil Action File No. _** |
| **MATTHEW PLATKIN**, in his official capacity as Attorney General for the State of New Jersey, | *Document Filed Electronically* |
| *Defendant.* | |

## INTRODUCTION

1. This is an action by Plaintiff First Choice Women's Resource Centers, Inc. ("First Choice," or "the Ministry"), a nonprofit faith-based entity organized under the laws of New Jersey, with a principal place of business of 82 Speedwell Avenue, Second Floor, Morristown, New Jersey 07960, against Defendant Matthew

Platkin ("AG Platkin"), in his official capacity as the Attorney General of the State of New Jersey, with a principal place of business of Richard J. Hughes Justice Complex, 8th Floor, West Wing, 25 Market Street, Trenton, New Jersey 08611.

2.     This action seeks to enjoin enforcement of an unreasonable and improper subpoena that mandates disclosure of privileged and/or irrelevant materials to advance an investigation that does not appear to be based on a complaint or other reason to suspect unlawful activity, and which selectively and unlawfully targets First Choice.

3.     First Choice is a faith-based pregnancy resource center that serves women and men in unplanned pregnancies by providing counseling, medical services, and practical support.

4.     Defendant is the Attorney General of New Jersey, who is nationally prominent among elected officials for his fervent advocacy for abortion, and prolific in his pronouncements of hostility toward and suspicion of pregnancy resource centers like those operated by First Choice.

5.     AG Platkin has issued a subpoena (the "Subpoena") demanding production of a broad range of documents under the pretense of conducting a civil investigation into possible violations of "the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -227, specifically N.J.S.A. 56:8-3 and 56:8-4, the Charitable Registration and Investigation Act, N.J.S.A. 45:17 A-18 to -40, specifically N.J.S.A. 45:17A-33(c), and the Attorney General's investigative authority regarding Professions and Occupations, N.J.S.A. 45:1-18" relating to the Ministry's handling of patient data and statements about the lawful practice of Abortion Pill Reversal.

App.020

6.      AG Platkin has never cited any complaint or other substantive evidence of wrongdoing to justify his demands but has launched an exploratory probe into the lawful activities, constitutionally protected speech, religious observance, constitutionally protected associations, and nonpublic internal communications and records of a non-profit organization that holds a view with which he disagrees as a matter of public policy.

7.      The information and documentation demanded by AG Platkin's Subpoena is so overbroad, it would sweep up massive amounts of information, confidential internal communications, and documents unrelated to his stated purpose for the investigation.

8.      First Choice has been singled out as a target of AG Platkin's demands even though dozens of other organizations operating in New Jersey also advertise their provision of many similar services and similarly collect sensitive client information.

9.      These demands violate First Choice's rights protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution and should be enjoined.

10.     Compliance with AG Platkin's demands would thwart First Choice's efforts to achieve its mission to serve women experiencing both planned and unplanned pregnancies in New Jersey.

11.     To avoid further violation of First Choice's constitutional rights and to limit additional time and resources that the Ministry is forced to spend to comply with unconstitutional investigative demands, the Ministry requests that this Court enjoin enforcement of AG Platkin's subpoena so that it may freely speak its beliefs,

App.021

exercise its faith, associate with like-minded individuals and organizations, and continue to provide services in a caring and compassionate environment to women and men facing difficult pregnancy circumstances.

## JURISDICTION AND VENUE

12.     This civil rights action raises federal questions under the United States Constitution, particularly the First, Fourth, and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13.     This Court has subject matter jurisdiction over First Choice's federal claims under 28 U.S.C. §§ 1331 and 1343.

14.     This court can issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and FED. R. CIV. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

15.     Venue lies in this district pursuant to 28 U.S.C. § 1391 because all events giving rise to the claims detailed herein occurred within the District of New Jersey and Defendant resides and operates in the District of New Jersey.

## FACTUAL BACKGROUND

**First Choice**

16.     First Choice serves women and men in unplanned pregnancies by providing counseling, medical services, and practical support.

17.     First Choice was incorporated as a religious nonprofit organization under the laws of New Jersey in 2007.

18.     First Choice currently operates out of five separate locations in New Jersey: Jersey City, Montclair, Morristown, Newark, and New Brunswick.

App.022

19.     First Choice aims to help pregnant women facing unplanned pregnancies evaluate their alternatives, empowering them to make informed decisions concerning the outcome of their pregnancies. Further, First Choice seeks to provide counsel to women and men experiencing unplanned or unwanted pregnancies to help them cope and take control of their lives.

20.     To achieve these aims, First Choice provides a variety of wrap-around services under the direction of a Medical Director, who is a licensed physician, including, but not limited to: pregnancy testing; pregnancy options counseling; sexually transmitted disease (STD) and sexually transmitted infection (STI) testing and referral; limited obstetric ultrasounds; parenting education; and the administration of material support, such as baby clothes and furnishing, diapers, maternity clothes, and food.

21.     First Choice began providing services in 1985 and has since served over 36,000 women facing unplanned pregnancies.

22.     First Choice provides all of its services entirely free of charge.

23.     First Choice does not discriminate in providing services based on the race, creed, color, national origin, age, or marital status of its clients.

24.     First Choice does not perform or refer for abortions, which it states on its websites and in its welcome forms to clients; but it does provide medically accurate information about abortion procedures and risks.

25.     First Choice solicits feedback from all clients in the form of exit interviews and online reviews. Client reviews are overwhelmingly positive, each location receiving either a 4.8- or 4.9-star average rating from public reviews on Google.

26.     Additionally, First Choice is a leading organization nationally in the administration of Abortion Pill Reversal ("APR"). Under the APR protocol, upon request from pregnant women who have taken mifepristone to begin the two-step chemical abortion pill regimen but who changed their minds before taking the second medication and wish to continue their pregnancies, First Choice prescribes progesterone to counter the effects of mifepristone. First Choice diligently attempts to follow up with all patients to whom it administers APR to track its effectiveness.

27.     APR is not guaranteed to save a pregnancy, and First Choice makes that clear to women seeking APR.

**First Choice's Religious Beliefs**

28.     First Choice is a Christian faith-based, nonprofit organization.

29.     All of the Ministry's employees, board members, and volunteers must adhere to its statement of faith.

30.     The Ministry believes and affirms that life begins at conception, at which time the full genetic blueprint for life is in place. Accordingly, First Choice believes that its expression of love and service to God requires that it work to protect and honor life in all stages of development. This belief also compels First Choice's statements regarding APR.

31.     The Ministry is therefore committed to providing clients with accurate and complete information about both prenatal development and abortion.

32.     To be true to its beliefs, teaching, missions, and values, First Choice abides by its Christian beliefs in how it operates, including in what it teaches and how it treats others.

6

App.024

**Defendant's Promotion of Abortion and Hostility Towards Pro-Life Pregnancy Resource Centers.**

33.    First Choice has no reason to believe that it possesses information relevant to a violation of New Jersey law.

34.    Defendant, however, has a well-documented zeal for abortion, strong antipathy toward organizations that protect pregnant women and unborn children from the harms of abortion, and a particular animus toward pregnancy resource centers like those operated by First Choice.

35.    On February 3, 2022, Defendant was appointed by New Jersey Governor Phil Murphy, who is a vocal supporter of expansive abortion policy, and confirmed by the New Jersey Senate as the state's Attorney General on September 29, 2022.

36.    During his short tenure in office, Defendant has made the liberalization of laws and regulations relating to abortion a central focus of his policy advocacy and political persona.

37.    Defendant has referred to the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overturning *Roe v. Wade*, 410 U.S. 113 (1973), as an "extreme right-wing decision"[1] that is a

---

[1] Press Release, New Jersey Office of the Attorney General, Acting AG Platkin, U.S. Attorney Sellinger Establish State-Federal Partnership to Ensure Protection of Individuals Seeking Abortion and Security of Abortion Providers (July 20, 2022), https://www.njoag.gov/acting-ag-platkin-u-s-attorney-sellinger-establish-state-federal-partnership-to-ensure-protection-of-individuals-seeking-abortion-and-security-of-abortion-providers/.

App.025

"devastating setback for women's rights in America" and threatens to "harm millions throughout the country[.]"[2]

38.     Defendant responded to the *Dobbs* decision in a joint statement with a coalition of attorneys general, stating "[i]f you seek access to abortion . . . we're committed to using the full force of the law to support you. You have our word."[3] He further stated he would "continue to use all legal tools at our disposal to fight for your rights," despite the plain language of *Dobbs* establishing that there is no constitutional right to abortion.

39.     Defendant has referred to pro-life groups as "extremists attempting to stop those from seeking reproductive healthcare that they need" and accused the United States Supreme Court of making it "abundantly clear that the rights of women will not be protected" in its jurisprudence on abortion.[4]

---

[2] Press Release, New Jersey Office of the Attorney General, Acting AG Platkin Establishes "Reproductive Rights Strike Force" to Protect Access to Abortion Care for New Jerseyans and Residents of Other States (July 11, 2022), https://www.njoag.gov/acting-ag-platkin-establishes-reproductive-rights-strike-force-to-protect-access-to-abortion-care-for-new-jerseyans-and-residents-of-other-states/.

[3] Press Release, New Jersey Office of the Attorney General, Despite U.S. Supreme Court decision, national coalition of 22 Attorneys General emphasizes that abortion remains safe and legal in states across the country (Jun. 27, 2022), https://www.njoag.gov/acting-attorney-general-platkin-national-coalition-of-attorneys-general-issue-joint-statement-reaffirming-commitment-to-protecting-access-to-abortion-care/.

[4] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (October 11, 2023, 1:49 PM), https://twitter.com/NewJerseyOAG/status/1712163603552342274.

App.026

40.     Just months into his tenure as *acting* Attorney General, Defendant established a "Reproductive Rights Strike Force" in his office.[5]

41.     Defendant also instituted a state-federal partnership with the U.S. Attorney for the District of New Jersey to ensure access to abortion for New Jersey residents and non-residents.[6]

42.     In the wake of *Dobbs*, Defendant issued guidance to all New Jersey's County Prosecutors "about charges they may bring against individuals who interfere with access to abortion rights."[7]

43.     Also in response to *Dobbs*, Defendant—the state's chief *legal* official—instituted a $5 million grant program to fund abortion training and expand the pool of abortion providers in New Jersey.[8]

44.     Defendant has referred to the plaintiff in the case *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210 (5th Cir. 2023), who is challenging the FDA's approval of the abortion pill mifepristone, as a "shadowy organization" and

---

[5] New Jersey Office of the Attorney General, *supra* note 2.

[6] New Jersey Office of the Attorney General, *supra* note 1.

[7] *Id.*

[8] Press Release, New Jersey Office of the Attorney General, AG Platkin Announces $5 Million in Grant Funding to Provide Training and Education to Expand Pool of Abortion Providers in New Jersey (December 2, 2022), https://www.njoag.gov/ag-platkin-announces-5-million-in-grant-funding-to-provide-training-and-education-to-expand-pool-of-abortion-providers-in-new-jersey/.

App.027

accused its lawsuit of "unleash[ing] significant confusion and misinformation about the medical safety and legal status of both mifepristone and abortion itself."[9]

45.   Defendant has joined over 20 other states in supporting the federal government in the FDA litigation to "support[] mifepristone's legality[.]"[10]

46.   Defendant has worked strategically with other state officials to attack pro-life laws enacted by a host of states, including Idaho,[11] Indiana,[12] and Texas.[13]

47.   Defendant has been transparent in his support for organizations such as Planned Parenthood that perform abortions and share his expansive views on abortion policy.

---

[9] Matthew J. Platkin, *AG: Mifepristone is available in New Jersey and we'll fight to keep it that way*, NJ.COM (April 30, 2023), https://www.nj.com/opinion/2023/04/ag-mifepristone-is-available-in-new-jersey-and-well-fight-to-keep-it-that-way-opinion.html; *see* David C. Reardon et al., *Deaths Associated with Abortion Compared to Childbirth—A Review of New and Old Data and the Medical and Legal Implications*, THE JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY, 20 (2), 279 (2004), https://scholarship.law.edu/jchlp/vol20/iss2/4/?utm_source=scholarship.law.edu%2Fjchlp%2Fvol20%2Fiss2%2F4&utm_medium=PDF&utm_campaign=PDFCoverPages.

[10] Matthew J. Platkin, *AG: Mifepristone is available in New Jersey and we'll fight to keep it that way*, NJ.COM, April 30, 2023, https://www.nj.com/opinion/2023/04/ag-mifepristone-is-available-in-new-jersey-and-well-fight-to-keep-it-that-way-opinion.html (last visited Dec. 12, 2023).

[11] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Aug. 2, 2023, 11:03 AM), https://twitter.com/NewJerseyOAG/status/1686754712048009217.

[12] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Nov. 9, 2021, 4:18 PM), https://twitter.com/NewJerseyOAG/status/1458182141922222084.

[13] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (Oct. 27, 2021, 3:02 PM), https://twitter.com/NewJerseyOAG/status/1453437059771813889.

App.028

48.     Defendant has spoken alongside the CEO of Planned Parenthood of Metropolitan New Jersey at a roundtable hosted by Vice President Kamala Harris with "advocates who are fighting on the frontlines to protect reproductive rights."[14]

49.     Defendant has participated in events hosted by the Planned Parenthood Action Fund of New Jersey.[15]

50.     Planned Parenthood publicly praised Defendant's appointment of Sundeep Iyer as Director of the New Jersey Division on Civil Rights, highlighting its approval of Mr. Iyer's commitment to the abortion provider's concept of reproductive rights.[16]

51.     On the main page of his office website, Defendant lists "Standing Up for Reproductive Rights" as one of the top five "spotlights" of his office.[17]

---

[14] Press Release, The White House, Readout of Vice President Kamala Harris's Meeting with New Jersey State Legislators on Reproductive Rights (July 18, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/18/readout-of-vice-president-kamala-harriss-meeting-with-new-jersey-state-legislators-on-reproductive-rights/.

[15] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (April 26, 2022, 12:35 PM), https://twitter.com/NewJerseyOAG/status/1518992190294351872.

[16] Press Release, New Jersey Office of the Governor, ICYMI: Attorney General Platkin Appoints Sundeep Iyer as Director of the New Jersey Division on Civil Rights, (Dec. 16, 2022), https://www.nj.gov/governor/news/news/562022/20221216c.shtml.

[17] NEW JERSEY OFFICE OF ATTORNEY GENERAL, njoag.gov (last visited Dec. 8, 2023).

52.     On a page entitled, "Standing Up for Reproductive Rights," Defendant boasts of his Reproductive Rights Strike Force and partnership with the U.S. Attorney's Office for the District of New Jersey.[18]

53.     On the same page, under the heading, "Safeguarding patient privacy," Defendant lists steps he has taken "to protect consumers' private reproductive health data[.]"[19] In this same paragraph on patient privacy and data security, Defendant highlights his "warning" to the public about pregnancy resource centers like those operated by First Choice.

54.     Defendant makes no reference to several large, recent, and well-publicized instances of the Planned Parenthood Federation of America exposing consumer data without consent, causing breaches of sensitive patient information such as abortion method used and the specific Planned Parenthood clinic where an appointment was booked.[20]

---

[18] *Standing Up for Reproductive Rights*, NEW JERSEY OFFICE OF ATTORNEY GENERAL, https://www.njoag.gov/spotlight/standing-up-for-reproductive-rights/ (last visited Dec. 8, 2023).

[19] *Id.*

[20] *See*, *e.g.*, Tatum Hunter, *You scheduled an abortion. Planned Parenthood's website could tell Facebook*, WASHINGTON POST (June 29, 2022), https://www.washingtonpost.com/technology/2022/06/29/planned-parenthood-privacy/; Gregory Yee & Christian Martinez, *Hack exposes personal information of 400,000 Planned Parenthood Los Angeles patients,* L.A. TIMES (Dec. 1, 2021), https://www.latimes.com/california/story/2021-12-01/data-breach-planned-parenthood-los-angeles-patients; and Brittany Renee Mayes, *D.C.'s Planned Parenthood reports data was breached last fall,* WASHINGTON POST (Apr. 16, 2021), https://www.washingtonpost.com/dc-md-va/2021/04/16/data-breach-planned-parenthood-dc/.

55.     Citing no evidentiary support, Defendant issued a statewide "consumer alert" alleging that pregnancy care centers like First Choice "provide[] false or misleading information[.]"[21]

56.     Through the alert, Defendant accuses pregnancy care centers of lying about the services they provide, providing inaccurate or misleading ultrasounds, and providing inaccurate information about reproductive health care services.

57.     Defendant urges women to avoid pregnancy care centers and explicitly encourages them to seek out abortion facilities instead, such as Planned Parenthood and the National Abortion Federation.

58.     Defendant enlisted the assistance of pro-abortion groups and abortion businesses such as the ACLU and Planned Parenthood, who are outspokenly opposed to pro-life pregnancy centers, to help his office draft the consumer alert.

59.     Specifically, on October 17, 2022, Sundeep Iyer forwarded a draft of the consumer alert and requested comment from Kaitlyn Wojtowicz, Vice President of Public Affairs at Planned Parenthood Action Fund of New Jersey. Exhibit 1. Ms. Wojtowicz responded with comments and suggested edits to the alert. Exhibit 2.

60.     The same day, Mr. Iyer forwarded a draft of the consumer alert and requested comment from Amol Sinha, Executive Director of ACLU New Jersey. Exhibit 3. Jeanne LoCicero, Legal Director for the ACLU of New Jersey, responded with comments and questions for consideration. Exhibit 4.

---

[21] Press Release, New Jersey Office of the Attorney General, AG Platkin Announces Actions to Protect Reproductive Health Care Providers and Those Seeking Reproductive Care in New Jersey, (December 7, 2022), https://www.njoag.gov/ag-platkin-announces-actions-to-protect-reproductive-health-care-providers-and-those-seeking-reproductive-care-in-new-jersey/.

App.031

61.     Mr. Iyer also forwarded a draft and requested comment from Roxanne Sutocky, Director of Community Engagement for The Women's Centers,[22] a group of abortion providers with facilities in New Jersey, Connecticut, Georgia, and Pennsylvania.[23] Exhibit 5. Ms. Sutocky responded with comments on the alert, referencing similar alerts issued in Massachusetts, Minnesota, and California. Exhibits 6, 7.

62.     In speaking about the alert, defendant has warned: "[i]f you're seeking reproductive care, beware of Crisis Pregnancy Centers!" And he has accused pro-life pregnancy centers of "pretend[ing] to be legitimate medical facilities."[24]

63.     Defendant's consumer alert has been exploited by other New Jersey elected officials to disparage pregnancy resource centers like those operated by First Choice; one New Jersey congressman cited the consumer alert in a press release calling pregnancy resource centers "Brainwashing Cult Clinics."[25]

---

[22] *Roxanne Sutocky*, ACLU NEW JERSEY, https://www.aclu-nj.org/en/biographies/roxanne-sutocky (last visited Dec. 12, 2023).

[23] THE WOMEN'S CENTERS, https://www.thewomenscenters.com/ (last visited Dec. 12, 2023).

[24] Attorney General Matt Platkin (@NewJerseyOAG), TWITTER (December 7, 2022, 3:20 PM), https://twitter.com/NewJerseyOAG/status/1600585960265228288.

[25] Press Release, U.S. House of Representatives Office of Josh Gottheimer, Gottheimer Launches Campaign to Shutdown [sic] Deceptive Anti-Choice Clinics Posing as Women's Healthcare Providers in NJ; Brainwashing Cult Clinics Are Dangerous to Women's Health (Oct. 6, 2023), https://gottheimer.house.gov/posts/release-gottheimer-launches-campaign-to-shutdown-deceptive-anti-choice-clinics-posing-as-womens-healthcare-providers-in-nj.

App.032

**Misstatements of Fact by Abortion Providers**

64.     Planned Parenthood makes erroneous public statements about chemical abortion that mislead women.

65.     Planned Parenthood states, for example, that a woman may have an abortion "[u]sing only misoprostol" and claims that "it's safe, effective, and legal to use in states where abortion is legal. It works 85-95% of the time and can be used up to 11 weeks from the first day of your last period."[26] This statement has been proven false by several studies showing that chemical abortions attempted using only misoprostol have high failure rates and are dangerous.[27]

66.     Despite the well-publicized data breaches and false statements made by Planned Parenthood, upon knowledge and belief, Defendant has not issued a single subpoena related to consumer fraud or the "privacy policies" of Planned Parenthood, its New Jersey affiliates, any of the abortion clinics in New Jersey, or any individual or entity that refers for abortion or advocates for increased availability of abortion.

---

[26] Planned Parenthood, *How do I have an abortion using only misoprostol?*, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-do-i-have-an-abortion-using-only-misoprostol (last visited December 12, 2023).

[27] *See*, *e.g.*, Vauzelle C, et al., *Birth defects after exposure to misoprostol in the first trimester of pregnancy: prospective follow-up study*, 36 Reprod. Toxicol. 98 (2012), doi: 10.1016/j.reprotox.2012.11.009 (2010 study comparing administration of standard mifepristone and misoprostol with administration of misoprostol alone documenting that using misoprostol only to induce abortion led to 23.8 percent failure rate requiring surgery).

App.033

**Defendant's Subpoena**

67.     On November 15, 2023, Defendant issued a Subpoena to First Choice. Exhibit 8.

68.     The Subpoena states that it was issued pursuant to the authority of the New Jersey Consumer Fraud Act ("CFA"), the Charitable Registration and Investigation Act ("CRIA"), and the Attorney General's investigative authority regarding Professions and Occupations.

69.     The Subpoena demands, among other things, during the stated period, the production of (emphasis added):

      a.     A copy of *every* solicitation and advertisement, including those appearing on any First Choice website, social media, print media, including newspapers and magazines, Amazon or other e-commerce platform, sponsored content, digital advertising, video advertising, other websites, Pinterest, radio, podcasts, and pamphlets.

      b.     *All* documents from December 1, 2013, substantiating a broad host of statements made on First Choice's websites, including statements that:

            i.     "Knowing the gestational age, and viability of your pregnancy will determine if a medical abortion is even an option";

            ii.     "The abortion pill reversal process involves a prescription for progesterone to counteract the mifepristone"; and

            iii.     "According to the Abortion Pill Rescue Network, there have also been successful reversals when treatment was starting within 72 hours of taking the first abortion pill."

App.034

     c.      "*All* Documents physically or electronically provided to Clients and/or Donors, Including intake forms, questionnaires, and Pamphlets."

     d.      "*All* Documents Concerning representations made by [First choice] to Clients about the confidentiality of Client information, Including privacy policies."

     e.      "*All* Documents Concerning any complaints or identifying any concerns from Clients or Donors about Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims, Including Your processes and procedures for handling complaints or concerns from Clients and Donors."

     f.      "Documents sufficient to Identify Personnel that You use or have used to provide any kind of ultrasound service."

     g.      "Documents sufficient to Identify to whom or where You refer Clients for Abortion Pill Reversal or other Services that require Professional Licensure, Including the interpretation and findings of ultrasound images."

     h.      *All* documents concerning Heartbeat International, the Abortion Pill Reversal Network, and Care Net.

     i.      Documents sufficient to identify the identity of First Choice's owners, officers, directors (including medical directors), partners, shareholders, and board members.

     j.      "Documents sufficient to Identify donations made to First Choice."

70.     The Subpoena does not reflect the existence of a complaint, nor does it reflect any factual basis for suspecting a violation of the cited New Jersey laws.

17

App.035

**Effect of the Subpoena on First Choice**

71.     Since the COVID-19 pandemic, First Choice has struggled to maintain its desired levels of full staffing. Accordingly, staff currently perform a range of functions to fulfill the Ministry's mission.

72.     Complying with the Subpoena would bury First Choice in an inordinate amount of work. The Ministry estimates that it would take several staff members—including the Executive Director, the volunteer Medical Director, the finance department, and all medical staff—at least an entire month to produce all requested documents.

73.     Already short-staffed, diverting resources to document compilation would severely impede the Ministry's ability to perform its core functions. Staff members who normally devote their time to serving women in need and communicating with essential supporters would have to cease their mission-driven activities to comply with AG Platkin's oppressive demands.

74.     Complying with the Subpoena would require such a large deployment of staff and resources that document production would become the driving focus of the Ministry, not its mission of serving women and men in need.

75.     Complying with the Subpoena would also harm First Choice's working relationships.

76.     Disclosure of documents that identify First Choice's donors, as required by the Subpoena, will likely result in a decrease in donations, as donors will be hesitant to associate with the Ministry out of fear of retaliation and public exposure. Donor anonymity is of paramount importance to First Choice, as its donors give for

App.036

personal or faith-driven reasons. First Choice therefore does not publish a list of donors or donation amounts.

77.   Disclosure of the identities of First Choice's employees will likely cause current employees to leave the already short-staffed Ministry and will deter prospective employees from applying out of the reasonable fear of retaliation and public disclosure.

78.   Disclosure of the nature of First Choice's relationships with other organizations, as the Subpoena demands, will likely cause those associates to end their association with the Ministry out of fear of retaliation, public disclosure, and investigation into their own activities.

79.   This risk of loss of donors, employees, and associates greatly jeopardizes the Ministry's ability to carry out its religious mission.

**FIRST CAUSE OF ACTION**

**First Amendment: Retaliatory Discrimination**

80.   Plaintiff repeats and realleges each allegation in paragraphs 1–79 of this complaint.

81.   The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out.

82.   A plaintiff is subject to unlawful retaliation if (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a causal connection between the protected activity and the retaliatory action.

19

App.037

83.     If a plaintiff proves these elements, the burden shifts to the government to show that it would have taken the same action even in the absence of the protected conduct.

84.     First Choice has engaged in constitutionally protected speech advancing a pro-life message, including providing information about APR.

85.     By subjecting First Choice to extensive and invasive investigations of that speech, Defendant has engaged in conduct that would chill a person of ordinary fitness from continuing to engage in protected speech.

86.     Defendant's animus for First Choice's pro-life messaging and pro-life organizations was a substantial or motivating factor in his decision to issue the Subpoena.

87.     Defendant cannot show that he would have investigated First Choice anyway, as he has refused to investigate similarly situated organizations that share his commitment to abortion.

88.     Accordingly, Defendant is liable to First Choice for unlawful retaliation against First Choice for exercise of its First Amendment rights.

## SECOND CAUSE OF ACTION

### First and Fourteenth Amendments: Selective Enforcement/Viewpoint Discrimination

89.     First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

90.     The First Amendment to the Constitution protects the First Choice's rights to speak and to be free from content and viewpoint discrimination.

20

App.038

91.    The Fourteenth Amendment to the Constitution protects the First Choice's right to the Equal Protection of the laws.

92.    Laws and regulations must not only be facially neutral but also enforced in a non-discriminatory and viewpoint-neutral manner.

93.    Defendant may not exercise enforcement discretion based upon viewpoint, targeting for investigative demands only organizations expressing one particular point of view on a controversial topic. Such action threatens and chills First Amendment rights.

94.    Upon information and belief, Defendant has not investigated any of dozens of similarly situated reproductive health-related clinics in New Jersey to examine the truthfulness of their marketing.

95.    First Choice is similar to these other entities in that they serve similar clientele—i.e., women and men seeking reproductive health services—and offer many of the same services—e.g., pregnancy testing, STD/STI testing, and ultrasounds.

96.    The most significant difference between First Choice and any of the dozens of abortion providers in New Jersey is that First Choice does not provide or refer for abortions, but this is not a legitimate basis upon which to base a decision to investigate First Choice's provision of *other* services.

97.    The dissimilar treatment of such similarly situated entities evinces viewpoint discrimination.

98.    Defendant's public statements also demonstrate that he is intentionally targeting First Choice with an unreasonable, intrusive, overbroad, and unduly burdensome Subpoena based on its speech and views on abortion.

App.039

99.   Since his appointment as Attorney General, Defendant has repeatedly allied himself with and spoken favorably toward organizations that perform abortions or advocate for the elimination of restrictions on abortion, while persistently and aggressively impugning the motives of pro-life entities like First Choice and accusing them of misleading their clients.

100.   Defendant issued the Subpoena based on the viewpoint of First Choice's speech targeting (among other things) its protected speech about Abortion Pill Reversal.

101.   Defendant's refusal to exercise his authority against similar entities who share his views on abortion while targeting First Choice violates the Ministry's First Amendment right to be free from viewpoint discrimination.

102.   Viewpoint-based enforcement of New Jersey law on the basis of views on abortion would have a chilling effect on a reasonable person's willingness to engage in protected activities.

103.   Investigating First Choice for engaging in constitutionally protected speech is not narrowly tailored to further any legitimate, rational, substantial, or compelling interest.

104.   Accordingly, Defendant's Subpoena is unconstitutional selective enforcement and viewpoint discrimination that violates First Choice's constitutional rights.

App.040

## THIRD CAUSE OF ACTION

### First Amendment: Free Exercise

105.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

106.   The Ministry's pro-life statement and beliefs, including its statements in support of APR, are sincere and rooted in their Christian faith.

107.   The Free Exercise Clause forbids government action that is not neutral toward religion unless it satisfies strict scrutiny.

108.   Defendant's service of the Subpoena on First Choice is not neutral to religion for several reasons.

109.   First, Defendant's discretion to decide where and when to serve subpoenas shows that his actions are not neutral to religion or generally applicable.

110.   Second, Defendant treats comparable secular activity—the operation of abortion facilities such as Planned Parenthood—more favorably than First Choice's religious activity, having declined to serve subpoenas on them despite their well-known failures in data security and misleading statements on their websites. The existence of an individualized assessment and discretionary mechanism to grant exemptions is sufficient to render a policy not generally applicable.

111.   Third, Defendant has shown direct hostility toward First Choice's Christian pro-life mission and its speech in support of that mission.

112.   Defendant lacks a legitimate or compelling state interest to justify his action against the Ministry, since First Choice is explicitly exempt from the New Jersey Consumer Fraud Act and the laws he invokes do not or cannot apply to the Ministry's conduct.

App.041

113.   Defendant's actions are not narrowly tailored or rationally related to furthering a legitimate or compelling state interest because he has not served subpoenas on Planned Parenthood, despite its well-known data breaches and misleading public statements.

114.   Accordingly, Defendant's subpoena fails to satisfy constitutional scrutiny and thus violates First Choice's First Amendment right to freely exercise its religion.

### FOURTH CAUSE OF ACTION

### First Amendment: Free Association

115.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

116.   An investigation that unjustifiably targets individuals and entities with whom First Choice associates violates the Ministry's First Amendment freedom of association.

117.   The First Amendment protects the right of people to associate with others in pursuit of many political, social, economic, educational, religious, and cultural ends.

118.   The First Amendment also prohibits the government from discouraging people from associating with others to express messages.

119.   First Choice is involved in an expressive association because people with like-minded beliefs, including those on staff and volunteers at its facilities, join together to serve and educate pregnant women and the fathers of their babies, and to express their beliefs about the value of unborn human life.

App.042

120.   The Ministry's directors, donors, staff, and volunteers, and many other people and organizations with whom First Choice associates advocate the view that unborn human life has value and deserves dignity and respect.

121.   First Choice likewise engages in expressive association when its staff and volunteers partner with each other and with pregnant mothers and expectant fathers to discuss these values.

122.   In offering services and education to those who seek them, First Choice expressively associates with pregnant women and the fathers of their babies to communicate desired messages to those individuals.

123.   Defendant's Subpoena demands that First Choice reveal the identities of and communications with its donors, clients, staff, vendors, ministry associates, owners, officers, directors, partners, shareholders, and board members.

124.   By investigating First Choice without a complaint or other factual basis, Defendant will cause individuals and entities who associate with the Ministry to understandably infer that it has engaged in wrongdoing, thereby discouraging those individuals and entities from associating with First Choice.

125.   Defendant's investigation also may cause individuals and entities who associate with First Choice to reasonably fear that they themselves will face retaliation or public exposure and thus discourages those individuals and entities from associating with First Choice.

126.   Accordingly, Defendant's Subpoena violates First Choice's right of free association guaranteed by the First Amendment to the United States Constitution, as incorporated and applied to the States through the Fourteenth Amendment.

App.043

## FIFTH CAUSE OF ACTION

### First Amendment: Privilege

127.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

128.   The First Amendment freedom to speak and associate concerns the ability of persons and groups to retain privacy in their associations.

129.   The First Amendment protects First Choice's freedom to engage in broad and uninhibited internal, nonpublic communications to advance its shared operational and political goals.

130.   Compelled disclosure of associations adversely affects protected speech and association by inducing members to withdraw from the association and dissuading others from joining it for fear of exposure of their beliefs, speech, and associations.

131.   First Amendment protections extend not only to organizations, but also to their staff, members, and others who affiliate with them.

132.   Government actions that have a deterrent effect on the exercise of First Amendment rights are subject to rigorous scrutiny.

133.   The chilling effect on First Amendment rights is not diminished simply because disclosure of private information is compelled by government process.

134.   Defendant's subpoena demands, without limitation, disclosure of vast swathes of First Choice's sensitive and confidential information, communications, and policies such as—to name just a few examples—personal employee and volunteer information, documents related to First Choice's relationships with other

26

App.044

pro-life groups, all complaints lodged against First Choice, and identities of First Choice's officers and directors.

135.   These unreasonable demands harass First Choice and discourage individuals and entities from associating with the Ministry.

136.   Defendant has no substantive evidence that First Choice has engaged in any violation of New Jersey law, much less any grounds suggesting that the disclosures of the private information he seeks justifies the deterrent effect on the Ministry's exercise of the constitutionally protected right of association.

137.   Accordingly, Defendant's Subpoena violates First Choice's First Amendment privilege.

**SIXTH CAUSE OF ACTION**

**Fourth Amendment: Unreasonable Search and Seizure**

138.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

139.   The demands for information unrelated to an investigation authorized by law violate the Ministry's Fourth Amendment protection against unreasonable government searches and seizures.

140.   The Fourth Amendment to the United States Constitution—made applicable to the states through the Fourteenth Amendment—protects First Choice from unreasonable searches and seizures and imposes on Defendant the obligation to state with particularity the place to be searched and the things to be seized.

141.   Defendant's investigative demands must be reasonably related to legitimate investigative inquiries and based on more than mere speculation or animus toward First Choice's views, speech, and religion.

App.045

142.   Upon information and belief, Defendant's Subpoena is not based on a complaint or any reason to suspect that First Choice has information relating to a violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN. 56:8-1 to -227, specifically N.J. STAT. ANN. 56:8-3 and 56:8-4, the Charitable Registration and Investigation Act, N.J. STAT. ANN. 45:17A-18-40, specifically N.J. STAT. ANN.45:17A-33(c), or the Professions and Occupations provision of N.J. STAT. ANN. 45:1-18. In fact, the Subpoena fails to allege what, if any, potential violation has occurred.

143.   Many requests for documentation and materials in the Subpoena have no rational relation to a legitimate investigation, and Defendant has no substantial evidence of any colorable violation of the aforementioned statutes.

144.   The New Jersey Consumer Fraud Act does not apply to First Choice because it explicitly exempts non-profit entities. N.J. STAT. ANN. 56:8-47 ("The provisions of this act shall not apply to any nonprofit public or private school, college or university; the State or any of its political subdivisions; or any bona fide nonprofit, religious, ethnic, or community organization.").

145.   AG Platkin has cited no practice declared unlawful that he may investigate under his Professions and Occupations authority.

146.   The Subpoena also calls for production of documents over a ten-year period even though the relevant statute of limitations is a maximum of six years.

147.   Defendant has made contemporaneous statements showing his disdain for organizations that seek to protect unborn human life in general and for pregnancy resource centers like those operated by First Choice in particular.

App.046

148.   Defendant is engaged in an intrusive, oppressive, unnecessary, unjustified, and irrelevant investigation of First Choice's organizational structure; personal information of leadership, volunteers, and personnel; associations; internal policies; irrelevant lawful activities; tax-exempt status; and other lawful aspects of First Choice's operations and relationships.

149.   Defendant's many unspecific demands for "any" and "all" information or materials, "without limitation," are not particular, as required by the Fourth Amendment.

150.   The overbreadth of Defendant's investigation in time and scope is unreasonable.

151.   Defendant's Subpoena harasses First Choice and causes the Ministry to spend limited time and resources responding to it for no apparent reason other than Defendant's disdain for First Choice's religious views and exercise.

152.   Defendant has threatened contempt of court and "other penalties" against First Choice to coerce the Ministry into complying with his unconstitutional demands.

153.   Thus, Defendant's Subpoena constitutes an unreasonable search and seizure under the Fourth Amendment.

### SEVENTH CAUSE OF ACTION

### First Amendment: Overbreadth

154.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

155.   The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of

App.047

the law are substantial when judged in relation to the statute's plainly legitimate sweep and no reasonable limiting construction is available that would render the policy unconstitutional.

156.   The CRIA's mandate that all statements made by charitable organizations "shall be truthful" is unconstitutionally overbroad and overbroad as applied, as is the authority it grants the enforcer to investigate statements that "although literally true, are presented in a manner that has the capacity to mislead the average consumer" (together, the "investigatory provisions").

157.   First, these nebulous standards reach a substantial amount of constitutionally protected conduct that will deter people from engaging in constitutionally protected speech and inhibit the free exchange of ideas.

158.   Second, the number of valid applications of the CRIA pales in comparison to the historic and likely frequency and the actual occurrence of impermissible applications against constitutionally protected conduct and speech AG Platkin disfavors, even outside the context of abortion.

159.   Third, the activity or conduct sought to be regulated is the expression of First Choice's constitutional rights to speak and associate freely and to exercise its religion.

160.   Fourth, the apparent interest in regulating false and deceptive speech in connection with charitable solicitations cannot possibly override the Ministry's constitutional liberties because (1) these purposes cannot be said to be compelling if they are only applied to pregnancy centers that do not support abortion, but not pregnancy centers that do support abortion; and (2) the statutes can be achieved with

a more narrowly tailored provision requiring a bona fide complaint or substantial evidence of wrongdoing.

161.   The statute's overbreadth has not only created a likelihood that its application will inhibit free expression; it has already had that actual effect.

162.   Thus, the CRIA's investigation provisions are unconstitutionally overbroad and overbroad as applied to the Ministry.

## EIGHTH CAUSE OF ACTION

### First and Fourteenth Amendment: Vagueness

163.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

164.   A statute will be invalidated for vagueness under the First Amendment if it endows officials with undue discretion to determine whether a given activity contravenes the law's mandates.

165.   A statute will be invalidated for vagueness under the Due Process Clause of the Fourteenth Amendment if it fails to provide people of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted or fails to give fair notice of what constitutes a violation.

166.   Laws that interfere with free speech are subject to more exacting scrutiny and require greater definiteness than other contexts.

167.   The CRIA's investigatory provisions fail to give persons of ordinary intelligence constitutionally fair notice of what constitutes a truthful statement and what has the capacity to mislead.

168.   The statute impermissibly delegates basic policy matters to AG Platkin for resolution on an ad hoc and subjective basis and has resulted in arbitrary and

discriminatory application against First Choice's constitutionally protected speech, association, and religious exercise.

169.   The statute fails to give fair warning of what is prohibited and is so imprecise that discriminatory enforcement is not only a real possibility but also a reality.

170.   Thus, the CRIA investigatory provisions are unconstitutionally vague and are vague as applied to the Ministry.

**NINTH CAUSE OF ACTION**

**First Amendment: Unbridled Discretion**

171.   First Choice repeats and realleges each allegation in paragraphs 1–79 of this complaint.

172.   A restriction on speech is constitutional only if the restriction is specific enough that it does not delegate unbridled discretion to the government officials entrusted to enforce the regulation.

173.   The CRIA's investigatory provisions lack objective standards for enforcement, empowering AG Platkin to punish any action he deems is in the public interest.

174.   The CRIA's investigatory provisions lack any objective standards for determining whether a true statement is presented in such a way that it will mislead an average consumer, or whether a restriction on speech is within the public interest.

175.   The statute necessarily requires AG Platkin to appraise facts, exercise judgment, and form an opinion that raises a danger of censorship and invites decisions based on the content of the speech and the viewpoint of the speaker.

App.050

176.   The statute allows AG Platkin to exercise arbitrary enforcement power to suppress pro-life points of view or any other point of view with which he disagrees.

177.   With so few restraints on AG Platkin's authority, this statute unlawfully grants the AG extraordinary power and unconstitutional unbridled discretion to suppress disfavored messages and is thus facially unconstitutional and unconstitutional as applied.

## PRAYER FOR RELIEF

First Choice respectfully prays for judgment against Defendant and requests the following relief:

A.   preliminary injunction enjoining enforcement of Defendant's Subpoena in its entirety or, in the alternative, modifying that Subpoena to eliminate those provisions that infringe on the constitutional protections of First Choice and their agents;

B.   permanent injunction granting the same relief;

C.   declaratory judgment that Defendant's subpoena violates First Choice's constitutional rights;

D.   an award of First Choice's costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

App.051

E.   any other relief that the Court deems equitable and just in the

circumstances.

Respectfully submitted this 13th day of December, 2023.

> */s/ Lincoln Davis Wilson*
> Lincoln Davis Wilson (N.J. Bar No 02011-2008)
> Timothy A. Garrison (Mo. Bar No. 51033)*
> Gabriella McIntyre (D.C. Bar No. 1672424)*
> Mercer Martin (Ariz. Bar No. 03138)*
> ALLIANCE DEFENDING FREEDOM
> 440 First Street NW, Suite 600
> Washington, DC 20001
> Telephone: (202) 393-8690
> Facsimile: (202) 347-3622
> lwilson@ADFLegal.org
> tgarrison@ADFLegal.org
> gmcintyre@ADFLegal.org
> mmartin@ADFLegal.org
>
> *Counsel for Plaintiff First Choice Women's Resource Centers, Inc.*
>
> *Motion for pro hac vice admission filed concurrently*

App.052

## VERIFICATION OF COMPLAINT

I, Aimee Huber, a citizen of the United States and a resident of

_____Warren_____, New Jersey, declare under penalty of perjury under 28 U.S.C.

§ 1746 that I have read the foregoing Verified Complaint and the factual allegations

therein, and the facts as alleged are true and correct.


Executed this _13th_ day of December, 2023, at __Morristown___, New Jersey.


_____

Aimee Huber

App.053

# EXHIBIT # 1

| | |
|---|---|
| **From:** | Sundeep Iyer |
| **To:** | Kaitlyn Wojtowicz |
| **Cc:** | Daniela Nogueira |
| **Subject:** | NJ AG crisis pregnancy center alert draft |
| **Date:** | Monday, October 17, 2022 3:15:02 PM |
| **Attachments:** | 2022 1017 DRAFT Crisis Pregnancy Center Consumer Alert.docx |

Kaitlyn,

Hope you're doing well!  I'm passing along here a draft of a consumer alert our Division of Consumer Affairs put together on crisis pregnancy centers.  (We'd be grateful if you could keep this under wraps until we release it.)  We wanted to flag this for you for your awareness.  We're hoping to get this document out this month, so if you have any feedback, questions, or concerns, please let us know this week, if possible.  Thanks so much.  Happy to discuss if you'd like.

Best wishes,
Sundeep

**CONSUMER ALERT**

**WARNING: Crisis Pregnancy Centers (CPCs) do NOT provide abortion care. CPCs are organizations that seek to prevent people from accessing abortion care. Here's what you need to know about CPCs.**

You have the right to truthful, accurate health information about abortion care and where to find it. If you are pregnant, consult with a licensed health care provider to understand your abortion options. Need help finding a provider? See the resources at the bottom of this page. Your right to an abortion is protected in New Jersey.

**What is a Crisis Pregnancy Center (CPC)?**

Crisis pregnancy centers (CPCs) try to convince pregnant people not to have abortions. *CPCs do not provide abortion care or provide referrals for abortion care.*

Many CPCs don't provide any health care at all. In addition, many CPCs do not employ licensed medical professionals, which means that CPC staff may not be required to keep your health information private or follow medical ethics rules and standards of care. CPCs may also provide false or misleading information about abortion—including the physical and mental health effects of abortion—to deter people from choosing abortion.

Some CPCs offer non-diagnostic ultrasounds, which may be performed by an unlicensed person who *may not be qualified to provide that service*. This non-diagnostic ultrasound may provide inaccurate or misleading results, including about how far along you are in your pregnancy.

**How can I spot a CPC?**

A CPC may:

- Be a website, a call center, an app, or a physical location that looks like or is located near a clinic or doctor's office.
- Have a name that is similar to that of a health care provider, including words like "care," "health," "pregnancy," "resource," and "choice."
- Offer free services (including pregnancy tests, ultrasounds, and adoption information) or supplies (including diapers and baby clothes) to individuals seeking abortion or pregnancy-related health care services.
- Offer limited "counseling" services without providing complete or accurate information regarding all options for pregnancy-related health care, including abortion.
- Postpone or reschedule appointments to delay individuals' access to abortions.
- Pressure individuals to delay an abortion or continue a pregnancy, sometimes by providing false or misleading information about the safety and legality of abortion.

OAG0433

App.056

A facility may be a crisis pregnancy center even if it:

- Has staff and volunteers who wear medical attire and collect personal and health information.
- Contains examination rooms with medical equipment (like an ultrasound machine) and supplies.

**What questions should I ask?**

The New Jersey Division of Consumer Affairs recommends that individuals seeking an abortion or comprehensive pregnancy-related health care services conduct their own research to determine what type of care is best and where to go for it. Look at reviews of the center and look at its website. If staff are unable or unwilling to answer your questions, consider getting treatment elsewhere. Be cautious of any attempts by the center to delay, or steer you away from, the services you are seeking. It is critical that you have timely access to care when you need it.

If you are considering abortion and would like to be sure that you are not contacting a crisis pregnancy center, here are some questions you can ask:

- Does this center provide abortions? If so, what type (medication, procedures)?
- If you don't provide abortion care yourselves, do you provide referrals to a provider where people can find abortion care?
- If I come in for a visit, will I be seen by a licensed medical professional? If so, what kind of licensed medical professional (doctor, nurse, midwife, etc.)?
- What services do you provide (contraception, STD testing and treatment, ultrasound)?
- How much does treatment cost?
- Does the center accept health insurance or Medicaid?
- Will my health information and the services provided by this center be protected and kept private?

**What should I do if I'm unsure about or uncomfortable with the care I am receiving?**

You should leave.  If at any point you realize or suspect that you are at a CPC and want to leave, it is your right to do so. You are under no obligation to a CPC or its staff.

**How can I find an abortion provider?**

If you are seeking reproductive health care or access to abortion providers and services in New Jersey, you can visit one of the following resources:

- Planned Parenthood, which provides a list of abortion providers, in addition to reproductive health care services and educational resources – https://www.plannedparenthood.org/.

OAG0434

- The National Abortion Federation, which provides a list of abortion providers – https://prochoice.org/.
- Abortion Finder, which provides a list of abortion providers – https://www.abortionfinder.org/.

**How can I file a complaint?**

If you believe you are a victim of fraudulent, deceptive, misleading, or unlawful conduct, please file a complaint with the New Jersey Division of Consumer Affairs at https://www.njconsumeraffairs.gov/Pages/Consumer-Complaints.aspx.

3

OAG0435

App.058

# EXHIBIT #2

| | |
|---|---|
| **From:** | Kaitlyn Wojtowicz |
| **To:** | Sundeep Iyer |
| **Cc:** | Daniela Nogueira |
| **Subject:** | Re: [EXTERNAL] NJ AG crisis pregnancy center alert draft |
| **Date:** | Wednesday, October 26, 2022 10:13:41 AM |
| **Attachments:** | PP comments 2022 1017 DRAFT Crisis Pregnancy Center Consumer Alert - JC edits.docx |

Hi Sundeep,

Yes, thank you. I'm attaching some very minor edits and comments we had, but in general we think it is great and appreciate this effort!

Best,
Kaitlyn

--

**Kaitlyn Wojtowicz**
Pronouns: She/Her (Why do I list this here?)
*Vice President of Public Affairs*
Planned Parenthood Action Fund of New Jersey
908-577-1778

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Date:** Wednesday, October 26, 2022 at 10:08 AM
**To:** Kaitlyn Wojtowicz <kaitlyn.wojtowicz@ppgnnj.org>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** RE: [EXTERNAL] NJ AG crisis pregnancy center alert draft

Kaitlyn,

Hope you're doing well.  Just wanted to follow up and see whether you've had a chance to take a look at this document.  Looking forward to your feedback—and no worries if you're not able to get to it.  (I know you all are incredibly busy!)  Thanks so much—and looking forward to seeing you tomorrow.

Best wishes,
Sundeep

**From:** Kaitlyn Wojtowicz <kaitlyn.wojtowicz@ppgnnj.org>
**Sent:** Tuesday, October 18, 2022 9:09 AM
**To:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** Re: [EXTERNAL] NJ AG crisis pregnancy center alert draft

Thank you Sundeep, we will keep this close and appreciate your offer for us to provide any feedback.

Best,
Kaitlyn

--

**Kaitlyn Wojtowicz**
Pronouns: She/Her (Why do I list this here?)
*Vice President of Public Affairs*
Planned Parenthood Action Fund of New Jersey
908-577-1778

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Date:** Monday, October 17, 2022 at 3:15 PM
**To:** Kaitlyn Wojtowicz <kaitlyn.wojtowicz@ppgnnj.org>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** [EXTERNAL] NJ AG crisis pregnancy center alert draft

Kaitlyn,

Hope you're doing well!  I'm passing along here a draft of a consumer alert our Division of Consumer Affairs put together on crisis pregnancy centers.  (We'd be grateful if you could keep this under wraps until we release it.)  We wanted to flag this for you for your awareness.  We're hoping to get this document out this month, so if you have any feedback, questions, or concerns, please let us know this week, if possible.  Thanks so much.  Happy to discuss if you'd like.

Best wishes,
Sundeep

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

This e-mail is for the sole use of the intended recipients and contains information belonging to PPNCSNJ, Inc. which is confidential and/or legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this e-mail information is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message.

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

This e-mail is for the sole use of the intended recipients and contains information belonging to PPNCSNJ, Inc. which is confidential and/or legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this e-mail information is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT #3

**From:**        Sundeep Iyer
**To:**          Amol Sinha
**Cc:**          Daniela Nogueira
**Subject:**     NJ AG crisis pregnancy center alert
**Date:**        Monday, October 17, 2022 3:35:36 PM
**Attachments:** 2022 1017 DRAFT Crisis Pregnancy Center Consumer Alert.docx

Amol,

Great to see you last week.  I'm passing along here a draft of a consumer alert our Division of
Consumer Affairs put together on crisis pregnancy centers.  (We'd be grateful if you could keep this
under wraps until we release it.)  We wanted to flag this for you for your awareness.  We're hoping
to get this document out this month, so if you have any feedback, questions, or concerns, please let
us know—ideally this week, if possible.  Thanks so much.

Best wishes,
Sundeep

**CONSUMER ALERT**

**WARNING: Crisis Pregnancy Centers (CPCs) do NOT provide abortion care. CPCs are organizations that seek to prevent people from accessing abortion care. Here's what you need to know about CPCs.**

You have the right to truthful, accurate health information about abortion care and where to find it. If you are pregnant, consult with a licensed health care provider to understand your abortion options. Need help finding a provider? See the resources at the bottom of this page. Your right to an abortion is protected in New Jersey.

**What is a Crisis Pregnancy Center (CPC)?**

Crisis pregnancy centers (CPCs) try to convince pregnant people not to have abortions. *CPCs do not provide abortion care or provide referrals for abortion care*.

Many CPCs don't provide any health care at all. In addition, many CPCs do not employ licensed medical professionals, which means that CPC staff may not be required to keep your health information private or follow medical ethics rules and standards of care. CPCs may also provide false or misleading information about abortion—including the physical and mental health effects of abortion—to deter people from choosing abortion.

Some CPCs offer non-diagnostic ultrasounds, which may be performed by an unlicensed person who *may not be qualified to provide that service*. This non-diagnostic ultrasound may provide inaccurate or misleading results, including about how far along you are in your pregnancy.

**How can I spot a CPC?**

A CPC may:

- Be a website, a call center, an app, or a physical location that looks like or is located near a clinic or doctor's office.
- Have a name that is similar to that of a health care provider, including words like "care," "health," "pregnancy," "resource," and "choice."
- Offer free services (including pregnancy tests, ultrasounds, and adoption information) or supplies (including diapers and baby clothes) to individuals seeking abortion or pregnancy-related health care services.
- Offer limited "counseling" services without providing complete or accurate information regarding all options for pregnancy-related health care, including abortion.
- Postpone or reschedule appointments to delay individuals' access to abortions.
- Pressure individuals to delay an abortion or continue a pregnancy, sometimes by providing false or misleading information about the safety and legality of abortion.

OAG0441

App.065

A facility may be a crisis pregnancy center even if it:

- Has staff and volunteers who wear medical attire and collect personal and health information.
- Contains examination rooms with medical equipment (like an ultrasound machine) and supplies.

**What questions should I ask?**

The New Jersey Division of Consumer Affairs recommends that individuals seeking an abortion or comprehensive pregnancy-related health care services conduct their own research to determine what type of care is best and where to go for it. Look at reviews of the center and look at its website. If staff are unable or unwilling to answer your questions, consider getting treatment elsewhere. Be cautious of any attempts by the center to delay, or steer you away from, the services you are seeking. It is critical that you have timely access to care when you need it.

If you are considering abortion and would like to be sure that you are not contacting a crisis pregnancy center, here are some questions you can ask:

- Does this center provide abortions? If so, what type (medication, procedures)?
- If you don't provide abortion care yourselves, do you provide referrals to a provider where people can find abortion care?
- If I come in for a visit, will I be seen by a licensed medical professional? If so, what kind of licensed medical professional (doctor, nurse, midwife, etc.)?
- What services do you provide (contraception, STD testing and treatment, ultrasound)?
- How much does treatment cost?
- Does the center accept health insurance or Medicaid?
- Will my health information and the services provided by this center be protected and kept private?

**What should I do if I'm unsure about or uncomfortable with the care I am receiving?**

You should leave.  If at any point you realize or suspect that you are at a CPC and want to leave, it is your right to do so. You are under no obligation to a CPC or its staff.

**How can I find an abortion provider?**

If you are seeking reproductive health care or access to abortion providers and services in New Jersey, you can visit one of the following resources:

- Planned Parenthood, which provides a list of abortion providers, in addition to reproductive health care services and educational resources – https://www.plannedparenthood.org/.

2

OAG0442

App.066

- The National Abortion Federation, which provides a list of abortion providers – https://prochoice.org/.
- Abortion Finder, which provides a list of abortion providers – https://www.abortionfinder.org/.

**How can I file a complaint?**

If you believe you are a victim of fraudulent, deceptive, misleading, or unlawful conduct, please file a complaint with the New Jersey Division of Consumer Affairs at https://www.njconsumeraffairs.gov/Pages/Consumer-Complaints.aspx.

3

OAG0443

App.067

# EXHIBIT #4

| | |
|---|---|
| **From:** | Jeanne LoCicero |
| **To:** | Sundeep Iyer; Daniela Nogueira; Amol Sinha |
| **Subject:** | [EXTERNAL] RE: NJ AG crisis pregnancy center alert |
| **Date:** | Tuesday, December 6, 2022 4:12:03 PM |
| **Attachments:** | image001.png |

Thank you both for this update, and of course, we will keep it close until the press release is issued. I'm looking forward to sharing them with partners.

I've found the data privacy piece to be particularly tricky, and may want to circle back with you in the new year on this issue.

I was also excited to see last week's announcement of the training grants.

Best,
Jeanne

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Sent:** Tuesday, December 6, 2022 3:25 PM
**To:** Jeanne LoCicero <JLoCicero@aclu-nj.org>; Daniela Nogueira <Daniela.Nogueira@njoag.gov>; Amol Sinha <ASinha@aclu-nj.org>
**Subject:** RE: NJ AG crisis pregnancy center alert

-|external|-

Jeanne and Amol,

Hope you're both doing well.  Thanks so much for your helpful feedback on the crisis pregnancy center alert.  Your feedback was extremely helpful, and you'll much of it reflected in the documents we are releasing.  We just wanted to let you both know that we are planning to issue three reproductive rights-related documents tomorrow—the crisis pregnancy center alert, a data privacy alert for providers, and a letter to the professional medical boards outlining their obligations under the laws enacted by the legislature after *Dobbs*.  We'll follow up tomorrow with the press release and the documents when they're released.  In the meantime, we would be grateful if you could keep this news close hold until we issue the release tomorrow.

Best wishes,
Sundeep

**From:** Sundeep Iyer
**Sent:** Wednesday, October 26, 2022 10:02 AM
**To:** Jeanne LoCicero <JLoCicero@aclu-nj.org>; Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** RE: NJ AG crisis pregnancy center alert

Jeanne,

Apologies for the delay here—these comments are incredibly helpful.  We really appreciate you taking the time to consider this.  We'll circle back soon with any questions.

Best wishes,
Sundeep

**From:** Jeanne LoCicero <JLoCicero@aclu-nj.org>
**Sent:** Sunday, October 23, 2022 6:33 PM
**To:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>; Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** [EXTERNAL] RE: NJ AG crisis pregnancy center alert

Hi Sundeep & Daniela – I'm attaching a few comments/questions for your consideration. Please let me know if a phone call would be helpful.

Thank you again for the OAG's leadership on these issues.

Best,
Jeanne

(Amol in bcc)

**From:** Jeanne LoCicero
**Sent:** Thursday, October 20, 2022 6:21 PM
**To:** Amol Sinha <ASinha@aclu-nj.org>; Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** RE: NJ AG crisis pregnancy center alert

Hi Sundeep and Daniela – We're excited to see that the OAG is moving on alerting the public about confusion with CPCs. I'll be in touch tomorrow with some minor suggestions.

Best,
Jeanne


**Jeanne LoCicero (she/her)**
*Legal Director*
ACLU of New Jersey
P.O. Box 32159
Newark, NJ  07102
**(e) jlocicero@aclu-nj.org**
**(p) 973-854-1715**

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system.*

**From:** Amol Sinha <ASinha@aclu-nj.org>
**Sent:** Thursday, October 20, 2022 3:28 PM
**To:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>; Jeanne LoCicero <JLoCicero@aclu-nj.org>
**Subject:** RE: NJ AG crisis pregnancy center alert

Hi Sundeep – Thanks so much for this and apologies for my delay. We're grateful that OAG is considering this consumer alert. We're collecting our thoughts – copying Jeanne here.

Thanks very much for sharing with us. Looking forward to next steps.

Best,
Amol

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Sent:** Monday, October 17, 2022 3:36 PM
**To:** Amol Sinha <ASinha@aclu-nj.org>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** NJ AG crisis pregnancy center alert

-|external|-

Amol,

Great to see you last week.  I'm passing along here a draft of a consumer alert our Division of Consumer Affairs put together on crisis pregnancy centers.  (We'd be grateful if you could keep this under wraps until we release it.)  We wanted to flag this for you for your awareness.  We're hoping to get this document out this month, so if you have any feedback, questions, or concerns, please let us know—ideally this week, if possible.  Thanks so much.

Best wishes,
Sundeep

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the

App.071

dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

# EXHIBIT #5

| | |
|---|---|
| **From:** | Sundeep Iyer |
| **To:** | Roxanne Sutocky |
| **Cc:** | Daniela Nogueira |
| **Subject:** | NJ AG crisis pregnancy center alert draft |
| **Date:** | Monday, October 17, 2022 3:18:22 PM |
| **Attachments:** | 2022 1017 DRAFT Crisis Pregnancy Center Consumer Alert.docx |

Roxanne,

Hope all is well.  I'm passing along here a draft of a consumer alert our Division of Consumer Affairs put together on crisis pregnancy centers.  (We'd be grateful if you could keep this under wraps until we release it.)  We wanted to flag this for you for your awareness.  We're hoping to get this document out this month, so if you have any feedback, questions, or concerns, please let us know this week, if possible.  Thanks so much.

Best wishes,
Sundeep

OAG0436

**CONSUMER ALERT**

**WARNING: Crisis Pregnancy Centers (CPCs) do NOT provide abortion care. CPCs are organizations that seek to prevent people from accessing abortion care. Here's what you need to know about CPCs.**

You have the right to truthful, accurate health information about abortion care and where to find it. If you are pregnant, consult with a licensed health care provider to understand your abortion options. Need help finding a provider? See the resources at the bottom of this page. Your right to an abortion is protected in New Jersey.

**What is a Crisis Pregnancy Center (CPC)?**

Crisis pregnancy centers (CPCs) try to convince pregnant people not to have abortions. *CPCs do not provide abortion care or provide referrals for abortion care*.

Many CPCs don't provide any health care at all. In addition, many CPCs do not employ licensed medical professionals, which means that CPC staff may not be required to keep your health information private or follow medical ethics rules and standards of care. CPCs may also provide false or misleading information about abortion—including the physical and mental health effects of abortion—to deter people from choosing abortion.

Some CPCs offer non-diagnostic ultrasounds, which may be performed by an unlicensed person who *may not be qualified to provide that service*. This non-diagnostic ultrasound may provide inaccurate or misleading results, including about how far along you are in your pregnancy.

**How can I spot a CPC?**

A CPC may:

- Be a website, a call center, an app, or a physical location that looks like or is located near a clinic or doctor's office.
- Have a name that is similar to that of a health care provider, including words like "care," "health," "pregnancy," "resource," and "choice."
- Offer free services (including pregnancy tests, ultrasounds, and adoption information) or supplies (including diapers and baby clothes) to individuals seeking abortion or pregnancy-related health care services.
- Offer limited "counseling" services without providing complete or accurate information regarding all options for pregnancy-related health care, including abortion.
- Postpone or reschedule appointments to delay individuals' access to abortions.
- Pressure individuals to delay an abortion or continue a pregnancy, sometimes by providing false or misleading information about the safety and legality of abortion.

1

OAG0437

App.075

A facility may be a crisis pregnancy center even if it:

- Has staff and volunteers who wear medical attire and collect personal and health information.
- Contains examination rooms with medical equipment (like an ultrasound machine) and supplies.

**What questions should I ask?**

The New Jersey Division of Consumer Affairs recommends that individuals seeking an abortion or comprehensive pregnancy-related health care services conduct their own research to determine what type of care is best and where to go for it. Look at reviews of the center and look at its website. If staff are unable or unwilling to answer your questions, consider getting treatment elsewhere. Be cautious of any attempts by the center to delay, or steer you away from, the services you are seeking. It is critical that you have timely access to care when you need it.

If you are considering abortion and would like to be sure that you are not contacting a crisis pregnancy center, here are some questions you can ask:

- Does this center provide abortions? If so, what type (medication, procedures)?
- If you don't provide abortion care yourselves, do you provide referrals to a provider where people can find abortion care?
- If I come in for a visit, will I be seen by a licensed medical professional? If so, what kind of licensed medical professional (doctor, nurse, midwife, etc.)?
- What services do you provide (contraception, STD testing and treatment, ultrasound)?
- How much does treatment cost?
- Does the center accept health insurance or Medicaid?
- Will my health information and the services provided by this center be protected and kept private?

**What should I do if I'm unsure about or uncomfortable with the care I am receiving?**

You should leave.  If at any point you realize or suspect that you are at a CPC and want to leave, it is your right to do so. You are under no obligation to a CPC or its staff.

**How can I find an abortion provider?**

If you are seeking reproductive health care or access to abortion providers and services in New Jersey, you can visit one of the following resources:

- Planned Parenthood, which provides a list of abortion providers, in addition to reproductive health care services and educational resources – https://www.plannedparenthood.org/.

2

OAG0438

- The National Abortion Federation, which provides a list of abortion providers – https://prochoice.org/.
- Abortion Finder, which provides a list of abortion providers – https://www.abortionfinder.org/.

**How can I file a complaint?**

If you believe you are a victim of fraudulent, deceptive, misleading, or unlawful conduct, please file a complaint with the New Jersey Division of Consumer Affairs at https://www.njconsumeraffairs.gov/Pages/Consumer-Complaints.aspx.

3

# EXHIBIT #6

**From:** Daniela Nogueira
**To:** Sundeep Iyer
**Subject:** RE: NJ AG crisis pregnancy center alert draft
**Date:** Monday, October 24, 2022 5:29:00 PM

I can discuss later tonight

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Sent:** Monday, October 24, 2022 2:52 PM
**To:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** FW: NJ AG crisis pregnancy center alert draft

**From:** Sundeep Iyer
**Sent:** Monday, October 24, 2022 2:52 PM
**To:** 'Roxanne Sutocky' <rsutocky@thewomenscenters.com>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** RE: NJ AG crisis pregnancy center alert draft

Thanks, Roxanne.  This is extremely, extremely helpful.  Very grateful for your thoughtful engagement on this.  We'll be back in touch if we have questions as we edit.

Best wishes,
Sundeep

**From:** Roxanne Sutocky <rsutocky@thewomenscenters.com>
**Sent:** Monday, October 24, 2022 2:34 PM
**To:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** [EXTERNAL] RE: NJ AG crisis pregnancy center alert draft

Hello and Happy Monday,

Thank you again for the opportunity to preview this draft and provide feedback on this important resource. I share these comments based on my perspective as someone who has worked with an abortion providing clinic and talked to patients who have engaged with CPCs over the last ten years. I also referenced recent consumer alerts from AG's in MA, MN, and CA.

Please do not hesitate to reach out if you have any questions or if I can provide any additional information.

Thank you, Roxanne

**Some additional resources that may be useful:**

OAG0488

App.079

A few years back, CHWC compiled the anonymized stories of patients that shared their experiences with CPCs and gave us permission to share them, see attached.
The public health risks of crisis pregnancy centers
Study on information and misinformation presented on the websites of crisis pregnancy centers
AMA Journal of Ethics: Why CPCs are legal but unethical

**Roxanne Sutocky**
**Director of Community Engagement**
**The Women's Centers**
**Pronouns:** she/her/hers

**Email:** rsutocky@thewomenscenters.com
**Office:** 856-675-1414| **Website:** www.TheWomensCenters.com

_____

**CONFIDENTIALITY:** This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system. Thanks.

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Sent:** Friday, October 21, 2022 3:51 PM
**To:** Roxanne Sutocky <rsutocky@thewomenscenters.com>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** Re: NJ AG crisis pregnancy center alert draft

No problem--thanks for taking a careful look!

**From:** Roxanne Sutocky <rsutocky@thewomenscenters.com>
**Sent:** Friday, October 21, 2022 2:57:07 PM
**To:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** [EXTERNAL] RE: NJ AG crisis pregnancy center alert draft

Hi Sundeep! I am still working through this- would it be possible to send you feedback by end of day Monday? With gratitude, Roxanne

**Roxanne Sutocky**
**Director of Community Engagement**
**The Women's Centers**
**Pronouns:** she/her/hers

**Email:** rsutocky@thewomenscenters.com
**Office:** 856-675-1414| **Website:** www.TheWomensCenters.com

_____

**CONFIDENTIALITY:** This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system. Thanks.

**From:** Sundeep Iyer <Sundeep.Iyer@njoag.gov>
**Sent:** Monday, October 17, 2022 3:18 PM
**To:** Roxanne Sutocky <rsutocky@thewomenscenters.com>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** NJ AG crisis pregnancy center alert draft

Roxanne,

Hope all is well.  I'm passing along here a draft of a consumer alert our Division of Consumer Affairs put together on crisis pregnancy centers.  (We'd be grateful if you could keep this under wraps until we release it.)  We wanted to flag this for you for your awareness.  We're hoping to get this document out this month, so if you have any feedback, questions, or concerns, please let us know this week, if possible.  Thanks so much.

Best wishes,
Sundeep
CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.
CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

# EXHIBIT #7

| | |
|---|---|
| **From:** | Sundeep Iyer |
| **To:** | Roxanne Sutocky; Kaitlyn Wojtowicz |
| **Cc:** | Daniela Nogueira |
| **Subject:** | RE: Data privacy alert for providers (pc/adc) |
| **Date:** | Tuesday, December 6, 2022 3:21:38 PM |

Roxanne and Kaitlyn,

Thanks so much for your helpful feedback on the documents we have sent you over the past few months.  Your feedback was extremely helpful, and you'll see almost all of it reflected in the documents we are releasing.  We just wanted to let you both know that we are planning to issue three documents tomorrow—the crisis pregnancy center alert, a data privacy alert for providers, and a letter to the professional medical boards outlining their obligations under the laws enacted by the legislature after *Dobbs*.  We'll follow up tomorrow with the press release and the documents when they're released.  In the meantime, we would be grateful if you could keep this news close hold until we issue the release tomorrow.

Thanks again for your partnership—we really appreciate your support.

Best wishes,
Sundeep

**From:** Sundeep Iyer
**Sent:** Wednesday, October 26, 2022 1:57 PM
**To:** Roxanne Sutocky <rsutocky@thewomenscenters.com>; Kaitlyn Wojtowicz <kaitlyn.wojtowicz@ppgnnj.org>
**Cc:** Daniela Nogueira <Daniela.Nogueira@njoag.gov>
**Subject:** Data privacy alert for providers (pc/adc)

Roxanne and Kaitlyn,

Hope you both are doing well.  Working together with the AG's Strike Force, our Division of Consumer Affairs has put together the attached data privacy alert for providers.  The document outlines some best practices we've identified for protecting patient and provider data.  We are looking forward to getting this out to providers, since we think it's one of the first documents of its kind put together by a State AG's office.

We are hoping to release this publicly soon, but we wanted to flag this document for you both first to see whether you have comments, questions, or concerns in light of your expertise.  (We would also appreciate if you would keep this close hold until we are ready to release it.)  One note:  We suspect that many of these measures are already being implemented by Cherry Hill and by Planned Parenthood clinics—so the guidance is likely going to be the most helpful for smaller clinics or individual providers.  To that end, if you think there are one or two smaller providers we should share this with to get feedback, please let us know.

We would be grateful for any feedback either of you might have by Tuesday next week, if at all

OAG0857

App.083

possible.  We know you're both extremely busy, so we also completely understand if you can't get to this on that timeline--but just wanted to be sure we flagged this in case you have a chance to comment.

Thanks so much.  Talk soon.

Best wishes,
Sundeep

OAG0858

# EXHIBIT #8

**MATTHEW J. PLATKIN**
**ATTORNEY GENERAL OF NEW JERSEY**
**Division of Law**
**124 Halsey Street – 5th Floor**
**P.O. Box 45029**
**Newark, New Jersey 07101**
**Attorney for New Jersey Division of Consumer Affairs**



**By:    Chanel Van Dyke**
       **Deputy Attorney General**
       **Consumer Fraud Prosecution Section**
       **Chanel.VanDyke@law.njoag.gov**

**ADMINISTRATIVE ACTION**

**SUBPOENA DUCES TECUM**

**THE STATE OF NEW JERSEY to:**    **First Choice Women's Resource Centers, Inc.**
                                     **c/o Aimee Huber, Registered Agent**
                                     **82 Speedwell Avenue**
                                     **Morristown, New Jersey 07960**

You are hereby commanded to produce to the New Jersey Division of Consumer Affairs, Office of Consumer Protection ("Division") through Chanel Van Dyke, Deputy Attorney General, at 124 Halsey Street, 5th Floor, Newark, New Jersey 07101, on or before **December 15, 2023**, at 10:00 a.m., the following:

**See Attached Schedule.**

In lieu of your appearance, you may provide the documents and information identified in the attached Schedule on or before the return date at the address listed above by Certified Mail, Return Receipt Requested, addressed to the attention of Chanel Van Dyke, Deputy Attorney General, Consumer Fraud Prosecution Section, 124 Halsey Street, 5th Floor, Newark, New Jersey 07101. You may, at your option and expense, provide certified, true copies in lieu of the original documents identified in the attached Schedule by completing and returning the Certification attached hereto.

In addition, you may supply the documents via email to Chanel.VanDyke@law.njoag.gov.

Failure to comply with this Subpoena may render you liable for contempt of Court and such other penalties as are provided by law.  This Subpoena is issued pursuant to the authority of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -227, specifically N.J.S.A. 56:8-3 and 56:8-4, the Charitable Registration and Investigation Act, N.J.S.A. 45:17A-18 to -40, specifically N.J.S.A. 45:17A-33(c), and the Attorney General's investigative authority regarding Professions and Occupations, N.J.S.A. 45:1-18.  You have an obligation to retain, and continue to maintain the requested Documents. Failure to comply with this Subpoena may render you liable for contempt of court and such other penalties as are provided by law.

s/ *Chanel Van Dyke*
Chanel Van Dyke
Deputy Attorney General

Dated: 11/15/23

2

App.087

## CERTIFICATION OF COMPLIANCE

I _____, certify as follows:

1. I am employed by First Choice Women's Resource Centers, Inc. in the position of _____;

2. First Choice Women's Resource Centers, Inc.'s productions and responses to the Subpoena of the Attorney General of the State of New Jersey, dated November 15, 2023 ("Subpoena"), were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete, and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the Instructions and Definitions set forth in the Subpoena;

4. First Choice Women's Resource Centers, Inc.'s production and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the Subpoena have been withheld from First Choice Women's Resource Centers, Inc.'s production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the Instructions in the Subpoena;

7. The Documents contained in First Choice Women's Resource Centers, Inc.'s productions and responses to the Subpoena are authentic, genuine, and what they purport to be;

8. Attached is a schedule representing a true and accurate record of all Persons who prepared and assembled any productions and responses to the Subpoena, all Persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all Persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such Person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

4

App.088

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: _____

_____
Name (signature)

_____
Name (print)

_____
Title or Position

5

App.089

## SCHEDULE

## INSTRUCTIONS AND DEFINITIONS

### A.   INSTRUCTIONS:

1.     This Request is directed to First Choice Women's Resource Centers, Inc., as well as its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, subsidiaries, affiliates, successors, assigns or any other individual or entity acting or purporting to act on its behalf.

2.     Unless otherwise specifically indicated, the period of time encompassed by this Request shall be from January 1, 2021 to the date of your response to this Subpoena.

3.     Unless otherwise specifically indicated, capitalized terms are defined as set forth in the Definitions below.

4.     You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence.  No agreement, written or otherwise, purporting to modify, limit, or otherwise vary the terms of this Subpoena and/or Your preservation obligations under the law, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish Your aforementioned preservation obligations, nor shall You act in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under the law.

5.     If there are no Documents responsive to any particular Subpoena request, You shall so certify in writing in the Certification of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

6.     If a Subpoena Request requires the production of Documents the form and/or content of which has changed over the relevant period, identify the period of time during which each such Document was used and/or otherwise in effect.

7.     Unless otherwise specifically stated, each and every Document produced shall be Bates-stamped or Bates-labeled or otherwise consecutively numbered and the Person making such production shall identify the corresponding Subpoena Request Number[s] to which each Document or group of Documents responds.

8.     Electronically Stored Information should be produced in the format specified in Exhibit A.

9.     Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, Including production of any Document or other material indicating filing or other organization.  Such production shall Include any file folder, file jacket, cover, or similar organization material, Including any folder bearing any title or legend that contains no Document.  Likewise, all Documents physically attached to each other in Your files shall remain so

6

App.090

attached in any production; or, if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

10.     If one or more Documents or any portions thereof requested herein are withheld under a claim of privilege or otherwise, identify each Document or portion thereof as to which the objection is made, together with the following information:

   a.     The Bates-stamp or Bates-label of the Document or portion thereof as to which the objection is made;

   b.     Each author or maker of the Document;

   c.     Each addressee or recipient of the Document or Person to whom its contents were disclosed or explained;

   d.     The date thereof;

   e.     The title or description of the general nature of the subject matter of the Document and the number of pages;

   f.     The present location of the Document;

   g.     Each Person who has possession, custody or control of the Document;

   h.     The legal ground for withholding or redacting the Document; and

   i.     If the legal ground is attorney-client privilege, You shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

11.     In the event that any Document that would have been responsive to these Subpoena Requests has been destroyed or discarded, provide the: (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) author[s] and recipient[s], and also include:

   a.     Date of the Document's destruction or discard;

   b.     Reason for the destruction or discard; and

   c.     Person[s] authorizing and/or carrying out such destruction or discard.

12.     A copy of the Certification of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this Subpoena, and You shall submit such Certification(s) of Compliance with Your response to this Subpoena.

13.     In a schedule attached to the Certification of Compliance provided herewith, You shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred. You shall further Identify all other natural person(s) able to competently testify: (a) that such productions and

App.091

responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine, and what they purport to be.

## B.  DEFINITIONS

1.    "Abortion Pill Reversal" refers to a drug protocol purportedly used to stop the process of medicated abortion and continue a pregnancy—specifically, the administration of progesterone after a pregnant person has taken mifepristone, misoprostol, or methotrexate.

2.    "Advertisement" shall be defined in accordance with N.J.S.A. 56:8-1(a) and/or N.J.A.C. 13:45A-9.1 and shall Include Endorsements and any attempt to induce any Person to use Your Services. This definition applies to other forms of the word "Advertisement," Including "Advertised" and "Advertising."

3.    "Any" includes "all" and vice versa.

4.    "Charitable Purpose" shall be defined in accordance with N.J.S.A. 45:17A-20.

5.    "Claim(s)" means all statements, implications, messages, or suggestions made in any Advertisement, Solicitation, Pamphlet, commercial, Endorsement, or other Communication.

6.    "Client[s]" refers to Persons who use or have used Your Services, or Persons to whom You Advertise Your Services.

7.    "Client Solicitation Page" refers to the website in which First Choice engages in Solicitation and requests for donations, specifically located at the First Choice Website and at https://myegiving.com/App/Form/24dff450-d338-49d3-b2f9-7ac52352d9f4.

8.    "Communication(s)" means any conversation, discussion, letter, email, text message, Social Media message or post, memorandum, meeting, note, picture, post, blog, or any other transmittal of information or message, whether transmitted in writing, orally, electronically, or by any other means, and shall Include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing. Except where otherwise stated, a request for "Communications" means a request for all such Communications.

9.    "Concerning" means relating to, pertaining to, referring to, describing, evidencing or constituting.

10.    "Contribution[s]" shall be defined in accordance with N.J.S.A. 45:17A-20.

11.    "Document" Includes all writings, word processing documents, records saved as a .pdf, spreadsheets, charts, presentations, graphics/drawings, images, emails and any attachments, instant messages, text messages, phone records, websites, audio files, and any other Electronically Stored Information. Documents Include drafts, originals and non-identical duplicates. If a printout of an electronic record is a non-identical copy of the electronic version (for example, because the printout has a signature, handwritten notation, other mark, or attachment not included in the computer document), both the electronic version in which the Document was created and the non-identical original Document must be produced.

App.092

12.     "Donor[s]" refers to Persons who make or have made Contributions to First Choice, or who You Solicit to make Contributions to First Choice.

13.     "Donor Solicitation Page" refers to the website in which First Choice engages in Solicitation and requests for donations, specifically located at the First Choice Donor Website and at https://www.myegiving.com/App/Giving/firstchoicewrc.

14.     "Electronically Stored Information" or "ESI" means any Document, Communication, or information stored or maintained in electronic format.

15.     "Employee" means any Person presently or formerly employed for hire including, but not limited to, independent contractors, any Person who manages or oversees the work of another, and any Person whose earnings are based in whole or in part on salary or commission for work performed.

16.     "Endorsement(s)" means any message (Including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual of the name or seal of an organization) that Clients and/or Donors are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser.

17.     "First Choice" means First Choice Women's Resource Centers, Inc., as well as its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, attorneys, corporations, subsidiaries, affiliates, successors, assigns, or any other Person acting or purporting to act on its behalf.

18.     "First Choice Donor Website" means the website located at https://1stchoicefriends.org and Includes the Donor Solicitation Page.

19.     "First Choice Facebook" means the Facebook page located at https://www.facebook.com/FirstChoiceWRC/, as well as any other Facebook page owned or controlled by First Choice through which it engages in Solicitation or promotes its Services.

20.     "First Choice Instagram" means the Instagram page located at https://www.instagram.com/firstchoicewrc/, as well as any other Instagram page owned or controlled by First Choice through which it engages in Solicitation or promotes its Services.

21.     "First Choice Website" means the website located at https://1stchoice.org and includes the Client Solicitation Page.

22.     "First Choice Website 2" means the website located at https://firstchoicewomancenter.com.

23.     "Identify" with respect to Persons, means to give, to the extent known, the Person's (a) full name; (b) present or last known address; (c) phone number; and when referring to a natural person, additionally, his or her (d) present or last known place of employment; (e) title(s) or position(s) held within Your organization, if any; and (f) dates of employment or time period in which You used the Person for their services generally or as a volunteer.

App.093

24.    "Include" and "Including" shall be construed as broadly as possible and shall mean "without limitation."

25.    "New Jersey" shall refer to the State of New Jersey.

26.    "Pamphlet[s]" shall be defined as any Document or collection of Documents which are given to Clients or Donors and which provide information on subject matters related to Your Charitable Purpose or Your Services.

27.    "Person[s]" shall be defined in accordance with N.J.S.A. 56:8-1(d).

28.    "Personnel" refers to Employees, volunteers, and other Persons You use to provide Your Services or support Your infrastructure, management, and day-to-day operations.

29.    "Policies" shall Include any procedures, practices, and/or established courses of action, whether written or oral.

30.    "Professional Licensee[s]" refers to Personnel licensed by any of the New Jersey Division of Consumer Affairs' Professional and Occupational Boards and Committees, or by any other State's Professional and Occupational Board responsible for professional licensure and professional regulation. This definition applies to other forms of the word "Professional Licensee," Including "Professionally Licensed" and "Professional Licensure."

31.    "Service(s)" shall be defined as the resources, practices, procedures, and actions that You provide or offer to provide to Clients in furtherance of Your Charitable Purpose, including but not limited to: Telehealth Nurse Consultation, Pregnancy Testing, Limited Obstetric Ultrasound, Intravaginal Ultrasound, Abdominal Ultrasound, Abortion Info Consultation, STD/STI testing, Consultation about option to carry to term or have an abortion, Counseling, After-abortion care, Referrals for Abortion Pill Reversal, OB-GYN Referrals, Referrals for Adoption or other financial resources.

32.    "Social Media" means any website and applications that enable users to create and store content or to participate in social networking, Including Facebook, Instagram, LinkedIn, Snapchat, TikTok, Twitter, and YouTube.

33.    "Solicitation[s]" shall be defined in accordance with N.J.S.A. 45:17A-20.

34.    "You" and "Your" mean First Choice.

35.    As used herein, the terms "all" and "each" shall be construed as all and each.

36.    As used herein, the conjunctions "and" and "or" shall be interpreted conjunctively and shall not be interpreted disjunctively to exclude any information otherwise within the scope of this Subpoena.

37.    As used herein, the plural shall Include the singular, and the singular shall Include the plural.

App.094

## DOCUMENT REQUESTS

1.  True, accurate, and complete copies of each and every Solicitation and Advertisement Concerning Services or goods offered in furtherance of Your Charitable Purpose, Including Solicitations and Advertisements appearing in or on any of the following:

    a.  First Choice Website;

    b.  First Choice Website 2;

    c.  First Choice Donor Website;

    d.  Social Media, Including, but not limited to First Choice Facebook and First Choice Instagram;

    e.  Print media, including newspapers and magazines;

    f.  Amazon or any other e-commerce platform;

    g.  Sponsored content;

    h.  Digital Advertising;

    i.  Video Advertising;

    j.  Native Advertising;

    k.  Other websites;

    l.  Pinterest;

    m.  Radio;

    n.  Podcasts; and

    o.  Pamphlets.

2.  All Documents Concerning distribution or placement of the Advertisements and Solicitations produced in response to Request No. 1, Including any criteria or algorithms used to determine the target audience for Advertisements and Solicitations, and any research used to identify and/or target the Persons or demographics that the Advertisements and Solicitations are intended to reach.

3.  All Documents physically or electronically provided to Clients and/or Donors, Including intake forms, questionnaires, and Pamphlets.

4.  All videos shown to Clients and/or Donors in the course of providing Your Services or soliciting donations, Including but not limited to those videos Concerning abortion procedures and their purported effects.

11

App.095

5.   All Documents Concerning representations made by You to Clients about the confidentiality of Client information, Including privacy policies.

6.   From December 1, 2013, to the date of Your response to this Subpoena, all Documents substantiating the following Claims made on the First Choice Website:

   a.   "The only sure way to confirm a pregnancy is with an ultrasound";

   b.   "Abortion Pill: Side Effects – Bleeding can last 9 to 16 days and possibly up to 30 days";

   c.   "If the pregnancy is not viable, the abortion pill should not be taken";

   d.   "A sexually transmitted infection should be ruled out prior to an abortion procedure to reduce your risk of complications and infection";

   e.   "[The Abortion Pill] is even used beyond 10 weeks from [the Last Menstrual Period], despite an increasing failure rate";

   f.   "One woman in 100 need a surgical scraping to stop the bleeding [from an Abortion Pill]";

   g.   "D&E After Viability – [] This procedure typically takes 2-3 days and is associated with increased risk to the life and health of the mother";

   h.   With respect to dilation and evacuation after viability, "[t]he 'Intact D&E' pulls the fetus out legs first, then crushes the skull in order to remove the fetus in one piece";

   i.   "For [medication abortion], you may need as many as three appointments";

   j.   "Because of the risk of serious complications, the abortion pill is only available through a restricted program";

   k.   "In states that have been measuring the side-effects, reported complications from the abortion pill have increased in the past several years";

   l.   "Taking the abortion pill without seeing a doctor or having an ultrasound is never recommended";

   m.   "The effects [of taking the abortion pill] range from unpleasant [] to life-threatening (sepsis, rupturing of the uterus, [], and more)";

   n.   "An aspiration abortion procedure can be performed up to 13 weeks after a woman's LMP";

   o.   "A D&E is typically performed between 9-20 weeks although late-term abortions can also be performed via D&E";

   p.   "The cost of an abortion . . . is determined after an ultrasound is performed";

12

App.096

q. "After the abortion, the sense of relief may be replaced by some of the following: depression, sadness, eating disorders, anxiety, feelings of low self-esteem, desire to avoid pregnant women and/or babies, recurring nightmares or flashbacks to the abortion experience, various types of addictive behaviors";

r. "Many credible studies have been done and psychologists are now recognizing PAS (Post-Abortion Stress) as a type of post-traumatic stress disorder";

s. "During an abortion, the cervix is opened. If you have an infection, this can increase the risk of the STI spreading to other organs";

t. "Having an abortion procedure while infected with chlamydia or gonorrhea, two of the most common STIs, can lead to Pelvic Inflammatory Disease (PID)";

u. "The medical community does not broadly recommend a misoprostol-only abortion due to the increased side effects and pain";

v. "Side effects of a misoprostol-only abortion are: ... inability to urinate, heavy sweating, hot and dry skin and feeling very thirsty ...";

w. "If I took the first dose, can I still decide to continue my pregnancy? Yes, if only the first dose of the abortion pill has been taken, it may be possible to stop the abortion and continue your pregnancy";

x. "The abortion pill reversal process involves a prescription for progesterone to counteract the mifepristone";

y. "Women typically need to start the protocol within 24 hours of taking mifepristone for the abortion pill reversal to be successful";

z. "According to Abortion Pill Rescue Network, there have also been successful reversals when treatment was starting within 72 hours of taking the first abortion pill";

aa. "Is it safe to stop or reverse the abortion pill? Yes. Bioidentical progesterone has been used to safely support healthy pregnancies since the 1950s, receiving FDA approval in 1998";

bb. "What is the success rate of abortion pill reversal? Initial studies of APR have shown it has a 64-68% success rate"; and

cc. "APR has been shown to increase the chances of allowing the pregnancy to continue."

7. From December 1, 2013, to the date of Your response to this Subpoena, all Documents substantiating the following Claims made on the First Choice Website 2:

a. "Knowing the gestational age, and viability of your pregnancy will determine if a medical abortion is even an option";

13

App.097

b. "An abortion pill or Surgical abortion would not even be needed if your pregnancy is not progressing";

c. "According to Planned Parenthood, the cost of a surgical abortion can be as high as $1500 for a first trimester abortion and even more after the first trimester";

d. "Other risks of both medical and surgical abortion include: hemorrhage (life-threatening heavy bleeding), infection, damage to organs (tearing or puncture by abortion instruments during surgical abortion), pre-term birth in later pregnancies, life-threatening anesthesia complications (surgical abortion)";

e. "Some women experience a range of long-term adverse psychological and emotional effects [after abortion]";

f. "According to WebMD as many as 50% of all pregnancies end in a miscarriage";

g. "After undergoing a Medical Abortion a follow-up appointment is generally required to determine if the abortion process is complete. An abortion doctor or abortion staff member will want to confirm that everything was expelled from your uterus";

h. "When should I take a pregnancy test? Normally, you would want to wait for 1 week after you missed your period";

i. "A pre-abortion ultrasound is generally required before you take the abortion pill and it can require several visits to a medical abortion facility, an abortion center, or to an abortion provider's office"; and

j. With respect to false negatives on pregnancy tests, "being on birth control ... can [] be [a] reason[] for a false negative."

8. To the extent not already produced, all Documents Concerning any test, study, publication, analysis, or evaluation You considered in making the Claims referenced in Request Nos. 6 and 7 above, Including sub-parts.

9. To the extent not already produced, all Documents, Including any tests, studies, publications, analyses, evaluations, or Communications received or made by You or on Your behalf, Concerning Abortion Pill Reversal, the risks of abortion, and contraceptives.

10. All Documents, Including Communications, Concerning the development of content for the First Choice Website, First Choice Website 2, and the First Choice Donor Website, Including the Client Solicitation Page and the Donor Solicitation Page.

11. All Documents Concerning any complaints or identifying any concerns from Clients or Donors about Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims, Including Your processes and procedures for handling complaints or concerns from Clients and Donors.

12. All Documents Concerning any settlements, judgments, mediations, arbitrations, cease and

App.098

desist orders, consent orders, assurances of voluntary compliance, lawsuits, court proceedings, or administrative/other proceedings against You in any jurisdiction within the United States, Including proceedings Concerning Your Services, Advertisements, Solicitations, Pamphlets, videos, or Your Claims.

13. All Documents Concerning any compliance Policies or procedures You utilize with respect to offering or providing Your Services.

14. Documents sufficient to Identify Professional Licensees that render any Services on Your behalf.

15. All Documents Concerning whether Professional Licensure is required to perform any of the Services You provide or offer to provide to Clients.

16. Documents sufficient to Identify Personnel that You use or have used to provide any kind of ultrasound service.

17. Documents sufficient to identify the ultrasound imaging technology utilized by You and the purposes for which it is used.

18. Documents sufficient to Identify to whom or where You refer Clients for Abortion Pill Reversal or other Services that require Professional Licensure, Including the interpretation and findings of ultrasound images.

19. All Documents, Policies, and Communications that You provide to Personnel to guide their interactions with Clients before, during, or after any of Your Services, Including volunteer handbooks, volunteer agreements, dress code policy, training materials, and scripts for phone calls, consultations, or use during ultrasounds.

20. All Documents, Policies, and Communications Concerning resources that You provide to Personnel to guide their interactions with Donors, Including resources that explain solicitation strategies and/or that instruct Personnel on how to describe Your Charitable Purpose.

21. All Documents Concerning and explaining the job description of "Client Advocate" and "Client Consultant" at First Choice.

22. All Documents Concerning Heartbeat International, Inc. and/or the Abortion Pill Reversal Network, Including the "Abortion Pill Reversal Hotline" referenced in Your Communications with Clients.

23. All Documents Concerning Your affiliation with Care Net, Including Your Care Net Certificate of Compliance, Pregnancy Center Statistical Report, and training, marketing, and informational materials provided to You by Care Net.

24. Documents sufficient to Identify the organizational structure of First Choice, Including:

   a. Date and location of formation;

   b. Principle place(s) of business;

15

App.099

    c.  All trade names;

    d.  All name changes, as well as the date(s) thereof;

    e.  Identity of owners, officers, directors (Including medical directors), partners, shareholders and/or board members, Including the dates each became associated with First Choice;

    f.  Articles and/or Certificates of Incorporation, as well as any amendments thereto;

    g.  By-Laws, as well as any amendments thereto;

    h.  Annual Reports filed with the Secretary of State, as well as any amendments thereto;

    i.  Certificates of fictitious or alternate name(s);

    j.  All organizational charts; and

    k.  If a partnership, all partnership Documents.

25.    All Documents Concerning Your tax-exempt status with the Internal Revenue Service, and/or any other tax jurisdiction, Including but not limited to Letters of Determination, IRS Form 1023, exempt ruling letters, and/or notices of revocation.

26.    Documents sufficient to Identify donations made to First Choice by any means other than through the Donor Solicitation Page.

27.    Documents sufficient to identify any licenses and registrations obtained or held by or on behalf of First Choice, and issued by any municipal, county, State, or federal authority.

28.    All Documents Concerning Your record retention Policies.

App.100

# EXHIBIT A



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DIVISION OF LAW

### Guidelines for the Production of Electronically Stored Information

These guidelines outline the technical requirements for producing scanned paper collections, email, and other electronically stored information (ESI) to the Division of Law (NJ DOL) in the New Jersey Attorney General's Office (NJ OAG), where the production will be loaded to *Relativity* software to search, review and retrieve documents. These guidelines are intended for use by a knowledgeable party that is familiar with the technical aspects of ESI including document storage, organization, and format issues. Any proposed production in a format other than those identified below must be discussed with and approved by the NJ OAG.

### I.   General Instructions

1. A cover letter should be included with each production. The cover letter should list each piece of media (hard drive, thumb drive, DVD or CD) included in the production along with the Bates range.

2. Documents created or stored electronically MUST be converted or processed to TIFF files, Bates numbered, and include fully searchable text (OCR), not printed to paper or .PDF files.

3. Data can be produced on CD, DVD, hard drive, or other removable media. Use the media requiring the least number of deliverables.

4. Each piece of media should be "self-contained," for example, if 5 CDs are provided, each must have its own associated load file. CD or other media can be separated over time and this practice ensures IT's ability to reload any particular piece of media at any time.

5. Label all media (printed not handwritten) with the following:
   a.   Case number
   b.   Production date
   c.   Bates range
   d.   Disk number (1 of X), if applicable

May 2019

App.102

6. For a given project, all load files should use the same field names, ordering and structure as the first delivery.

7. Ensure there are no truncated file or folder names in your production. These would be indicated by a tilde ~. (E.g. AAA000~1.TIF).

8. When reviewing your load file, missing or empty folders indicate a potential problem. If your image folder contains subfolders 012, 013 and 015, your first question should be what happened to 001-011 and 014.

9. Organize productions by custodian, unless otherwise instructed. All documents from an individual custodian should be confined to a single load file.

10. All productions should be checked and produced free of computer viruses or other malware.

11. Passwords for documents, files, compressed archives and encrypted media should be provided separately either via email or in a separate cover letter from the custodian.

## II. Delivery Formats

Subpart A of this section sets forth the standard production format. Under limited circumstances, it may not be possible to produce ESI in that preferred format. Under those circumstances, and with prior approval of the NJ OAG, .PDF files and Email native files may be produced in the formats provided in subparts B. and C. of this section, respectively.

### A. Production Format

All scanned paper, email and native file collections should be converted or processed to TIFF files, Bates numbered, and include fully searchable text (OCR). Most document productions will contain the elements listed below:

**Folder labeled IMAGES**
**Folder labeled DATA**
**Folder labeled TEXT**
**Folder labeled NATIVES**

### 1. Bates Numbering

The Bates number must be a unique, consistently formatted identifier consisting of an alpha prefix along with a fixed length number for each custodian, e.g., "ABC0000001". This format must remain consistent across all production numbers. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should spaces, hyphens, or other separators be added or deleted. Avoid Bates prefixes containing characters other than A through Z.

May 2019

App.103

### 2.    Images

#### a.    Generally

1.    Black and White images should b e single-page, Group IV TIFS (1 bit), and scanned at 200-300 DPI (Presentation software such as PowerPoint, AUTOCAD images and Spreadsheet images are exceptions please see step 4 below.) Color images should be single-page JPGS.

2.    File names cannot contain embedded spaces.

3.    The number of TIFF files per folder should not exceed 1000 files.

4.    Rendering PowerPoint, AUTOCAD images and Excel files to images:
     i.    PowerPoint: All pages of the file should be scanned in full slide image format, with any speaker notes following the appropriate slide image.
     ii.   AUTOCAD images: If possible, files should be scanned to single page JPEG (.JPG) file format. Color images can be discussed on a case by case basis.
     iii.  Excel: A placeholder image, named by the *IMAGEID* of the file, may be used.

#### b.    Image Cross-Reference File

The image cross-reference file is needed to link the images to the database. It is a comma-delimited file consisting of seven fields per line. There must be a line in the cross-reference file for every image in the database. The format is as follows:

ImageID, VolumeLabel, ImageFilePath, DocumentBreak, FolderBreak, BoxBreak, PageCount

| | |
|---|---|
| ImageID: | The unique designation that is used to identify an image. |
| | *Note*: This ImageID key must be a unique and fixed length number. This number will be used in the .DAT file as the ImageID field that links the database to the images. The format of this image key must be consistent across all productions. It is recommended that the format be a 7 digit number to allow for the possible increase in the size of a production. |
| VolumeLabel: | Optional, but names for volumes should not be longer than eight characters, with a suffix not wider than three characters. |
| ImageFilePath: | The full path to the image file. |
| DocumentBreak: | The letter "Y" denotes the first page of a document. If this field is blank, then the page is not the first page of a document. |
| FolderBreak: | Leave empty |
| BoxBreak: | Leave empty |
| PageCount: | Optional |

**Sample IMAGE Load file** (Often referred to as Opticon or .OPT file)....

IMG0000001,IMG01,E:\IMAGES\001\IMG0000001.TIF,Y,,,3
IMG0000002,IMG01,E:\IMAGES\001\IMG0000002.TIF,,,,
IMG0000003,IMG01,E:\IMAGES\001\IMG0000003.TIF,,,,

May 2019

App.104

IMG0000004,IMG01,E:\IMAGES\001\IMG0000004.TIF,Y,,,2
IMG0000005,IMG01,E:\IMAGES\001\IMG0000005.TIF,Y,,,,

The fields are, from left to right:

- Field One – (IMG0000001) – page identifier
- Field Two – (IMG01) – the volume identifier  not required
- Field Three – (E:\IMAGES\001\IMG0000001.TIF) – a path to the image to be loaded
- Field Four – (Y) – Document marker – a "Y" indicates the start of a unique document
- Field Five – (blank) – can be used to indicate a folder
- Field Six – (blank) – can be used to indicate box
- Field Seven – (3) – used to store page count

*Note*: Only images belong in the Opticon load file. If OCR files are included in the same folder as the images, errors will occur when retrieving the images.

### 3.    DATA Load File (.DAT file)

The data file (.DAT) contains all the fielded information that will be loaded into the database. Data can be delivered utilizing standard delimited files for coded data (.DAT) and .TXT files for OCR data. The data file (.DAT) contains all of the fielded information that will be loaded into the database:

1. The first line of the .DAT file must be a header row identifying the field names.

2. The best practice is to use the following standard delimiters in the .DAT file:

> The following chart represents the most common delimiter characters used in Relativity, along with its decimal equivalent. If the source program you are importing from uses a different font, it can change the symbolic representation of the delimiters. If this happens, match the delimiter characters with the decimal equivalents instead of relying on the displayed symbol. Using the decimal equivalents will always result in a correct delimiter match. For a complete list of delimited characters you may reference the following link.

https://help.relativity.com/9.7/Content/Relativity/Relativity_Desktop_Client/Importing/Load_fil
e_specifications.htm

| Delimiter Name | Symbol | Decimal Equivalent |
|---|---|---|
| Comma | , | 044 |
| Paragraph | ¶ | 020 |
| Quote | þ | 254 |
| Newline | ® | 174 |
| semi-colon | ; | 059 |

3. Date fields should be provided in the format: mm/dd/yyyy
   a.  E.g. "01/01/2004" and not "01/01/2004 12:01:01PM"

4.  Date and time fields must be two separate fields

5. All attachments should sequentially follow the parent document/email. Parent Email and attachment document families should be kept intact.

6. All metadata associated with email, audio files, and native electronic document collections should be produced.

7. The .DAT file for scanned paper collections must contain, at a minimum, the following fields:
   1) BEGBATES: Beginning Bates number
   2) ENDBATES: Ending Bates number
   3) IMAGEID: Image Key field
   4) CUSTODIAN: Individual from whom the document originated

8. The .DAT file should NOT include document text.

9. For all non-redacted documents, please include the General Metadata fields for all files and respective metadata fields for emails and electronic documents (e.g., MS Word, MS Excel, etc.) where available using industry standard techniques. With respect to redacted documents, some metadata may be withheld as needed to preserve privileges.

10. Spaces and returns must match the original text. No odd characters, such as a semi-colon, should appear in lieu of a soft-return or a space.

11. Fields provided in a .DAT file may include the following:

| GENERAL Metadata | Definition | Field Name |
|---|---|---|
| BEG BATES | The start bates of the document | Bates Beg |
| END BATES | The end bates of the document | Bates End |
| BEG ATTACH | start bates of attachment | Bates Beg Attach |
| END ATTACH | The end bates of attachment | Bates End Attach |
| Page Count | Number of pages | Pages |
| Custodian | The name of the original custodian of the file | Custodian |
| File extension | The extension of the file | File Extension |
| Confidential | Value | Confidential |
| Email type | Defines if a message file is an email or attachment | Record Type |
| Email Attachment | Defines if email has an attachment | Email Has Attachment |
| File path | The address where the file resides on the electronic media | Source Path |
| File Size | The amount of space the file takes up on the electronic | File Size |
| MD5Hash | The MD5 Hash for the original file | MD5 Hash |
| Native File Link | Relative path of submitted native files | Native File |
| | | |

| Email Metadata | Definition | Field Name |
|---|---|---|
| FROM | The person who authored the email | Email From |
| TO | Recipient(s) of the email | Email To |
| COPIED | Person(s) copied on the email | Email CC |
| BCC | Person(s) blind copied on the email | Email BCC |

May 2019

App.106

| Date Sent | Date the email was sent expressed usually Eastern Standard Time if in US | Email Sent Date |
| Time Sent | Time the email was sent expressed usually Eastern Standard Time if in US | Email Sent Time |
| Time Zone | The time zone in which the emails were standardized | Time Zone Field |
| Date Received | Date Received Date received in EST | Email Received Date |
| Time Received | Time Received Date received in EST | Email Received Time |
| Subject | Subject line of email | Email Subject |
| Attachment Count | Number of attachments | Number of Attachments |
| INTFILEPATH | Original location of email including original file name | Email Folder Path |
| INTMSGID | Unique Message ID | Message ID |

| EDocs Metadata | Definition | Field Name |
|---|---|---|
| Author | The person who authored the document | Author |
| Date Created | Date the document was created | Created Date |
| Time Created | Time the document was created | Created Time |
| Date Last Modified | Date the file was last changed/saved | Last Modified Date |
| Time Last Modified | Time the file was last changed/saved | Last Modified Time |
| Printed Date | Date that the file was last printed | Last Printed Date |
| Title | Title of the document | Title |
| Extracted Text/OCR Path | Path to extracted text of the native file | Extracted Text |
| Path | Path where native file document was stored including | File Path |

12. No more than one document per database record. The database and load files should be sorted sequentially by Bates number. Relativity displays records in the same order they are loaded.

### 4.    Text

Searchable text of the entire document must be provided for every record, at the document level. For redacted documents, provide the full text for the redacted version. Delivery should be as follows:

1. The text should be delivered as multi-page ASCII text files with the files named the same as the ImageID field.

2. Text files must be placed in a separate folder labeled TEXT.

3. The number of files per folder should be limited to 1000 files.

4. Note:
   a. DO NOT include the searchable text in the same folder as the IMAGES folder.
   b. DO NOT include searchable text in the .DAT file.

### 5.    Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

1. Native files must be named with the same naming convention associated with its associated files in the production:

May 2019

App.107

EXAMPLE:

NJOAG0012345 – beginning bates number from the load file.
NJOAG0012345.tif – associated image file
NJOAG0012345.txt – associated text file
NJOAG0012345.xls – associated native Excel spreadsheet.

2. The full path of the native file must be provided in the .DAT file for the LINK field.

3. The number of native files per folder should not exceed 1000 files.

4. These files should be located in a folder named NATIVE.

## B.    .PDF File Production

Production in this format requires prior approval from the NJ OAG.

1. When approved, .PDF files may be produced in native file format.

2. .PDF files should be produced in separate folders.

3. All .PDFs must be unitized at the document level, i.e. each .PDF should represent a distinct document; a single .PDF file cannot contain multiple documents.

4. All .PDF files must contain embedded text that includes all discernable words within the document, not selected text only. This requires all layers of the .PDF to be flattened first.

5. If .PDF files are Bates endorsed, the .PDF files must be named by the Bates range.

## C.    Email Native File Production

Production in this format requires prior approval from the NJ OAG. When approved, Outlook (e.g., .PST) email files may be produced in native file format. A separate folder should be provided for each custodian.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**MINUTES OF PROCEEDINGS**

**OFFICE:**  TRENTON                          **DATE:**  DECEMBER 19, 2023

**JUDGE MICHAEL A. SHIPP**

**COURT REPORTER:**  SHANNAN GAGLIARDI

                                   **CIVIL ACTION #** 23-23076 (MAS)

**TITLE OF CASE:**
FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.,
        v.
MATTHEW J. PLATKIN

**APPEARANCES:**
Lincoln Wilson, Esq. and Timothy Garrison, Esq. on behalf of Plaintiff
Angela Cai, Esq. on behalf of Defendant

**NATURE OF PROCEEDINGS:**
Telephone Status Conference held re (ECF No. 12) Emergency MOTION for Temporary Restraining Order and
Preliminary Injunction.
ORDERED that the parties are directed to meet and confer and shall provide the Court with a joint proposed briefing
schedule by no later than close of business on December 20, 2023.


Time Commenced:      11:30 AM
Time Adjourned:      11:55 AM
Total Time:          25 mins


                                   s/ Jair Bodnar
                                   **DEPUTY CLERK**

App.109

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO BOX 080
TRENTON, NJ  08625-0080

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

December 20, 2023

The Honorable Michael A. Shipp, U.S.D.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

Re: *First Choice Women's Resource Ctrs., Inc. v. Platkin*, No. 3:23-cv-23076

Dear Judge Shipp,

After meeting and conferring, the parties jointly request the following briefing schedule for Plaintiff's motion for preliminary injunction (ECF No. 5, 6, 12):

- State's opposition papers: February 2, 2024
- Plaintiff's reply: February 23, 2024.

The parties were unable to come to an agreement about interim relief, and their respective positions are as follows. The parties also attach their correspondence following the meet-and-confer.

**State's Position**:

This Court should not issue a TRO barring the State from enforcing the November 15, 2023 Subpoena in the interim period.

The State's request is narrow. The State's objective is *not* to obtain documents before this Court considers the PI papers. Rather, the State's objective is to prevent the following scenario: even if this court denies a PI, Plaintiff still would not produce documents, and the State would have to file a subsequent subpoena enforcement action

App.110

in state court, where Plaintiff would raise additional state-law defenses. That process—PI adjudication in this Court and appeal, followed by state-court litigation and related state-court appeals—can delay obtaining documents for many months or even years, even if the Subpoena is adjudged lawful.

Plaintiff unfortunately rejected the State's proposed solution.. The State is willing to suspend the Subpoena's return date until after this Court resolves the PI motion and even until after any emergency application pending appeal, but if those motions are denied, Plaintiff must comply with the Subpoena within 30 days, and will not require the State to file a subsequent state-court action to enforce the Subpoena. Plaintiff disagreed, representing that it reserves rights to litigate additional state-law defenses to the Subpoena. Plaintiff cannot undercut the State's authority to enforce its rights in state court merely by filing a PI, yet still insist on subsequent state-court proceedings if it loses.

The State now proposes a path forward to the Court. The State only seeks the ability to initiate a state-court subpoena-enforcement action, so that if the PI is denied, the State can timely access documents. The State will *not*, however, request sanctions against Plaintiff in the form of penalties or an injunction for non-compliance with the Subpoena, and would only do so if Plaintiff subsequently violates a court order. This Court's order denying a TRO could include findings regarding the State's binding commitment, but would otherwise allow the State to initiate a state court subpoena-enforcement action.

Nor will the subpoena-enforcement action harm Plaintiff. Without any threat of penalties, it  needs only litigate any defenses in Superior Court—the only court that can ultimately order compliance with the subpoena. *See* N.J. Stat. Ann. § 45:17A-33; § 45:1-18; § 56:8-3. Blackletter law makes clear that litigating claims in a court of law is not irreparable harm. *See F.T.C. v. Standard Oil Co. of Calif.*, 449 U.S. 232, 244 (1980). Moreover, there is little chance the subpoena-enforcement action will conclude before this Court resolves the PI. Nor would document production necessarily moot Plaintiff's arguments if the documents would be used in any future enforcement action.

If this Court grants a PI, Plaintiffs of course need not produce the documents. But if a PI is denied, the State must be entitled to timely access those documents. The State's proposal achieves both goals. By contrast, a TRO preventing the State from initiating the months-long enforcement process in state court imposes serious delay on the State—even if this Court eventually agrees this is a lawful Subpoena.

**Plaintiff's Position**:

On the matter of interim relief, First Choice agrees with the Court's proposal to suspend the due date of the Subpoena, which First Choice submits should run until 30 days after the Court rules on the preliminary-injunction motion. The Court may

App.111

grant this relief either under its general case management authority to set deadlines for the orderly conduct of proceedings, *see In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982), or as a temporary restraining order.

This case calls for the classic use of a temporary restraining order, which is to preserve the status quo. *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (collecting cases). Allowing enforcement of the Subpoena now could well moot this proceeding, and as shown in the Verified Complaint, would irreparably harm First Choice. It would divert First Choice's resources and severely limit its ability to carry out its mission, ECF No. 1 ¶¶ 72–74, as well as harming its associational interests by alienating donors, officers, employees, volunteers, and vendors through fear of retaliation and public disclosure, *id.* ¶¶ 75–79. In contrast, the Attorney General faces no irreparable harm, having shown no urgent need for the documents he requests. Plus, "[t]here is a strong public interest in upholding the requirements of the First Amendment." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022).

First Choice has also made the requisite showing on the merits of its challenge under the First, Fourth, and Fourteenth Amendments. That does not require "a resolution of 'any merit-based issue.'" *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (quotation omitted). Rather, relief is appropriate based on a showing of "reasonable probability of eventual success in the litigation," which means "significantly better than negligible," not "more likely than not." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 (3d Cir. 2017) (quotation omitted). Even further, if irreparable harm to the movant "decidedly outweighs any potential harm" to the opposing party, then the movant need only show "serious questions going to the merits." *In re Revel AC, Inc.*, 802 F.3d 558, 569–70 (3d Cir. 2015) (quotation omitted). First Choice clearly meets that standard: the irreparable harm to First Choice from the Attorney General's unlawful Subpoena wholly eclipses his desire to obtain documents, and there can be no dispute that this case presents serious questions going to the merits.

First Choice cannot accept the Attorney General's proposal for temporary relief, which would require First Choice to abandon any state-law defenses to the Subpoena (see attached correspondence). The proposal would also limit First Choice's appellate rights to emergency motion practice and thus require it to forego a merits adjudication on appeal. Yet the proposal would not require the same of the Attorney General. The Subpoena is unlawful in its entirety, and First Choice cannot preliminarily abandon its right to assert that position before any court.

Respectfully yours,

By: /s/  Angela Cai

App.112

                    Angela Cai
                    Deputy Solicitor General
                    Counsel for Defendant

By: /s/Lincoln Davis Wilson
                    Lincoln Davis Wilson
                    Counsel for First Choice Women's Resource
                    Centers, Inc.

CC: All counsel via ECF

App.113

Exhibit A

## Angela Cai

| | |
|---|---|
| **From:** | Lincoln Wilson <lwilson@adflegal.org> |
| **Sent:** | Tuesday, December 19, 2023 5:55 PM |
| **To:** | Angela Cai; Tim Garrison |
| **Cc:** | Chanel VanDyke |
| **Subject:** | [EXTERNAL] RE: PI briefing schedule |

Thanks Angela. To begin with the positives, your proposed briefing schedule is fine with us. However, what you outline below is not our position on interim relief. We do not maintain that we will not comply with a valid subpoena, but rather that if a PI and all emergency appellate relief is denied, we reserve our rights to litigate state-law defenses to the validity of the subpoena and to federal appellate review on the merits, rather than just an emergency application. That said, I suspect we still will not reach an agreement on this point, so we will plan on sending you our section on this issue for the joint letter by 4:30 tomorrow. Should we agree in advance to word limits on those inserts?

Thank you,

Lincoln

From: Angela Cai <Angela.Cai@njoag.gov>
Sent: Tuesday, December 19, 2023 2:48 PM
To: Lincoln Wilson <lwilson@adflegal.org>; Tim Garrison <tgarrison@adflegal.org>
Cc: Chanel VanDyke <Chanel.VanDyke@law.njoag.gov>
Subject: RE: PI briefing schedule

> You don't often get email from angela.cai@njoag.gov. Learn why this is important

**\*EXTERNAL\***

Hi Lincoln,

I just wanted to confirm that you are rejecting the following proposal:

> Defendant would agree not to initiate subpoena enforcement proceedings regarding the Subpoena in New Jersey Superior Court pending resolution of the motion for preliminary injunction in the District of New Jersey and emergency motion for injunction pending appeal to the Third Circuit Court of Appeals and/or emergency application to the United States Supreme Court ("emergency appellate relief"). If Plaintiff's motion for preliminary injunction is denied, and emergency appellate relief is denied, Plaintiff shall comply with the subpoena within 30 days of the last denial without a subpoena-enforcement order from the New Jersey Superior Court, and thus waives any state law defenses to the validity of the Subpoena. In the event of a deficient production, Defendant retain all rights to pursue all available remedies in New Jersey Superior Court.

If so, is your position that even if a PI and emergency appellate relief is denied in the federal courts, your client would still refuse to comply with the Subpoena, and only *then* can the State even begin to initiate subpoena-enforcement proceedings in New Jersey Superior Court?

If that is correct, let's do this: each party will submit its position on this issue of interim relief to the Court in the joint letter. Please send me your section by 4:30pm tomorrow.

1

App.115

Regarding the briefing schedule for the PI.  The State does not plan to file a combined motion to dismiss at this time.  As such, are you amenable to the following PI briefing schedule per our phone discussion?

- State's opposition papers: February 2, 2024
- Plaintiff's reply: February 23, 2024.

Thanks,
Angela


Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General
(609) 414-5954
angela.cai@njoag.gov


**From:** Lincoln Wilson <lwilson@adflegal.org>
**Sent:** Tuesday, December 19, 2023 4:56 PM
**To:** Angela Cai <Angela.Cai@njoag.gov>; Tim Garrison <tgarrison@adflegal.org>
**Cc:** Chanel VanDyke <Chanel.VanDyke@law.njoag.gov>
**Subject:** [EXTERNAL] RE: PI briefing schedule

Angela and Chanel:

Thank you for speaking with us this afternoon. As discussed, we are happy to agree to a briefing schedule with your opposition in late January or early February and our reply three weeks later. Please let us know if you plan to move to dismiss and we can adjust timing and page limits as appropriate.

Separately, we have now had the opportunity to speak to our client, and we are unable to agree to your proposal regarding interim relief. We believe we should adopt the approach the Court suggested, which would be to suspend the due date on the subpoena and to have it resume within 30 days of any order denying our motion for preliminary injunction. Please let us know as soon as possible if that is acceptable to the Attorney General.

Thank you,

Lincoln Davis Wilson


**From:** Angela Cai <Angela.Cai@njoag.gov>
**Sent:** Tuesday, December 19, 2023 9:05 AM
**To:** Lincoln Wilson <lwilson@adflegal.org>; Tim Garrison <tgarrison@adflegal.org>
**Subject:** RE: PI briefing schedule

> You don't often get email from angela.cai@njoag.gov. Learn why this is important

**\*EXTERNAL\***

Yes, that would work. I can send around a dial-in.


**From:** Lincoln Wilson <lwilson@adflegal.org>
**Sent:** Tuesday, December 19, 2023 12:02 PM

**To:** Angela Cai <Angela.Cai@njoag.gov>; Tim Garrison <tgarrison@adflegal.org>
**Subject:** [EXTERNAL] RE: PI briefing schedule

Hi Angela,

Was just emailing you. Either time works for me, but 2:00 pm would be better so we can iron out any issues sooner. Tim, does that work for you?

Thanks,

Lincoln



Lincoln Wilson
Sr. Counsel, Center for Life
+1 571 707 4655 (Office)
571-707-4790 (Fax)
lwilson@adflegal.org
ADFlegal.org

**From:** Angela Cai <Angela.Cai@njoag.gov>
**Sent:** Tuesday, December 19, 2023 9:00 AM
**To:** Tim Garrison <tgarrison@adflegal.org>; Lincoln Wilson <lwilson@adflegal.org>
**Subject:** PI briefing schedule

**\*EXTERNAL\***

Tim and Lincoln,

Would you like to have a phone call to discuss? I'm available at 2pm and 4pm and later EST today.

Thank you,
Angela


Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General
(609) 414-5954
angela.cai@njoag.gov

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.
CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it

App.117

contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

App.118

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

| | |
|---|---|
| FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC., | Hon. Michael A. Shipp, U.S.D.J. Hon. Tonianne J. Bongiovanni, U.S.M.J. |
| Plaintiff, | |
| v. | Docket No. 23-CV-23076 |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey, | **[PROPOSED] ORDER** |
| Defendant. | |

### ORDER DENYING TEMPORARY RESTRAINING ORDER

This matter having come before the Court on Plaintiff First Choice Women's Resource Centers, Inc's ("Plaintiff") Motion for a Temporary Restraining Order, and the Court, having considered the submissions and argument of both parties' counsel; and

Whereas Defendant, New Jersey Attorney General Matthew J. Platkin (the "State"), has represented that Defendant will not seek sanctions or penalties against Plaintiff in any state-court proceeding for failure to comply with the November 11, 2023 investigatory Subpoena (the "Subpoena"); and

Whereas the State will only seek an order from the New Jersey Superior Court compelling production of documents pursuant to the Subpoena; and

App.120

Whereas the State will not require actual production of documents until this Court has ruled on Plaintiff's Motion for Preliminary Injunction (Dkt. 12); and

Whereas Plaintiff will suffer no immediate and irreparable harm while this Court considers the aforementioned Motion for Preliminary Injunction; and

Whereas the parties have agreed on a briefing schedule for the aforementioned Motion for Preliminary Injunction (Dkts. 17, 20); and for other good cause shown:

**IT IS** on this ___ day of _____ 2024 **ORDERED** that:

1. The motion for a temporary restraining order is DENIED.

2. Paragraph 3 of this Court's December 22, 2023 Order is VACATED.

3. Paragraphs 1 and 2 of this Court's December 22, 2023 Order setting forth the briefing schedule shall remain in force.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

App.121

EXHIBIT B

App.122

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
PO Box 93
Trenton, New Jersey 08625
Attorney for Defendant

By:    Angela Cai (NJ Bar 121692014)
       Deputy Solicitor General
       Angela.Cai@njoag.gov

---

| | |
|---|---|
| FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC. | Hon. Michael A. Shipp, U.S.D.J. Hon. Tonianne J. Bongiovanni, U.S.M.J. |
| Plaintiff, | Docket No. 23-CV-23076 |
| v. | CIVIL ACTION |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General for the State of New Jersey, | **CERTIFICATION OF GREGORY K. TURNER** |
| Defendant. | |

---

I, Gregory K. Turner, an employee of the State of New Jersey, certify as follows:

1.     I am an Assistant Deputy of Enforcement of the Office of Consumer Protection ("OCP") within the Division of Consumer Affairs ("Division"). The Division operates under the direction of the Attorney General within the Department of Law & Public Safety.

App.123

2.     In my role as Assistant Deputy of Enforcement, I am primarily responsible for the management and oversight of OCP investigations, as well as coordination efforts of investigations with various other sections including the Charities Registration and Investigation Section ("CRI") and the Enforcement Bureau ("EB"). In this capacity, I have general oversight of the collection and preservation of evidence for OCP investigations, as well as oversight of the investigators and/or supervisors who conduct investigations on behalf of the Division.

3.     The Division initiated a confidential investigation that included considering whether actions taken by First Choice Women's Resource Centers, Inc. and its staff ("First Choice") had violated various statutes and regulations. The Division's ongoing investigation has included—among other investigative steps—a review of First Choice's registration status with the Charities Registration & Investigation Unit and a review of publicly available information, including First Choice's own divergent representations across its multiple websites and social media accounts.

4.     The Division's investigation revealed that First Choice maintains multiple websites, each of which contains different representations about its work. (See Exhibit 1, Exhibit 2, Exhibit 3)

App.124

5.      Upon review of the websites, the Division's investigation revealed that there are discrepancies in how First Choice messages its mission and services across its different platforms, based on the distinct audiences each website appears to be intended to reach. (See Exhibit 1, Exhibit 2, Exhibit 3). Additionally, First Choice makes numerous statements purporting to convey medical information, and states that it has medical personnel onsite to provide services. (See Exhibit 1, Exhibit 3)

6.      Additional investigation by the Division revealed that First Choice represents in phone calls that it has nurses on staff and has doctors who oversee medical services.

7.      That investigation further showed that when First Choice meets with clients at its facility, First Choice informs them that it has a doctor that oversees the facility, although it admits that it does not have a doctor onsite.

8.      The Division's investigation also revealed that First Choice offers to conduct a pregnancy test and ultrasound, but does not provide information about the risks of abortion absent an agreement to submit to a pregnancy test.

9.      The Division's investigation raised significant concerns about the information First Choice and its staff provide to potential clients, donors, and the public, about the services it offers and about the personnel who deliver those services.

App.125

10.     Based on the Division's investigation thus far, the Division determined that a subpoena for documents was warranted to gather further information about First Choice's representations and practices.

11.     To learn more, on November 15, 2023, the Division served an Administrative Subpoena Duces Tecum ("Subpoena") on First Choice at 82 Speedwell Avenue, Morristown, NJ 07960. Among other things, the Subpoena sought copies of First Choice solicitations and advertisements, documents substantiating the claims made therein, and identification of the medical personnel involved in the provision of its services. The subpoena set a December 15, 2023 deadline for First Choice to respond. (See Exhibit 4)

12.     I have reviewed all documents submitted with this Certification and certify that all are true copies of the documents in possession with the Division.

13.     I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_Gregory K. Turner_
_____
Gregory K. Turner
Assistant Deputy of Enforcement

Dated:      January <u>5</u>, 2024

EXHIBIT C

56:8-39 to 56:8-48

## LEGISLATIVE HISTORY CHECKLIST

NJSA:   56:8-39 to 56:8-48          (Health clubs-- regulate)

LAWS OF:  1987                      CHAPTER:  238

Bill No:   S1308, S913, A1163

Sponsor(s):   Codey and Laskin

Date Introduced:   Pre-filed

Committee:        Assembly:  Higher Education and Regulated Professions

                  Senate:   Labor, Industry and Professions

Amended during passage:        Yes          Amendments during passage denoted
                                            by asterisks.

Date of Passage:          Assembly:    June 29, 1987

                          Senate:   June 18, 1987

Date of Approval:   August 12, 1987

Following statements are attached if available:

Sponsor statement:                          Yes

Committee statement:      Assembly         Yes

                          Senate           Yes

Fiscal Note:                                No

Veto Message:                               No

Message on Signing:                         Yes

Following were printed:

Reports:                                    No

Hearings:                                   No

See newspaper clippings-- attached:

"Health club regulations become law", 8-13-87 Star Ledger.

REPOSITORY COPY
Do Not Remove From Library

App.128

CHAPTER 238 LAWS OF N. J. 1987

APPROVED 8/12/87

SENATE COMMITTEE SUBSTITUTE FOR

# SENATE Nos. 1308, 913 and ASSEMBLY No. 1163

# STATE OF NEW JERSEY

### ADOPTED MAY 21, 1987

Sponsored by Senators CODEY and LASKIN
and Assemblyman ROCCO

An Act regulating the sellers of health club services and supplementing P. L. 1960, c. 39 (C. 56:8-1 et seq.).

1  BE IT ENACTED *by the Senate and General Assembly of the State*
2  *of New Jersey:*

1  1. As used in this act:
2  a. "Director" means the Director of the Division of Consumer
3  Affairs in the Department of Law and Public Safety.
4  b. "Health club" means an establishment which devotes or will
5  devote 40% or more of its square footage to providing services
6  or facilities for the preservation, maintenance, encouragement or
7  development of physical fitness or physical well-being. The term
8  includes an establishment designated as "reducing salon," "health
9  spa," "spa," "exercise gym," "health studio," "health club" or by
10  other terms of similar import.
11  c. "Health club services" means those services offered by a
12  health club for the preservation, maintenance, encouragement or
13  development of physical fitness or physical well-being.
14  d. "Health club services contract" means an agreement under
15  which the buyer of health club services purchases or becomes
16  obligated to purchase health club services.
17  e. "Operating day" means any calendar day on which patrons
18  may inspect and use the health club's facilities and services during
19  a period of at least eight hours, except holidays and Sundays.

2

2. Each person who sells or offers for sale health club services in this State shall register with the director on forms the director provides. The registration shall be renewed every two years. Upon the sale of the health club facility or a change in the majority ownership of the stock of the corporate owner, the health club facility shall reregister with the director and shall pay the registration fee. The person shall provide the full name and address of each business location where health club services are sold in the State as well as any other information regarding the ownership and operation of each health club that the director deems appropriate. The registration and renewal fees shall be established or changed by the director and shall be fixed at a level to allow for the proper administration and enforcement of this act, but shall not be fixed at a level that will raise amounts in excess of the amount estimated to be so required.

3. a. A person who sells or offers for sale health club services shall, for each health club facility operated in the State, maintain a bond issued by a surety authorized to transact business in this State or maintain an irrevocable letter of credit by a bank or maintain with the director securities, moneys or other security acceptable to the director to fulfill the requirements of this subsection. The principal sum of the bond, letter of credit, or securities, moneys or other security shall be 10% of the health club's gross income for health club services during the club's last fiscal year, except that the principal sum of the bond, letter of credit, or securities, moneys or other security shall not be less than $25,000.00, nor more than $50,000.00. However, the principal sum of the bond, letter of credit, or securities, moneys or other security shall be $50,000.00 for any period of time that a person sells or offers for sale health club services prior to the opening of the health club facility. After the health club facility opens, the bond, letter of credit, or securities, moneys or other security shall be adjusted to the appropriate sum. The bond, letter of credit, or securities, moneys or other security shall be filed or deposited with the director and shall be excuted to the State of New Jersey for the use of any person who, after entering into a health club services contract, is damaged or suffers any loss by reason of breach of contract or bankruptcy by the seller. Any person claiming against the bond, letter of credit, or securities, moneys, or other security may maintain an action at law against the health club and the surety, bank or director, as the case may be. The aggregate liability of the surety, bank, or the director to all persons for all breaches of the conditions of the bond, letter of credit, or the

3

29   securities, moneys or other security held by the director shall not
30   exceed the amount of the bond, letter of credit, or the securities,
31   moneys or other security held by the director.

32       In the case of a bond, the health club shall file a copy of the
33   bond with the director and a certificate by the surety that the
34   surety will notify the director at least 10 days in advance of the
35   date of any cancellation or material change in the bond.

36       b. The provisions of subsection a. of this section shall not be
37   applicable to a person who sells or offers for sale health club
38   services in which the buyer of the health club services purchases
39   or becomes obligated to purchase health club services to be rendered
40   over a period no longer than three months and in which the seller
41   of the health club services requires or collects no more than three
42   months' payment in advance. The person who sells or offers for
43   sale health club services under contracts provided for in this
44   subsection shall file with the director, within 30 days following
45   the effective date of this act and no later than January 15 of every
46   even-numbered year, a declaration, executed under penalty of per-
47   jury, stating he sells or offers for sale only health club services
48   under contracts which comply with this subsection. Any person
49   who has filed a declaration pursuant to this subsection and who
50   intends to sell or offer for sale health club services under contracts
51   with longer terms or greater payments in advance than those pro-
52   vided in this subsection shall comply with subsection a. of this
53   section.

1        4. a. Every contract for health club services shall be in writing.
2    A copy of the written contract shall be given to the buyer at the
3    time the buyer signs the contract.

4        b. A health club services contract shall specifically set forth in
5    a conspicuous manner on the first page of the contract the buyer's
6    total payment obligation for health club services to be received
7    pursuant to the contract.

8        c. A health club services contract of a health club facility which
9    maintains a bond, irrevocable letter of credit or securities, moneys
10   or other security pursuant to subsection a. of section 3 of this act
11   shall set forth that a bond, irrevocable letter of credit or securities,
12   moneys or other security is filed or deposited with the Director of
13   the Division of Consumer Affairs to protect buyers of these con-
14   tracts who are damaged or suffer any loss by reason of breach of
15   contract or bankruptcy by the seller.

16       d. Services to be rendered to the buyer under the contract shall
17   not obligate the buyer for more than three years from the date the
18   contract is signed by the buyer.

App.131

4

19    e. A contract for new or increased health club services may be
20    cancelled by the buyer for any reason at any time before midnight
21    of the third operating day after the buyer receives a copy of the
22    contract. In order to cancel a contract the buyer shall notify the
23    health club of cancellation in writing, by registered or certified
24    mail, return receipt requested, or personal delivery, to the address
25    specified in the contract. All moneys paid pursuant to the cancelled
26    contract shall be fully refunded within 30 days of receipt of the
27    notice of cancellation. If the customer has executed any credit or
28    loan agreement through the health club to pay all or part of health
29    club services, the negotiable instrument executed by the buyer
30    shall also be returned within 30 days. The contract shall contain
31    a conspicuous notice printed in at least 10-point bold-faced type
32    as follows:

"NOTICE TO CUSTOMER

33    You are entitled to a copy of this contract at the time you sign it.
34    You may cancel this contract at any time before midnight of
35    the third operating day after receiving a copy of this contract.
36    If you choose to cancel this contract, you must either:
37    1. Send a signed and dated written notice of cancellation by
38    registered or certified mail, return receipt requested; or
39    2. Personally deliver a signed and dated written notice of can-
40    cellation to:
41    .................................... (Name of health club)
42    .................................... (Address of health club)
43    If you cancel this contract within the three-day period, you are
44    entitled to a full refund of your money. If the third operating
45    day falls on a Sunday or holiday, notice is timely given if it is
46    mailed or delivered as specified in this notice on the next operating
47    day. Refunds must be made within 30 days of receipt of the can-
48    cellation notice to the health club.
49    'Operating day' means any calendar day on which patrons may
50    inspect and use the health club's facilities and services during a
51    period of at least eight hours, except holidays and Sundays."
52    f. A health club services contract shall provide that it is subject
53    to cancellation by notice sent by registered or certified mail, return
54    receipt requested, or personally delivered, to the address of the
55    health club specified in the contract upon the buyer's death or
56    permanent disability, if the permanent disability is fully described
57    and confirmed to the health club by a physician. In a cancellation
58    under this subsection, the health club may retain the portion of
59    the total contract price representing the services used plus re-

5

60 imbursement for expenses incurred in an amount not to exceed
61 10% of the total contract price.
62    g. A health club services contract shall provide that it is subject
63 to cancellation by notice sent by registered or certified mail, return
64 receipt requested, or personally delivered, to the address of the
65 health club specified in the contract upon the buyer's change of
66 permanent residence to a location more than 25 miles from the
67 health club or an affiliated health club offering the same or similar
68 services and facilities at no additional expense to the buyer. In a
69 cancellation under this subsection, the health club may require
70 proof of the new permanent residence and may retain a prorated
71 share of the total contract price based upon the date the notice
72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.
74    h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.
80    i. A health club services contract shall not obligate the buyer
81 to renew the contract.
82    j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.
1    5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.
5    b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the
8 assignee acquires the contract in good faith and for value.
1    6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.
1    7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the

App.133

6

4  health club is voidable at the option of the buyer of the contract.
5  Any health club services contract which does not comply with the
6  applicable provisions of this act is voidable at the option of the
7  buyer of the contract.
8    b. Any waiver by the buyer of the provisions of this act is void.

1    8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2  (C. 56:8–1 et seq.) to violate the provisions of this act.

1    9. The provisions of this act shall not apply to any nonprofit
2  public or private school, college or university; the State or any
3  of its political subdivisions; or any bona fide nonprofit, religious,
4  ethnic, or community organization.

1    10. The director shall adopt pursuant to the provisions of the
2  "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1
3  et seq.), rules and regulations necessary to effectuate the purposes
4  of this act.

1    11. This act shall take effect on the 120th day after enactment
2  and shall apply to all health club services contracts entered into
3  on or after the effective date.

---

### REGULATED PROFESSIONS
Regulates the sale of health club services.

---

App.134

# ASSEMBLY, No. 1163

Introduced Pending Technical Review by Legislative Counsel

PRE-FILED FOR INTRODUCTION IN THE 1986 SESSION

By Assemblyman ROCCO

SENATE COMMITTEE SUBSTITUTE FOR

## SENATE Nos. 1434, 1207 and

## ASSEMBLY No. 1155

[SECOND OFFICIAL COPY REPRINT]

# STATE OF NEW JERSEY

ADOPTED FEBRUARY 25, 1985

Sponsored by Senators CODEY and LASKIN
and Assemblyman ROCCO

AN ACT regulating the sellers of health club services and supplementing P. L. 1960. c. 39 (C. 56:8–1 et seq.).

1   BE IT ENACTED *by the Senate and General Assembly of the State*
2   *of New Jersey:*
1       1. As used in this act:
2       a. "Director" means the Director of the Division of Consumer
3   Affairs in the Department of Law and Public Safety.
4       b. "Health club" means an establishment which devotes or will
5   devote 40% or more of its square footage to providing services
6   or facilities for the preservation, maintenance, encouragement or
7   development of physical fitness or physical well-being. The term
8   includes an establishment designated as "reducing salon," "health
9   spa," "spa," "exercise gym," "health studio," "health club," or by
10  other terms of similar import.
11      c. "Health club services" means those services offered by a
12  health club for the preservation, maintenance, encouragement or
13  development of physical fitness or physical well-being.
14      d. "Health club services contract" means an agreement under
15  which the buyer of health club services purchases or becomes
16  obligated to purchase health club services.
17      e. "Operating day" means any calendar day on which patrons
18  may inspect and use the health club's facilities and services during
19  a period of at least eight hours, except holidays and Sundays.
1       2. Each person who sells or offers for sale health club services
2   in this State shall register with the director on forms the director
3   provides. The registration shall be renewed every two years. Upon
4   the sale of the health club facility or a change in the majority

App.135

2

5  ownership of the stock of the corporate owner, the health club
6  facility shall reregister with the director and shall pay the regis-
7  tration fee. The person shall provide the full name and address
8  of each business location where health club services are sold in the
9  State as well as any other information regarding the ownership
10  and operation of each health club that the director deems appro-
11  priate. The registration and renewal fees shall be established or
12  changed by the director and shall be fixed at a level to allow for
13  the proper administration and enforcement of this act, but shall
14  not be fixed at a level that will raise amounts in excess of the
15  amount estimated to be so required.

1   3. a. A person who sells or offers for sale health club services
2  shall, for each health club facility operated in the State, maintain
3  a bond issued by a surety authorized to transact business in this
4  State or maintain an irrevocable letter of credit by a bank or
5  maintain with the director securities, moneys or other security
6  acceptable to the director to fulfill the requirements of this sub-
7  section. The principal sum of the bond, letter of credit, or secur-
8  ities, moneys or other security shall be 10% of the health club's
9  gross income for health club services during the club's last fiscal
10  year, except that the principal sum of the bond, letter of credit,
11  or securities, moneys or other security shall not be less than
12  $25,000.00, nor more than $50,000.00. However, the principal sum
13  of the bond, letter of credit, or securities, moneys or other security
14  shall be $50,000.00 for any period of time that a person sells or
15  offers for sale health club services prior to the opening of the
16  health club facility. After the health club facility opens, the bond,
17  letter of credit, or securities, moneys or other security shall be
18  adjusted to the appropriate sum. The bond, letter of credit, or
19  securities, moneys or other security shall be filed or deposited with
20  the director and shall be executed to the State of New Jersey
21  for the use of any person who, after entering into a health club
22  services contract, is damaged or suffers any loss by reason of
23  breach of contract or bankruptcy by the seller. Any person claim-
24  ing against the bond, letter of credit, or securities, moneys, or other
25  security may maintain an action at law against the health club
26  and the surety, bank or director, as the case may be. The aggregate
27  liability of the surety, bank, or the director to all persons for all
28  breaches of the conditions of the bond, letter of credit, or the
29  securities, moneys or other security held by the director shall not
30  exceed the amount of the bond, letter of credit, or the securities,
31  moneys or other security held by the director.
32   In the case of a bond, the health club shall file a copy of the

App.136

3

33   bond with the director and a certificate by the surety that the
34   surety will notify the director at least 10 days in advance of the
35   date of any cancellation or material change in the bond.

36     b. The provisions of subsection a. of this section shall not be
37   applicable to a person who sells or offers for sale health club
38   services in which the buyer of the health club services purchases
39   or becomes obligated to purchase health club services to be rendered
40   over a period no longer than three months and in which the seller
41   of the health club services requires or collects no more than three
42   months' payment in advance. The person who sells or offers for
43   sale health club services under contracts provided for in this
44   subsection shall file with the director, within 30 days following
45   the effective date of this act and no later than January 15 of every
46   even-numbered year, a declaration, executed under penalty of per-
47   jury, stating he sells or offers for sale only health club services
48   under contracts which comply with this subsection. Any person
49   who has filed a declaration pursuant to this subsection and who
50   intends to sell or offer for sale health club services under contracts
51   with longer terms or greater payments in advance than those pro-
52   vided in this subsection shall comply with subsection a. of this
53   section.

1     4. a. Every contract for health club services shall be in writing.
2   A copy of the written contract shall be given to the buyer at the
3   time the buyer signs the contract.

4     b. A health club services contract shall specifically set forth in
5   a conspicuous manner on the first page of the contract the buyer's
6   total payment obligation for health club services to be received
7   pursuant to the contract.

8     c. A health club services contract of a health club facility which
9   maintains a bond, irrevocable letter of credit or securities, moneys
10   or other security pursuant to subsection a. of section 3 of this act
11   shall set forth that a bond, irrevocable letter of credit or securities,
12   moneys or other security is filed or deposited with the Director of
13   the Division of Consumer Affairs to protect buyers of these con-
14   tracts who are damaged or suffer any loss by reason of breach of
15   contract or bankruptcy by the seller.

16     d. Services to be rendered to the buyer under the contract shall
17   not obligate the buyer for more than three years from the date the
18   contract is signed by the buyer.

19     e. A contract for new or increased health club services may be
20   cancelled by the buyer for any reason at any time before midnight
21   of the third operating day after the buyer receives a copy of the
22   contract. In order to cancel a contract the buyer shall notify the

4

23  health club of cancellation in writing, by registered or certified
24  mail, return receipt requested, or personal delivery, to the address
25  specified in the contract. All moneys paid pursuant to the cancelled
26  contract shall be fully refunded within 30 days of receipt of the
27  notice of cancellation. If the customer has executed any **credit** or
28  loan agreement through the health club to pay all or part of health
29  club services, the negotiable instrument executed by the buyer
30  shall also be returned within 30 days. The contract shall contain
31  a conspicuous notice printed in at least 10-point bold-faced type
32  as follows:

"NOTICE TO CUSTOMER"

33    You are entitled to a copy of this contract at the time you sign it.
34    You may cancel this contract at any time before midnight of
35  the third operating day after receiving a copy of this contract.
36  If you choose to cancel this contract, you must either:
37    1. Send a signed and dated written notice of cancellation by
38  registered or certified mail, return receipt requested; or
39    2. Personally deliver a signed and dated written notice of can-
40  cellation to:
41  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (Name of health club)
42  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (Address of health club)
43    If you cancel this contract within the three-day period, you are
44  entitled to a full refund of your money. If the third operating
45  day falls on a Sunday or holiday, notice is timely given if it is
46  mailed or delivered as specified in this notice on the next operating
47  day. Refunds must be made within 30 days of receipt of the can-
48  cellation notice to the health club.
49    'Operating day' means any calendar day on which patrons may
50  inspect and use the health club's facilities and services during a
51  period of at least eight hours, except holidays and Sundays."
52    f. A health club services contract shall provide that it is subject
53  to cancellation by notice sent by registered or certified mail, return
54  receipt requested, or personally delivered, to the address of the
55  health club specified in the contract upon the buyer's death or
56  permanent disability, if the permanent disability is fully described
57  and confirmed to the health club by a physician. In a cancellation
58  under this subsection, the health club may retain the portion of
59  the total contract price representing the services used plus re-
60  imbursement for expenses incurred in an amount not to exceed
61  10% of the total contract price.
62    g. A health club services contract shall provide that it is subject
63  to cancellation by notice sent by registered or certified mail, return
64  receipt requested, or personally delivered, to the address of the

App.138

5

65  health club specified in the contract upon the buyer's change of
66  permanent residence to a location more than 25 miles from the
67  health club or an affiliated health club offering the same or similar
68  services and facilities at no additional expense to the buyer. In a
69  cancellation under this subsection, the health club may require
70  proof of the new permanent residence and may retain a prorated
71  share of the total contract price based upon the date the notice
72  was received plus reimbursement for expenses incurred in an
73  amount not to exceed 10% of the total contract price.
74      h. A health club services contract shall provide that if a health
75  club facility is closed for a period longer than 30 days through
76  no fault of the buyer of the health club services contract, the buyer
77  is entitled to either extend the contract for a period equal to that
78  during which the facility is closed or to receive a prorated refund
79  of the amount paid by the buyer under the contract.
80      i. A health club services contract shall not obligate the buyer
81  to renew the contract.
82      j. If a health club facility is not in existence on the date the
83  contract is executed, the health club services contract shall provide
84  that a buyer of a contract may cancel the contract if the facility
85  is not open for business on a date which shall be set forth in the
86  contract and receive a full refund of any deposit or payment on
87  the contract.
1      5. a. A health club services contract shall not require the execu-
2  tion of any note or series of notes by the buyer which, if separately
3  negotiated, will cut off as to third parties any right of action or
4  defense which the buyer has against the health club.
5      b. A right of action or defense arising out of a health club
6  services contract which the buyer has against the health club shall
7  not be cut off by assignment of the contract whether or not the as-
8  signee acquires the contract in good faith and for value.
1      6. A health club may not charge and accept a down payment
2  exceeding 25% of the total contract price prior to opening the
3  health club facility.
1      7. a. Any health club services contract entered into in reliance
2  upon any fraudulent or substantially and willfully false or mis-
3  leading information, representation, notice or advertisement of the
4  health club is voidable at the option of the buyer of the contract.
5  Any health club services contract which does not comply with the
6  applicable provisions of this act is voidable at the option of the
7  buyer of the contract.
8      b. Any waiver by the buyer of the provisions of this act is void.
1      8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2  (C. 56:8–1 et seq.) to violate the provisions of this act.

App.139

6

1    9. The provisions of this act shall not apply to any nonprofit
2  public or private school, college or university; the State or any
3  of its political subdivisions; or any bona fide nonprofit, religious,
4  ethnic, or community organization.

1    10. The director shall adopt pursuant to the provisions of the
2  "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1
3  et seq.), rules and regulations necessary to effectuate the purposes
4  of this act.

1    11. This act shall take effect on the 120th day after enactment
2  and shall apply to all health club services contracts entered into
3  on or after the effective date.

---

### STATEMENT

This bill provides for the registration and regulation of health
clubs. A health club is an establishment which devotes or will devote
40% or more of its square footage to providing services or facilities
for the preservation, maintenance, encouragement or development
of physical fitness or physical well-being.

Each health club which sells health club services must register
with the Director of the Division of Consumer Affairs. The health
club would also be required to maintain a bond, irrevocable letter of
credit, or securities or monies in the amount of 10% of the health
club's gross income for the past year, except that the amount shall
not be less than $25,000.00, nor more than $50,000.00. However, the
amount of the bond or other security shall be $50,000.00 during any
period of sales prior to the opening of the health club facility. The
bond or other security would be used to cover any loss or damage
suffered by a buyer of a health club services contract as a result of
breach of contract or bankruptcy. However, the bond or other
security would not have to be maintained by a health club if the
health club does not sell health club services contracts that exceed
three months' duration and require more than three months' pay-
ment in advance.

The bill contains other consumer protection provisions. Every
contract for health club services must be in writing and the buyer
must receive a copy when he signs the contract. These contracts
cannot exceed three years' duration. The bill provides for a three-
day cooling-off-period during which the buyer of health club
services may cancel the contract. Also, it provides that, if the buyer
of a contract dies, becomes permanently disabled or moves more
than 25 miles from the health club or affiliated health club, the con-
tract may be cancelled and a refund made to the buyer or estate for
the unused services less expenses incurred. Also, if for some reason

App.140

7

the health club is closed for longer than one month through no fault of the buyer of a contract, the buyer is entitled to extend his membership for a period equal to that during which the facility was closed or to receive a prorated refund of the amount he has paid under the contract. A health club services contract may not obligate the buyer to renew the contract. Lastly, the buyer of a health club services contract that is executed before the health club facility is opened may cancel the contract and receive a refund of any deposit or payment on the contract if the facility is not open for business on the date promised in the contract.

A health club may not charge or accept a down payment exceeding 25% of the contract price prior to opening the health club facility. Also, a buyer of a health club services contract may void a contract entered into in reliance upon any fraudulent or substantially and willfully false or misleading information or representation of the health club.

The provisions of this bill do not apply to schools, colleges, or universities; the State or its political subdivisions; or nonprofit, religious, ethnic, or community organizations.

The bill supplements the "consumer fraud act" (P. L. 1960, c. 39) and therefore makes violators of its provisions subject to the penalties and other sanctions provided in that law.

# SENATE, No. 913

Introduced Pending Technical Review by Legislative Counsel

PRE-FILED FOR INTRODUCTION IN THE 1986 SESSION

By Senator LASKIN

SENATE COMMITTEE SUBSTITUTE FOR

# SENATE Nos. 1434, 1207 and ASSEMBLY No. 1155

[Second Official Copy Reprint]

# STATE OF NEW JERSEY

ADOPTED FEBRUARY 25, 1985

Sponsored by Senators CODEY and LASKIN
and Assemblyman ROCCO

An Act regulating the sellers of health club services and supplementing P. L. 1960, c. 39 (C. 56:8–1 et seq.).

1   Be it enacted *by the Senate and General Assembly of the State*
2   *of New Jersey:*

1   1. As used in this act:
2      a. "Director" means the Director of the Division of Consumer
3   Affairs in the Department of Law and Public Safety.
4      b. "Health club" means an establishment which devotes or will
5   devote 40% or more of its square footage to providing services
6   or facilities for the preservation, maintenance, encouragement or
7   development of physical fitness or physical well-being. The term
8   includes an establishment designated as "reducing salon," "health
9   spa," "spa," "exercise gym," "health studio," "health club," or by
10  other terms of similar import.
11     c. "Health club services" means those services offered by a
12  health club for the preservation, maintenance, encouragement or
13  development of physical fitness or physical well-being.
14     d. "Health club services contract" means an agreement under
15  which the buyer of health club services purchases or becomes
16  obligated to purchase health club services.
17     e. "Operating day" means any calendar day on which patrons
18  may inspect and use the health club's facilities and services during
19  a period of at least eight hours, except holidays and Sundays.
1   2. Each person who sells or offers for sale health club services
2   in this State shall register with the director on forms the director
3   provides. The registration shall be renewed every two years. Upon
4   the sale of the health club facility or a change in the majority

2

5   ownership of the stock of the corporate owner, the health club
6   facility shall reregister with the director and shall pay the regis-
7   tration fee. The person shall provide the full name and address
8   of each business location where health club services are sold in the
9   State as well as any other information regarding the ownership
10  and operation of each health club that the director deems appro-
11  priate. The registration and renewal fees shall be established or
12  changed by the director and shall be fixed at a level to allow for
13  the proper administration and enforcement of this act, but shall
14  not be fixed at a level that will raise amounts in excess of the
15  amount estimated to be so required.

1   3. a. A person who sells or offers for sale health club services
2   shall, for each health club facility operated in the State, maintain
3   a bond issued by a surety authorized to transact business in this
4   State or maintain an irrevocable letter of credit by a bank or
5   maintain with the director securities, moneys or other security
6   acceptable to the director to fulfill the requirements of this sub-
7   section. The principal sum of the bond, letter of credit, or secur-
8   ities, moneys or other security shall be 10% of the health club's
9   gross income for health club services during the club's last fiscal
10  year, except that the principal sum of the bond, letter of credit,
11  or securities, moneys or other security shall not be less than
12  $25,000.00, nor more than $50,000.00. However, the principal sum
13  of the bond, letter of credit, or securities, moneys or other security
14  shall be $50,000.00 for any period of time that a person sells or
15  offers for sale health club services prior to the opening of the
16  health club facility. After the health club facility opens, the bond,
17  letter of credit, or securities, moneys or other security shall be
18  adjusted to the appropriate sum. The bond, letter of credit, or
19  securities, moneys or other security shall be filed or deposited with
20  the director and shall be executed to the State of New Jersey
21  for the use of any person who, after entering into a health club
22  services contract, is damaged or suffers any loss by reason of
23  breach of contract or bankruptcy by the seller. Any person claim-
24  ing against the bond, letter of credit, or securities, moneys, or other
25  security may maintain an action at law against the health club
26  and the surety, bank or director, as the case may be. The aggregate
27  liability of the surety, bank, or the director to all persons for all
28  breaches of the conditions of the bond, letter of credit, or the
29  securities, moneys or other security held by the director shall not
30  exceed the amount of the bond, letter of credit, or the securities,
31  moneys or other security held by the director.
32      In the case of a bond, the health club shall file a copy of the

3

33 bond with the director and a certificate by the surety that the
34 surety will notify the director at least 10 days in advance of the
35 date of any cancellation or material change in the bond.
36   b. The provisions of subsection a. of this section shall not be
37 applicable to a person who sells or offers for sale health club
38 services in which the buyer of the health club services purchases
39 or becomes obligated to purchase health club services to be rendered
40 over a period no longer than three months and in which the seller
41 of the health club services requires or collects no more than three
42 months' payment in advance. The person who sells or offers for
43 sale health club services under contracts provided for in this
44 subsection shall file with the director, within 30 days following
45 the effective date of this act and no later than January 15 of every
46 even-numbered year, a declaration, executed under penalty of per-
47 jury, stating he sells or offers for sale only health club services
48 under contracts which comply with this subsection. Any person
49 who has filed a declaration pursuant to this subsection and who
50 intends to sell or offer for sale health club services under contracts
51 with longer terms or greater payments in advance than those pro-
52 vided in this subsection shall comply with subsection a. of this
53 section.
1   4. a. Every contract for health club services shall be in writing.
2 A copy of the written contract shall be given to the buyer at the
3 time the buyer signs the contract.
4   b. A health club services contract shall specifically set forth in
5 a conspicuous manner on the first page of the contract the buyer's
6 total payment obligation for health club services to be received
7 pursuant to the contract.
8   c. A health club services contract of a health club facility which
9 maintains a bond, irrevocable letter of credit or securities, moneys
10 or other security pursuant to subsection a. of section 3 of this act
11 shall set forth that a bond, irrevocable letter of credit or securities,
12 moneys or other security is filed or deposited with the Director of
13 the Division of Consumer Affairs to protect buyers of these con-
14 tracts who are damaged or suffer any loss by reason of breach of
15 contract or bankruptcy by the seller.
16   d. Services to be rendered to the buyer under the contract shall
17 not obligate the buyer for more than three years from the date the
18 contract is signed by the buyer.
19   e. A contract for new or increased health club services may be
20 cancelled by the buyer for any reason at any time before midnight
21 of the third operating day after the buyer receives a copy of the
22 contract. In order to cancel a contract the buyer shall notify the

4

23  health club of cancellation in writing, by registered or certified
24  mail, return receipt requested, or personal delivery, to the address
25  specified in the contract. All moneys paid pursuant to the cancelled
26  contract shall be fully refunded within 30 days of receipt of the
27  notice of cancellation. If the customer has executed any credit or
28  loan agreement through the health club to pay all or part of health
29  club services, the negotiable instrument executed by the buyer
30  shall also be returned within 30 days. The contract shall contain
31  a conspicuous notice printed in at least 10-point bold-faced type
32  as follows:

"NOTICE TO CUSTOMER

33    You are entitled to a copy of this contract at the time you sign it.
34    You may cancel this contract at any time before midnight of
35  the third operating day after receiving a copy of this contract.
36  If you choose to cancel this contract, you must either:
37    1. Send a signed and dated written notice of cancellation by
38  registered or certified mail, return receipt requested; or
39    2. Personally deliver a signed and dated written notice of can-
40  cellation to:
41  .................................... (Name of health club)
42  .................................... (Address of health club)
43    If you cancel this contract within the three-day period, you are
44  entitled to a full refund of your money. If the third operating
45  day falls on a Sunday or holiday, notice is timely given if it is
46  mailed or delivered as specified in this notice on the next operating
47  day. Refunds must be made within 30 days of receipt of the can-
48  cellation notice to the health club.
49    'Operating day' means any calendar day on which patrons may
50  inspect and use the health club's facilities and services during a
51  period of at least eight hours, except holidays and Sundays."
52    f. A health club services contract shall provide that it is subject
53  to cancellation by notice sent by registered or certified mail, return
54  receipt requested, or personally delivered, to the address of the
55  health club specified in the contract upon the buyer's death or
56  permanent disability, if the permanent disability is fully described
57  and confirmed to the health club by a physician. In a cancellation
58  under this subsection, the health club may retain the portion of
59  the total contract price representing the services used plus re-
60  imbursement for expenses incurred in an amount not to exceed
61  10% of the total contract price.
62    g. A health club services contract shall provide that it is subject
63  to cancellation by notice sent by registered or certified mail, return
64  receipt requested, or personally delivered, to the address of the

App.145

5

65 health club specified in the contract upon the buyer's change of
66 permanent residence to a location more than 25 miles from the
67 health club or an affiliated health club offering the same or similar
68 services and facilities at no additional expense to the buyer. In a
69 cancellation under this subsection, the health club may require
70 proof of the new permanent residence and may retain a prorated
71 share of the total contract price based upon the date the notice
72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.

74 h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.

80 i. A health club services contract shall not obligate the buyer
81 to renew the contract.

82 j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.

1 5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.

5 b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the as-
8 signee acquires the contract in good faith and for value.

1 6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.

1 7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the
4 health club is voidable at the option of the buyer of the contract.
5 Any health club services contract which does not comply with the
6 applicable provisions of this act is voidable at the option of the
7 buyer of the contract.

8 b. Any waiver by the buyer of the provisions of this act is void.

1 8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2 (C. 56:8–1 et seq.) to violate the provisions of this act.

App.146

6

1    9. The provisions of this act shall not apply to any nonprofit
2  public or private school, college or university; the State or any
3  of its political subdivisions; or any bona fide nonprofit, religious,
4  ethnic, or community organization.

1    10. The director shall adopt pursuant to the provisions of the
2  "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1
3  et seq.), rules and regulations necessary to effectuate the purposes
4  of this act.

1    11. This act shall take effect on the 120th day after enactment
2  and shall apply to all health club services contracts entered into
3  on or after the effective date.

## STATEMENT

This bill provides for the registration and regulation of health clubs by the State.

# SENATE, No. 1308

# STATE OF NEW JERSEY

### PRE-FILED FOR INTRODUCTION IN THE 1986 SESSION

#### By Senator CODEY

An Act regulating the sellers of health club services and supplementing P. L. 1960, c. 39 (C. 56:8-1 et seq.).

1  BE IT ENACTED *by the Senate and General Assembly of the State*
2  *of New Jersey:*

1  1. As used in this act:
2  a. "Director" means the Director of the Division of Consumer
3  Affairs in the Department of Law and Public Safety.
4  b. "Health club" means an establishment which devotes or will
5  devote 40% or more of its square footage to providing services
6  or facilities for the preservation, maintenance, encouragement or
7  development of physical fitness or physical well-being. The term
8  includes an establishment designated as "reducing salon," "health
9  spa," "spa," "exercise gym," "health studio," "health club," or by
10  other terms of similar import.
11  c. "Health club services" means those services offered by a
12  health club for the preservation, maintenance, encouragement or
13  development of physical fitness or physical well-being.
14  d. "Health club services contract" means an agreement under
15  which the buyer of health club services purchases or becomes
16  obligated to purchase health club services.
17  e. "Operating day" means any calendar day on which patrons
18  may inspect and use the health club's facilities and services during
19  a period of at least eight hours, except holidays and Sundays.
1  2. Each person who sells or offers for sale health club services
2  in this State shall register with the director on forms the director
3  provides. The registration shall be renewed every two years. Upon
4  the sale of the health club facility or a change in the majority

App.148

2

5 ownership of the stock of the corporate owner, the health club
6 facility shall reregister with the director and shall pay the regis-
7 tration fee. The person shall provide the full name and address
8 of each business location where health club services are sold in the
9 State as well as any other information regarding the ownership
10 and operation of each health club that the director deems appro-
11 priate. The registration and renewal fees shall be established or
12 changed by the director and shall be fixed at a level to allow for
13 the proper administration and enforcement of this act, but shall
14 not be fixed at a level that will raise amounts in excess of the
15 amount estimated to be so required.

1     3. a. A person who sells or offers for sale health club services
2 shall maintain a bond issued by a surety authorized to transact
3 business in this State or maintain an irrevocable letter of credit by
4 a bank or maintain with the director securities, moneys or other
5 security acceptable to the director to fulfill the requirements of
6 this subsection. The principal sum of the bond, letter of credit,
7 or securities, moneys or other security shall be according to the fol-
8 lowing schedule: one location $25,000.00; two locations $50,000.00;
9 three locations $75,000.00; four or five locations $100,000.00; six
10 or seven locations $120,000.00; eight or nine locations $140,000.00;
11 and 10 or more locations $150,000.00. The bond, letter of credit, or
12 securities, moneys or other security shall be filed or deposited with
13 the director and shall be executed to the State of New Jersey
14 for the use of any person who, after entering into a health club
15 services contract, is damaged or suffers any loss by reason of
16 breach of contract or bankruptcy by the seller. Any person claim-
17 ing against the bond, letter of credit, or securities, moneys, or other
18 security may maintain an action at law against the health club
19 and the surety, bank or director, as the case may be. The aggregate
20 liability of the surety, bank, or the director to all persons for all
21 breaches of the conditions of the bond, letter of credit, or the
22 securities, moneys or other security held by the director shall not
23 exceed the amount of the bond, letter or credit, or the securities,
24 moneys or other security held by the director.

25    In the case of a bond, the health club, shall file a copy of the
26 bond with the director and a certificate by the surety that the
27 surety will notify the director at least 10 days in advance of the
28 date of any cancellation or material change in the bond.

29    b. The provisions of subsection a. of this section shall not be
30 applicable to a person who sells or offers for sale health club
31 services in which the buyer of the health club services purchases
32 or becomes obligated to purchase health club services to be rendered

3

33 over a period no longer than three months and in which the seller
34 of the health club services requires or collects no more than three
35 months' payment in advance. The person who sells or offers for
36 sale health club services under contracts provided for in this
37 subsection shall file with the director, within 30 days following
38 the effective date of this act and no later than January 15 of every
39 even-numbered year, a declaration, executed under penalty of per-
40 jury, stating he sells or offers for sale only health club services
41 under contracts which comply with this subsection. Any person
42 who has filed a declaration pursuant to this subsection and who
43 intends to sell or offer for sale health club services under contracts
44 with longer terms or greater payments in advance than those pro-
45 vided in this subsection shall comply with subsection a. of this
46 section.

1    4. a. Every contract for health club services shall be in writing.
2 A copy of the written contract shall be given to the buyer at the
3 time the buyer signs the contract.
4    b. A health club services contract shall specifically set forth in
5 a conspicuous manner on the first page of the contract the buyer's
6 total payment obligation for health club services to be received
7 pursuant to the contract.
8    c. A health club services contract of a health club facility which
9 maintains a bond, irrevocable letter of credit or securities, moneys
10 or other security pursuant to subsection a. of section 3 of this act
11 shall set forth that a bond, irrevocable letter of credit or securities,
12 moneys or other security is filed or deposited with the Director of
13 the Division of Consumer Affairs to protect buyers of these con-
14 tracts who are damaged or suffer any loss by reason of breach of
15 contract or bankruptcy by the seller.
16    d. Services to be rendered to the buyer under the contract shall
17 not obligate the buyer for more than three years from the date the
18 contract is signed by the buyer.
19    e. A contract for new or increased health club services may be
20 cancelled by the buyer for any reason at any time before midnight
21 of the third operating day after the buyer receives a copy of the
22 contract. In order to cancel a contract the buyer shall notify the
23 health club of cancellation in writing, by registered or certified
24 mail, return receipt requested, or personal delivery, to the address
25 specified in the contract. All moneys paid pursuant to the cancelled
26 contract shall be fully refunded within 30 days of receipt of the
27 notice of cancellation. If the customer has executed any credit or
28 loan agreement through the health club to pay all or part of health
29 club services, the negotiable instrument executed by the buyer

App.150

4

30 shall also be returned within 30 days. The contract shall contain
31 a conspicuous notice printed in at least 10-point bold-faced type
32 as follows:

"NOTICE TO CUSTOMER

33     You are entitled to a copy of this contract at the time you sign it.

34     You may cancel this contract at any time before midnight of
35 the third operating day after receiving a copy of this contract.
36 If you choose to cancel this contract, you must either:

37     1. Send a signed and dated written notice of cancellation by
38 registered or certified mail, return receipt requested; or

39     2. Personally deliver a signed and dated written notice of can-
40 cellation to:

41 .................................... (Name of health club)

42 .................................... (Address of health club)

43     If you cancel this contract within the three-day period, you are
44 entitled to a full refund of your money. If the third operating
45 day falls on a Sunday or holiday, notice is timely given if it is
46 mailed or delivered as specified in this notice on the next operating
47 day. Refunds must be made within 30 days of receipt of the can-
48 cellation notice to the health club.

49     'Operating day' means any calendar day on which patrons may
50 inspect and use the health club's facilities and services during a
51 period of at least eight hours, except holidays and Sundays."

52     f. A health club services contract shall provide that it is subject
53 to cancellation by notice sent by registered or certified mail, return
54 receipt requested, or personally delivered, to the address of the
55 health club specified in the contract upon the buyer's death or
56 permanent disability, if the permanent disability is fully described
57 and confirmed to the health club by a physician. In a cancellation
58 under this subsection, the health club may retain the portion of
59 the total contract price representing the services used plus re-
60 imbursement for expenses incurred in an amount not to exceed
61 10% of the total contract price.

62     g. A health club services contract shall provide that it is subject
63 to cancellation by notice sent by registered or certified mail, return
64 receipt requested, or personally delivered, to the address of the
65 health club specified in the contract upon the buyer's change of
66 permanent residence to a location more than 25 miles from the
67 health club or an affiliated health club offering the same or similar
68 services and facilities at no additional expense to the buyer. In a
69 cancellation under this subsection, the health club may require
70 proof of the new permanent residence and may retain a prorated
71 share of the total contract price based upon the date the notice

5

72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.

74 h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.

80 i. A health club services contract shall not obligate the buyer
81 to renew the contract.

82 j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.

1 5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.

5 b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the
8 assignee acquires the contract in good faith and for value.

1 6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.

1 7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the
4 health club is voidable at the option of the buyer of the contract.
5 Any health club services contract which does not comply with the
6 applicable provisions of this act is voidable at the option of the
7 buyer of the contract.

8 b. Any waiver by the buyer of the provisions of this act is void.

1 8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2 (C. 56:8-1 et seq.) to violate the provisions of this act.

1 9. The provisions of this act shall not apply to any nonprofit
2 public or private school, college or university; the State or any
3 of its political subdivisions; or any bona fide nonprofit, religious,
4 ethnic, or community organization.

1 10. The director shall adopt pursuant to the provisions of the
2 "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B-1

App.152

6

3  et seq.), rules and regulations necessary to effectuate the purposes
4  of this act.
1      11. This act shall take effect on the 120th day after enactment
2  and shall apply to all health club services contracts entered into
3  on or after the effective date.

————————

### STATEMENT

   This bill provides for the registration and regulation of health
clubs. A health club is an establishment which devotes or will
devote 40% or more of its square footage to providing services or
facilities for the preservation, maintenance, encouragement or
development of physical fitness or physical well-being.

————————

**ASSEMBLY HIGHER EDUCATION AND REGULATED
PROFESSIONS COMMITTEE**

STATEMENT TO

SENATE COMMITTEE SUBSTITUTE FOR

# SENATE Nos. 1308, 913 and
# ASSEMBLY No. 1163

# STATE OF NEW JERSEY

DATED: JUNE 22, 1987

The Assembly Higher Education and Regulated Professions Committee favorably reports the Senate Committee Substitute for Senate Bill No. 1308, Senate Bill No. 913 and Assembly Bill No. 1163.

This bill provides for the registration and regulation of health clubs. Under the bill's provisions, a health club is defined as an establishment which devotes 40% or more of its square footage to providing services or facilities for the preservation, maintenance, encouragement or development of physical fitness or physical well being.

The bill stipulates that any person who sells health club services must register with the Director of the Division of Consumer Affairs. Also, a health club must maintain a bond, letter of credit or securities, moneys or other security in an amount which represents 10% of the club's gross income for the previous fiscal year. The principal sum of the bond or other security shall be not less than $25,000.00 nor more than $50,000.00; except that for any period of time in which a person sells health club services prior to the opening of the facility, the principal sum shall be $50,000.00. The bond or security is to be filed with the Director of the Division of Consumer Affairs and is to be available for claims made by persons who suffer any loss as a result of a breach of contract or the bankruptcy of the seller of health club services. A bond or security would not have to be maintained, however, by a health club if the club does not sell health club services contracts that exceed three months in duration and require more than three months payment in advance.

This bill also provides the following consumer protection provisions:

1. A health club services contract must be in writing and a copy given to the buyer at the time of signature;

2. A buyer shall not be obligated under the contract for more than three years from the date of signature;

3. A buyer shall have three operating days from the date of receipt of the contract to cancel and is entitled to a full refund within 30 days of the club's receipt of the notice of cancellation;

App.154

2

4. A buyer may cancel the contract if he suffers a permanent disability which is confirmed by a physician or if he moves his permanent residence to a location more than 25 miles from the club or an affiliate which offers similar services;

5. If the health club is closed for a period longer than 30 days, the buyer is entitled to extend the contract or receive a prorated refund; and

6. A buyer may cancel the contract if the facility is not opened for business on the promised date.

Finally, the bill supplements the "consumer fraud act" (P. L. 1960, c. 39) and therefore makes violators of its provisions subject to the penalties in that law.

SENATE LABOR, INDUSTRY AND PROFESSIONS
COMMITTEE

STATEMENT TO

SENATE COMMITTEE SUBSTITUTE FOR

SENATE Nos. 1308, 913 and
ASSEMBLY No. 1163

# STATE OF NEW JERSEY

DATED: MAY 21, 1987

This bill, Senate Committee Substitute for Senate Bill Nos. 1308,
913 and Assembly Bill No. 1163, provides for the registration and
regulation of health clubs. A health club is an establishment which
devotes or will devote 40% or more of its square footage to providing
services or facilities for the preservation, maintenance, encouragement
or development of physical fitness or physical well-being.

Each health club must register with the Director of the Division of
Consumer Affairs. Each health club would be required to maintain a
bond, irrevocable letter of credit, or securities or moneys in the amount
of 10% of the health club's gross income for the past fiscal year,
except that the amount could not be less than $25,000.00, nor more than
$50,000.00. However, the amount of the bond or other security would
be required to be $50,000.00 during any period of sales prior to the
opening of the health club facility. The bond or other security would
be used to cover any loss or damage suffered by a buyer of a health
club services contract as a result of breach of contract or bankruptcy.
However, the bond or other security would not have to be maintained
by a health club if the health club does not sell health club services
contracts that exceed three months' duration or that require more than
three months' payment in advance.

The bill contains other consumer protection provisions. Every con-
tract for health club services must be in writing and the buyer must
receive a copy when he signs the contract. These contracts cannot
exceed three years' duration. The bill provides for a three-day cooling-
off-period during which the buyer of health club services may cancel
the contract. Also, if the buyer of a contract dies, becomes permanently
disabled or moves more than 25 miles from the health club or an
affiliated health club, the contract may be cancelled and a refund made
to the buyer or estate for the unused services less expenses incurred.
Further, if for some reason the health club is closed for longer than

App.156

2

one month through no fault of the buyer of a contract, the buyer is
entitled to extend his membership for a period equal to that during
which the facility was closed or to receive a prorated refund of the
amount he has paid under the contract. A health club services contract
may not obligate the buyer to renew the contract. Lastly, the buyer
of a health club services contract that is executed before the health
club facility is opened may cancel the contract and receive a refund
of any deposit or payment on the contract if the facility is not open
for business on the date promised in the contract.

A health club may not charge or accept a down payment exceeding
25% of the contract price prior to opening the health club facility.
Also, a buyer of a health club services contract may void a contract
entered into in reliance upon any fraudulent or substantially and
willfully false or misleading information or representation of the
health club.

The provisions of this bill do not apply to schools, colleges, or uni-
versities; the State or its political subdivisions or nonprofit, religious,
ethnic, or community organizations.

The bill supplements the consumer fraud act (P. L. 1960, c. 39) and
therefore makes violations of its provisions subject to the penalties
and the other sanctions provided in that law.

# OFFICE OF THE GOVERNOR
## NEWS RELEASE

**CN-001**
**Contact:** JOHN SAMERJAN
609-292-8956 OR 292-6000 EXT. 207

**TRENTON, N.J. 08625**
**Release:** WED., AUG. 12, 1987

Governor Thomas H. Kean today signed legislation regulating the financial and contractual aspects of health club services.

The legislation, S-1308/913/A-1163, sponsored by Senator Richard Codey, D-Essex, Senator Lee Laskin, R-Camden and Assemblyman John Rocco, R-Camden, supplements the Consumer Fraud Act to protect consumers against fraudulent practices when health spas go out of business and fail to meet their obligations.

Among the provisions of the legislation is the requirement of sellers of health club services to maintain a bond to protect buyers of such services who suffer a loss by the breaching of the agreement by the health spa. The principle sum of this security shall be not less than $25,000 nor more than $50,000.

Further, every contract for health club services is required to be in writing, shall not obligate the buyer for more than three years, and shall set forth in a clear manner the buyer's total payment obligation.

The Division of Consumer Affairs in the Department of Law and Public Safety will implement the legislation.

The legislation is effective in 120 days.

Governor Kean today also signed legislation expanding the types of claims the New Jersey Surplus Lines Guaranty Fund covers to include claims arising out of the insolvency of the Northeastern Fire Insurance Company.

-more-

App.158



NT - Consumer

# Health club
## regulations
# become law

SL 8/13/87

Gov. Thomas Kean signed legislation yesterday that imposes stringent regulations on health clubs and provides customers with protection from unscrupulous club operators.

The measure, signed by Kean without comment, requires health club operators to register with the Office of Consumer Affairs and post a security bond. In addition, customers would have a three-day review period to back out of any membership contract and the club could not offer any contract that exceeds three years.

The legislation (S-1308/A-1163) was sponsored by Sen. Richard Codey (D-Essex), Sen. Lee Laskin (R-Camden) and Assemblyman John Rocco (R-Camden).

Among other things, the law would require new health clubs to post a $50,000 security bond if any memberships are sold before the facility opens. Clubs already in operation would have to post a security bond of up to 10 percent of the gross income from the previous year. The minimum would be $25,000 and the maximum $50,000.

In addition, clubs could not collect more than a 25 percent down payment on contracts before opening.

"Too many people have found out the hard way that so-called lifetime memberships are only good for the lifetime of the corporation—not the lifetime of the health club member," said Codey.

Laskin noted that a few years ago there was a sudden rash of health club closings, after thousands of consumers had joined.

"In many instances these individuals paid substantial advance membership fees which they lost when the club they had joined suddenly vanished in the middle of the night or was forced into bankruptcy," Laskin said.

Rocco echoed these statements saying many "fly-by-night" health club operators have no assets to liquidate if the business fails.

"This left members and other creditors out in the cold with no recourse to recoup their money," he added.

The law also calls for a prorated refund if a member dies, is disabled or moves more than 25 miles away from the facility.

The Division of Consumer Affairs will implement the law which will become effective in 120 days.

EXHIBIT C

56:8-39  to  56:8-48

## LEGISLATIVE HISTORY CHECKLIST

**NJSA:**      56:8-39 to 56:8-48          (Health clubs-- regulate)

**LAWS OF:**  1987                          **CHAPTER:** 238

**Bill No:**  S1308, S913, A1163

**Sponsor(s):**  Codey and Laskin

**Date Introduced:**  Pre-filed

**Committee:**        **Assembly:** Higher Education and Regulated Professions

                     **Senate:**  Labor, Industry and Professions

**Amended during passage:**      Yes          Amendments during passage denoted
                                              by asterisks.

**Date of Passage:**      **Assembly:**   June 29, 1987

                         **Senate:**  June 18, 1987

**Date of Approval:**  August 12, 1987

**Following statements are attached if available:**

**Sponsor statement:**                        Yes

**Committee statement:**       **Assembly**    Yes

                              **Senate**     Yes

**Fiscal Note:**                              No

**Veto Message:**                             No

**Message on Signing:**                       Yes

**Following were printed:**

**Reports:**                                  No

**Hearings:**                                 No

See newspaper clippings-- attached:

"Health club regulations become law", 8-13-87 <u>Star Ledger.</u>

REPOSITORY COPY
Do Not Remove From Library

App.161

CHAPTER 238 LAWS OF N. J. 1987
APPROVED 8/12/87

SENATE COMMITTEE SUBSTITUTE FOR

**SENATE Nos. 1308, 913 and
ASSEMBLY No. 1163**

# STATE OF NEW JERSEY

ADOPTED MAY 21, 1987

Sponsored by Senators CODEY and LASKIN
and Assemblyman ROCCO

An Act regulating the sellers of health club services and supplementing P. L. 1960, c. 39 (C. 56:8–1 et seq.).

1    Be it enacted by the Senate and General Assembly of the State
2   of New Jersey:
1     1. As used in this act:
2     a. "Director" means the Director of the Division of Consumer
3   Affairs in the Department of Law and Public Safety.
4     b. "Health club" means an establishment which devotes or will
5   devote 40% or more of its square footage to providing services
6   or facilities for the preservation, maintenance, encouragement or
7   development of physical fitness or physical well-being. The term
8   includes an establishment designated as "reducing salon," "health
9   spa," "spa," "exercise gym," "health studio," "health club" or by
10   other terms of similar import.
11    c. "Health club services" means those services offered by a
12   health club for the preservation, maintenance, encouragement or
13   development of physical fitness or physical well-being.
14    d. "Health club services contract" means an agreement under
15   which the buyer of health club services purchases or becomes
16   obligated to purchase health club services.
17    e. "Operating day" means any calendar day on which patrons
18   may inspect and use the health club's facilities and services during
19   a period of at least eight hours, except holidays and Sundays.

App.162

2

1    2. Each person who sells or offers for sale health club services
2    in this State shall register with the director on forms the director
3    provides. The registration shall be renewed every two years. Upon
4    the sale of the health club facility or a change in the majority
5    ownership of the stock of the corporate owner, the health club
6    facility shall reregister with the director and shall pay the regis-
7    tration fee. The person shall provide the full name and address
8    of each business location where health club services are sold in the
9    State as well as any other information regarding the ownership
10    and operation of each health club that the director deems appro-
11    priate. The registration and renewal fees shall be established or
12    changed by the director and shall be fixed at a level to allow for
13    the proper administration and enforcement of this act, but shall
14    not be fixed at a level that will raise amounts in excess of the
15    amount estimated to be so required.

1    3. a. A person who sells or offers for sale health club services
2    shall, for each health club facility operated in the State, maintain
3    a bond issued by a surety authorized to transact business in this
4    State or maintain an irrevocable letter of credit by a bank or
5    maintain with the director securities, moneys or other security
6    acceptable to the director to fulfill the requirements of this sub-
7    section. The principal sum of the bond, letter of credit, or secur-
8    ities, moneys or other security shall be 10% of the health club's
9    gross income for health club services during the club's last fiscal
10    year, except that the principal sum of the bond, letter of credit,
11    or securities, moneys or other security shall not be less than
12    $25,000.00, nor more than $50,000.00. However, the principal sum
13    of the bond, letter of credit, or securities, moneys or other security
14    shall be $50,000.00 for any period of time that a person sells or
15    offers for sale health club services prior to the opening of the
16    health club facility. After the health club facility opens, the bond,
17    letter of credit, or securities, moneys or other security shall be
18    adjusted to the appropriate sum. The bond, letter of credit, or
19    securities, moneys or other security shall be filed or deposited with
20    the director and shall be excuted to the State of New Jersey
21    for the use of any person who, after entering into a health club
22    services contract, is damaged or suffers any loss by reason of
23    breach of contract or bankruptcy by the seller. Any person claim-
24    ing against the bond, letter of credit, or securities, moneys, or other
25    security may maintain an action at law against the health club
26    and the surety, bank or director, as the case may be. The aggregate
27    liability of the surety, bank, or the director to all persons for all
28    breaches of the conditions of the bond, letter of credit, or the

App.163

3

29   securities, moneys or other security held by the director shall not
30   exceed the amount of the bond, letter of credit, or the securities,
31   moneys or other security held by the director.

32       In the case of a bond, the health club shall file a copy of the
33   bond with the director and a certificate by the surety that the
34   surety will notify the director at least 10 days in advance of the
35   date of any cancellation or material change in the bond.

36       b. The provisions of subsection a. of this section shall not be
37   applicable to a person who sells or offers for sale health club
38   services in which the buyer of the health club services purchases
39   or becomes obligated to purchase health club services to be rendered
40   over a period no longer than three months and in which the seller
41   of the health club services requires or collects no more than three
42   months' payment in advance. The person who sells or offers for
43   sale health club services under contracts provided for in this
44   subsection shall file with the director, within 30 days following
45   the effective date of this act and no later than January 15 of every
46   even-numbered year, a declaration, executed under penalty of per-
47   jury, stating he sells or offers for sale only health club services
48   under contracts which comply with this subsection. Any person
49   who has filed a declaration pursuant to this subsection and who
50   intends to sell or offer for sale health club services under contracts
51   with longer terms or greater payments in advance than those pro-
52   vided in this subsection shall comply with subsection a. of this
53   section.

1        4. a. Every contract for health club services shall be in writing.
2   A copy of the written contract shall be given to the buyer at the
3   time the buyer signs the contract.

4        b. A health club services contract shall specifically set forth in
5   a conspicuous manner on the first page of the contract the buyer's
6   total payment obligation for health club services to be received
7   pursuant to the contract.

8        c. A health club services contract of a health club facility which
9   maintains a bond, irrevocable letter of credit or securities, moneys
10   or other security pursuant to subsection a. of section 3 of this act
11   shall set forth that a bond, irrevocable letter of credit or securities,
12   moneys or other security is filed or deposited with the Director of
13   the Division of Consumer Affairs to protect buyers of these con-
14   tracts who are damaged or suffer any loss by reason of breach of
15   contract or bankruptcy by the seller.

16       d. Services to be rendered to the buyer under the contract shall
17   not obligate the buyer for more than three years from the date the
18   contract is signed by the buyer.

4

19    e. A contract for new or increased health club services may be
20  cancelled by the buyer for any reason at any time before midnight
21  of the third operating day after the buyer receives a copy of the
22  contract. In order to cancel a contract the buyer shall notify the
23  health club of cancellation in writing, by registered or certified
24  mail, return receipt requested, or personal delivery, to the address
25  specified in the contract. All moneys paid pursuant to the cancelled
26  contract shall be fully refunded within 30 days of receipt of the
27  notice of cancellation. If the customer has executed any credit or
28  loan agreement through the health club to pay all or part of health
29  club services, the negotiable instrument executed by the buyer
30  shall also be returned within 30 days. The contract shall contain
31  a conspicuous notice printed in at least 10-point bold-faced type
32  as follows:

### "NOTICE TO CUSTOMER

33    You are entitled to a copy of this contract at the time you sign it.
34    You may cancel this contract at any time before midnight of
35  the third operating day after receiving a copy of this contract.
36  If you choose to cancel this contract, you must either:
37    1. Send a signed and dated written notice of cancellation by
38  registered or certified mail, return receipt requested; or
39    2. Personally deliver a signed and dated written notice of can-
40  cellation to:
41  .................................... (Name of health club)
42  .................................... (Address of health club)
43    If you cancel this contract within the three-day period, you are
44  entitled to a full refund of your money. If the third operating
45  day falls on a Sunday or holiday, notice is timely given if it is
46  mailed or delivered as specified in this notice on the next operating
47  day. Refunds must be made within 30 days of receipt of the can-
48  cellation notice to the health club.
49    'Operating day' means any calendar day on which patrons may
50  inspect and use the health club's facilities and services during a
51  period of at least eight hours, except holidays and Sundays."
52    f. A health club services contract shall provide that it is subject
53  to cancellation by notice sent by registered or certified mail, return
54  receipt requested, or personally delivered, to the address of the
55  health club specified in the contract upon the buyer's death or
56  permanent disability, if the permanent disability is fully described
57  and confirmed to the health club by a physician. In a cancellation
58  under this subsection, the health club may retain the portion of
59  the total contract price representing the services used plus re-

App.165

5

60 imbursement for expenses incurred in an amount not to exceed
61 10% of the total contract price.
62   g. A health club services contract shall provide that it is subject
63 to cancellation by notice sent by registered or certified mail, return
64 receipt requested, or personally delivered, to the address of the
65 health club specified in the contract upon the buyer's change of
66 permanent residence to a location more than 25 miles from the
67 health club or an affiliated health club offering the same or similar
68 services and facilities at no additional expense to the buyer. In a
69 cancellation under this subsection, the health club may require
70 proof of the new permanent residence and may retain a prorated
71 share of the total contract price based upon the date the notice
72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.
74   h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.
80   i. A health club services contract shall not obligate the buyer
81 to renew the contract.
82   j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.
1   5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.
5   b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the
8 assignee acquires the contract in good faith and for value.
1   6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.
1   7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the

App.166

6

4  health club is voidable at the option of the buyer of the contract.
5  Any health club services contract which does not comply with the
6  applicable provisions of this act is voidable at the option of the
7  buyer of the contract.
8  b. Any waiver by the buyer of the provisions of this act is void.
1  8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2  (C. 56:8–1 et seq.) to violate the provisions of this act.
1  9. The provisions of this act shall not apply to any nonprofit
2  public or private school, college or university; the State or any
3  of its political subdivisions; or any bona fide nonprofit, religious,
4  ethnic, or community organization.
1  10. The director shall adopt pursuant to the provisions of the
2  "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1
3  et seq.), rules and regulations necessary to effectuate the purposes
4  of this act.
1  11. This act shall take effect on the 120th day after enactment
2  and shall apply to all health club services contracts entered into
3  on or after the effective date.

---

**REGULATED PROFESSIONS**

Regulates the sale of health club services.

---

App.167

# ASSEMBLY, No. 1163

Introduced Pending Technical Review by Legislative Counsel

PRE-FILED FOR INTRODUCTION IN THE 1986 SESSION

By Assemblyman ROCCO

SENATE COMMITTEE SUBSTITUTE FOR

## SENATE Nos. 1434, 1207 and

## ASSEMBLY No. 1155

[SECOND OFFICIAL COPY REPRINT]

# STATE OF NEW JERSEY

ADOPTED FEBRUARY 25, 1985

Sponsored by Senators CODEY and LASKIN
and Assemblyman ROCCO

AN ACT regulating the sellers of health club services and supplementing P. L. 1960. c. 39 (C. 56:8–1 et seq.).

1     BE IT ENACTED *by the Senate and General Assembly of the State*
2 *of New Jersey:*

1     1. As used in this act:
2     a. "Director" means the Director of the Division of Consumer
3 Affairs in the Department of Law and Public Safety.
4     b. "Health club" means an establishment which devotes or will
5 devote 40% or more of its square footage to providing services
6 or facilities for the preservation, maintenance, encouragement or
7 development of physical fitness or physical well-being. The term
8 includes an establishment designated as "reducing salon," "health
9 spa," "spa," "exercise gym," "health studio," "health club," or by
10 other terms of similar import.
11     c. "Health club services" means those services offered by a
12 health club for the preservation, maintenance, encouragement or
13 development of physical fitness or physical well-being.
14     d. "Health club services contract" means an agreement under
15 which the buyer of health club services purchases or becomes
16 obligated to purchase health club services.
17     e. "Operating day" means any calendar day on which patrons
18 may inspect and use the health club's facilities and services during
19 a period of at least eight hours, except holidays and Sundays.

1     2. Each person who sells or offers for sale health club services
2 in this State shall register with the director on forms the director
3 provides. The registration shall be renewed every two years. Upon
4 the sale of the health club facility or a change in the majority

App.168

2

5  ownership of the stock of the corporate owner, the health club
6  facility shall reregister with the director and shall pay the regis-
7  tration fee. The person shall provide the full name and address
8  of each business location where health club services are sold in the
9  State as well as any other information regarding the ownership
10  and operation of each health club that the director deems appro-
11  priate. The registration and renewal fees shall be established or
12  changed by the director and shall be fixed at a level to allow for
13  the proper administration and enforcement of this act, but shall
14  not be fixed at a level that will raise amounts in excess of the
15  amount estimated to be so required.

1    3. a. A person who sells or offers for sale health club services
2  shall, for each health club facility operated in the State, maintain
3  a bond issued by a surety authorized to transact business in this
4  State or maintain an irrevocable letter of credit by a bank or
5  maintain with the director securities, moneys or other security
6  acceptable to the director to fulfill the requirements of this sub-
7  section. The principal sum of the bond, letter of credit, or secur-
8  ities, moneys or other security shall be 10% of the health club's
9  gross income for health club services during the club's last fiscal
10  year, except that the principal sum of the bond, letter of credit,
11  or securities, moneys or other security shall not be less than
12  $25,000.00, nor more than $50,000.00. However, the principal sum
13  of the bond, letter of credit, or securities, moneys or other security
14  shall be $50,000.00 for any period of time that a person sells or
15  offers for sale health club services prior to the opening of the
16  health club facility. After the health club facility opens, the bond,
17  letter of credit, or securities, moneys or other security shall be
18  adjusted to the appropriate sum. The bond, letter of credit, or
19  securities, moneys or other security shall be filed or deposited with
20  the director and shall be executed to the State of New Jersey
21  for the use of any person who, after entering into a health club
22  services contract, is damaged or suffers any loss by reason of
23  breach of contract or bankruptcy by the seller. Any person claim-
24  ing against the bond, letter of credit, or securities, moneys, or other
25  security may maintain an action at law against the health club
26  and the surety, bank or director, as the case may be. The aggregate
27  liability of the surety, bank, or the director to all persons for all
28  breaches of the conditions of the bond, letter of credit, or the
29  securities, moneys or other security held by the director shall not
30  exceed the amount of the bond, letter of credit, or the securities,
31  moneys or other security held by the director.
32    In the case of a bond, the health club shall file a copy of the

3

33 bond with the director and a certificate by the surety that the
34 surety will notify the director at least 10 days in advance of the
35 date of any cancellation or material change in the bond.

36    b. The provisions of subsection a. of this section shall not be
37 applicable to a person who sells or offers for sale health club
38 services in which the buyer of the health club services purchases
39 or becomes obligated to purchase health club services to be rendered
40 over a period no longer than three months and in which the seller
41 of the health club services requires or collects no more than three
42 months' payment in advance. The person who sells or offers for
43 sale health club services under contracts provided for in this
44 subsection shall file with the director, within 30 days following
45 the effective date of this act and no later than January 15 of every
46 even-numbered year, a declaration, executed under penalty of per-
47 jury, stating he sells or offers for sale only health club services
48 under contracts which comply with this subsection. Any person
49 who has filed a declaration pursuant to this subsection and who
50 intends to sell or offer for sale health club services under contracts
51 with longer terms or greater payments in advance than those pro-
52 vided in this subsection shall comply with subsection a. of this
53 section.

1    4. a. Every contract for health club services shall be in writing.
2 A copy of the written contract shall be given to the buyer at the
3 time the buyer signs the contract.

4    b. A health club services contract shall specifically set forth in
5 a conspicuous manner on the first page of the contract the buyer's
6 total payment obligation for health club services to be received
7 pursuant to the contract.

8    c. A health club services contract of a health club facility which
9 maintains a bond, irrevocable letter of credit or securities, moneys
10 or other security pursuant to subsection a. of section 3 of this act
11 shall set forth that a bond, irrevocable letter of credit or securities,
12 moneys or other security is filed or deposited with the Director of
13 the Division of Consumer Affairs to protect buyers of these con-
14 tracts who are damaged or suffer any loss by reason of breach of
15 contract or bankruptcy by the seller.

16    d. Services to be rendered to the buyer under the contract shall
17 not obligate the buyer for more than three years from the date the
18 contract is signed by the buyer.

19    e. A contract for new or increased health club services may be
20 cancelled by the buyer for any reason at any time before midnight
21 of the third operating day after the buyer receives a copy of the
22 contract. In order to cancel a contract the buyer shall notify the

4

23 health club of cancellation in writing, by registered or certified
24 mail, return receipt requested, or personal delivery, to the address
25 specified in the contract. All moneys paid pursuant to the cancelled
26 contract shall be fully refunded within 30 days of receipt of the
27 notice of cancellation. If the customer has executed any credit or
28 loan agreement through the health club to pay all or part of health
29 club services, the negotiable instrument executed by the buyer
30 shall also be returned within 30 days. The contract shall contain
31 a conspicuous notice printed in at least 10-point bold-faced type
32 as follows:

"NOTICE TO CUSTOMER

33    You are entitled to a copy of this contract at the time you sign it.
34    You may cancel this contract at any time before midnight of
35 the third operating day after receiving a copy of this contract.
36 If you choose to cancel this contract, you must either:
37    1. Send a signed and dated written notice of cancellation by
38 registered or certified mail, return receipt requested; or
39    2. Personally deliver a signed and dated written notice of can-
40 cellation to:
41 .................................... (Name of health club)
42 .................................... (Address of health club)
43    If you cancel this contract within the three-day period, you are
44 entitled to a full refund of your money. If the third operating
45 day falls on a Sunday or holiday, notice is timely given if it is
46 mailed or delivered as specified in this notice on the next operating
47 day. Refunds must be made within 30 days of receipt of the can-
48 cellation notice to the health club.
49    'Operating day' means any calendar day on which patrons may
50 inspect and use the health club's facilities and services during a
51 period of at least eight hours, except holidays and Sundays."
52    f. A health club services contract shall provide that it is subject
53 to cancellation by notice sent by registered or certified mail, return
54 receipt requested, or personally delivered, to the address of the
55 health club specified in the contract upon the buyer's death or
56 permanent disability, if the permanent disability is fully described
57 and confirmed to the health club by a physician. In a cancellation
58 under this subsection, the health club may retain the portion of
59 the total contract price representing the services used plus re-
60 imbursement for expenses incurred in an amount not to exceed
61 10% of the total contract price.
62    g. A health club services contract shall provide that it is subject
63 to cancellation by notice sent by registered or certified mail, return
64 receipt requested, or personally delivered, to the address of the

App.171

5

65 health club specified in the contract upon the buyer's change of
66 permanent residence to a location more than 25 miles from the
67 health club or an affiliated health club offering the same or similar
68 services and facilities at no additional expense to the buyer. In a
69 cancellation under this subsection, the health club may require
70 proof of the new permanent residence and may retain a prorated
71 share of the total contract price based upon the date the notice
72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.

74     h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.

80     i. A health club services contract shall not obligate the buyer
81 to renew the contract.

82     j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.

1     5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.

5     b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the as-
8 signee acquires the contract in good faith and for value.

1     6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.

1     7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the
4 health club is voidable at the option of the buyer of the contract.
5 Any health club services contract which does not comply with the
6 applicable provisions of this act is voidable at the option of the
7 buyer of the contract.

8     b. Any waiver by the buyer of the provisions of this act is void.

1     8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2 (C. 56:8–1 et seq.) to violate the provisions of this act.

App.172

6

1    9. The provisions of this act shall not apply to any nonprofit
2  public or private school, college or university; the State or any
3  of its political subdivisions; or any bona fide nonprofit, religious,
4  ethnic, or community organization.

1    10. The director shall adopt pursuant to the provisions of the
2  "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1
3  et seq.), rules and regulations necessary to effectuate the purposes
4  of this act.

1    11. This act shall take effect on the 120th day after enactment
2  and shall apply to all health club services contracts entered into
3  on or after the effective date.

---

### STATEMENT

This bill provides for the registration and regulation of health
clubs. A health club is an establishment which devotes or will devote
40% or more of its square footage to providing services or facilities
for the preservation, maintenance, encouragement or development
of physical fitness or physical well-being.

Each health club which sells health club services must register
with the Director of the Division of Consumer Affairs. The health
club would also be required to maintain a bond, irrevocable letter of
credit, or securities or monies in the amount of 10% of the health
club's gross income for the past year, except that the amount shall
not be less than $25,000.00, nor more than $50,000.00. However, the
amount of the bond or other security shall be $50,000.00 during any
period of sales prior to the opening of the health club facility. The
bond or other security would be used to cover any loss or damage
suffered by a buyer of a health club services contract as a result of
breach of contract or bankruptcy. However, the bond or other
security would not have to be maintained by a health club if the
health club does not sell health club services contracts that exceed
three months' duration and require more than three months' pay-
ment in advance.

The bill contains other consumer protection provisions. Every
contract for health club services must be in writing and the buyer
must receive a copy when he signs the contract. These contracts
cannot exceed three years' duration. The bill provides for a three-
day cooling-off-period during which the buyer of health club
services may cancel the contract. Also, it provides that, if the buyer
of a contract dies, becomes permanently disabled or moves more
than 25 miles from the health club or affiliated health club, the con-
tract may be cancelled and a refund made to the buyer or estate for
the unused services less expenses incurred. Also, if for some reason

App.173

7

the health club is closed for longer than one month through no fault of the buyer of a contract, the buyer is entitled to extend his membership for a period equal to that during which the facility was closed or to receive a prorated refund of the amount he has paid under the contract. A health club services contract may not obligate the buyer to renew the contract. Lastly, the buyer of a health club services contract that is executed before the health club facility is opened may cancel the contract and receive a refund of any deposit or payment on the contract if the facility is not open for business on the date promised in the contract.

A health club may not charge or accept a down payment exceeding 25% of the contract price prior to opening the health club facility. Also, a buyer of a health club services contract may void a contract entered into in reliance upon any fraudulent or substantially and willfully false or misleading information or representation of the health club.

The provisions of this bill do not apply to schools, colleges, or universities; the State or its political subdivisions; or nonprofit, religious, ethnic, or community organizations.

The bill supplements the "consumer fraud act" (P. L. 1960, c. 39) and therefore makes violators of its provisions subject to the penalties and other sanctions provided in that law.

————

# SENATE, No. 913

Introduced Pending Technical Review by Legislative Counsel

PRE-FILED FOR INTRODUCTION IN THE 1986 SESSION

By Senator LASKIN

SENATE COMMITTEE SUBSTITUTE FOR

## SENATE Nos. 1434, 1207 and
## ASSEMBLY No. 1155

[Second Official Copy Reprint]

# STATE OF NEW JERSEY

ADOPTED FEBRUARY 25, 1985

Sponsored by Senators CODEY and LASKIN
and Assemblyman ROCCO

An Act regulating the sellers of health club services and supplementing P. L. 1960, c. 39 (C. 56:8–1 et seq.).

1    Be it enacted *by the Senate and General Assembly of the State*
2 *of New Jersey:*
1    1. As used in this act:
2    a. "Director" means the Director of the Division of Consumer
3 Affairs in the Department of Law and Public Safety.
4    b. "Health club" means an establishment which devotes or will
5 devote 40% or more of its square footage to providing services
6 or facilities for the preservation, maintenance, encouragement or
7 development of physical fitness or physical well-being. The term
8 includes an establishment designated as "reducing salon," "health
9 spa," "spa," "exercise gym," "health studio," "health club," or by
10 other terms of similar import.
11    c. "Health club services" means those services offered by a
12 health club for the preservation, maintenance, encouragement or
13 development of physical fitness or physical well-being.
14    d. "Health club services contract" means an agreement under
15 which the buyer of health club services purchases or becomes
16 obligated to purchase health club services.
17    e. "Operating day" means any calendar day on which patrons
18 may inspect and use the health club's facilities and services during
19 a period of at least eight hours, except holidays and Sundays.
1    2. Each person who sells or offers for sale health club services
2 in this State shall register with the director on forms the director
3 provides. The registration shall be renewed every two years. Upon
4 the sale of the health club facility or a change in the majority

2

5   ownership of the stock of the corporate owner, the health club
6   facility shall reregister with the director and shall pay the regis-
7   tration fee. The person shall provide the full name and address
8   of each business location where health club services are sold in the
9   State as well as any other information regarding the ownership
10  and operation of each health club that the director deems appro-
11  priate. The registration and renewal fees shall be established or
12  changed by the director and shall be fixed at a level to allow for
13  the proper administration and enforcement of this act, but shall
14  not be fixed at a level that will raise amounts in excess of the
15  amount estimated to be so required.

1   3. a. A person who sells or offers for sale health club services
2   shall, for each health club facility operated in the State, maintain
3   a bond issued by a surety authorized to transact business in this
4   State or maintain an irrevocable letter of credit by a bank or
5   maintain with the director securities, moneys or other security
6   acceptable to the director to fulfill the requirements of this sub-
7   section. The principal sum of the bond, letter of credit, or secur-
8   ities, moneys or other security shall be 10% of the health club's
9   gross income for health club services during the club's last fiscal
10  year, except that the principal sum of the bond, letter of credit,
11  or securities, moneys or other security shall not be less than
12  $25,000.00, nor more than $50,000.00. However, the principal sum
13  of the bond, letter of credit, or securities, moneys or other security
14  shall be $50,000.00 for any period of time that a person sells or
15  offers for sale health club services prior to the opening of the
16  health club facility. After the health club facility opens, the bond,
17  letter of credit, or securities, moneys or other security shall be
18  adjusted to the appropriate sum. The bond, letter of credit, or
19  securities, moneys or other security shall be filed or deposited with
20  the director and shall be executed to the State of New Jersey
21  for the use of any person who, after entering into a health club
22  services contract, is damaged or suffers any loss by reason of
23  breach of contract or bankruptcy by the seller. Any person claim-
24  ing against the bond, letter of credit, or securities, moneys, or other
25  security may maintain an action at law against the health club
26  and the surety, bank or director, as the case may be. The aggregate
27  liability of the surety, bank, or the director to all persons for all
28  breaches of the conditions of the bond, letter of credit, or the
29  securities, moneys or other security held by the director shall not
30  exceed the amount of the bond, letter of credit, or the securities,
31  moneys or other security held by the director.
32      In the case of a bond, the health club shall file a copy of the

App.176

3

33 bond with the director and a certificate by the surety that the
34 surety will notify the director at least 10 days in advance of the
35 date of any cancellation or material change in the bond.
36    b. The provisions of subsection a. of this section shall not be
37 applicable to a person who sells or offers for sale health club
38 services in which the buyer of the health club services purchases
39 or becomes obligated to purchase health club services to be rendered
40 over a period no longer than three months and in which the seller
41 of the health club services requires or collects no more than three
42 months' payment in advance. The person who sells or offers for
43 sale health club services under contracts provided for in this
44 subsection shall file with the director, within 30 days following
45 the effective date of this act and no later than January 15 of every
46 even-numbered year, a declaration, executed under penalty of per-
47 jury, stating he sells or offers for sale only health club services
48 under contracts which comply with this subsection. Any person
49 who has filed a declaration pursuant to this subsection and who
50 intends to sell or offer for sale health club services under contracts
51 with longer terms or greater payments in advance than those pro-
52 vided in this subsection shall comply with subsection a. of this
53 section.
1    4. a. Every contract for health club services shall be in writing.
2 A copy of the written contract shall be given to the buyer at the
3 time the buyer signs the contract.
4    b. A health club services contract shall specifically set forth in
5 a conspicuous manner on the first page of the contract the buyer's
6 total payment obligation for health club services to be received
7 pursuant to the contract.
8    c. A health club services contract of a health club facility which
9 maintains a bond, irrevocable letter of credit or securities, moneys
10 or other security pursuant to subsection a. of section 3 of this act
11 shall set forth that a bond, irrevocable letter of credit or securities,
12 moneys or other security is filed or deposited with the Director of
13 the Division of Consumer Affairs to protect buyers of these con-
14 tracts who are damaged or suffer any loss by reason of breach of
15 contract or bankruptcy by the seller.
16    d. Services to be rendered to the buyer under the contract shall
17 not obligate the buyer for more than three years from the date the
18 contract is signed by the buyer.
19    e. A contract for new or increased health club services may be
20 cancelled by the buyer for any reason at any time before midnight
21 of the third operating day after the buyer receives a copy of the
22 contract. In order to cancel a contract the buyer shall notify the

4

23  health club of cancellation in writing, by registered or certified
24  mail, return receipt requested, or personal delivery, to the address
25  specified in the contract. All moneys paid pursuant to the cancelled
26  contract shall be fully refunded within 30 days of receipt of the
27  notice of cancellation. If the customer has executed any credit or
28  loan agreement through the health club to pay all or part of health
29  club services, the negotiable instrument executed by the buyer
30  shall also be returned within 30 days. The contract shall contain
31  a conspicuous notice printed in at least 10-point bold-faced type
32  as follows:

"NOTICE TO CUSTOMER

33  You are entitled to a copy of this contract at the time you sign it.
34  You may cancel this contract at any time before midnight of
35  the third operating day after receiving a copy of this contract.
36  If you choose to cancel this contract, you must either:
37  1. Send a signed and dated written notice of cancellation by
38  registered or certified mail, return receipt requested; or
39  2. Personally deliver a signed and dated written notice of can-
40  cellation to:
41  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (Name of health club)
42  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (Address of health club)
43  If you cancel this contract within the three-day period, you are
44  entitled to a full refund of your money. If the third operating
45  day falls on a Sunday or holiday, notice is timely given if it is
46  mailed or delivered as specified in this notice on the next operating
47  day. Refunds must be made within 30 days of receipt of the can-
48  cellation notice to the health club.
49  'Operating day' means any calendar day on which patrons may
50  inspect and use the health club's facilities and services during a
51  period of at least eight hours, except holidays and Sundays."
52  f. A health club services contract shall provide that it is subject
53  to cancellation by notice sent by registered or certified mail, return
54  receipt requested, or personally delivered, to the address of the
55  health club specified in the contract upon the buyer's death or
56  permanent disability, if the permanent disability is fully described
57  and confirmed to the health club by a physician. In a cancellation
58  under this subsection, the health club may retain the portion of
59  the total contract price representing the services used plus re-
60  imbursement for expenses incurred in an amount not to exceed
61  10% of the total contract price.
62  g. A health club services contract shall provide that it is subject
63  to cancellation by notice sent by registered or certified mail, return
64  receipt requested, or personally delivered, to the address of the

5

65 health club specified in the contract upon the buyer's change of
66 permanent residence to a location more than 25 miles from the
67 health club or an affiliated health club offering the same or similar
68 services and facilities at no additional expense to the buyer. In a
69 cancellation under this subsection, the health club may require
70 proof of the new permanent residence and may retain a prorated
71 share of the total contract price based upon the date the notice
72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.

74     h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.

80     i. A health club services contract shall not obligate the buyer
81 to renew the contract.

82     j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.

1     5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.

5     b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the as-
8 signee acquires the contract in good faith and for value.

1     6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.

1     7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the
4 health club is voidable at the option of the buyer of the contract.
5 Any health club services contract which does not comply with the
6 applicable provisions of this act is voidable at the option of the
7 buyer of the contract.

8     b. Any waiver by the buyer of the provisions of this act is void.

1     8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2 (C. 56:8-1 et seq.) to violate the provisions of this act.

App.179

6

1   9. The provisions of this act shall not apply to any nonprofit
2   public or private school, college or university; the State or any
3   of its political subdivisions; or any bona fide nonprofit, religious,
4   ethnic, or community organization.

1   10. The director shall adopt pursuant to the provisions of the
2   "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1
3   et seq.), rules and regulations necessary to effectuate the purposes
4   of this act.

1   **11.** This act shall take effect on the 120th day after enactment
2   and shall apply to all health club services contracts entered into
3   on or after the effective date.

---

### STATEMENT

This bill provides for the registration and regulation of health clubs by the State.

---

# SENATE, No. 1308

# STATE OF NEW JERSEY

### PRE-FILED FOR INTRODUCTION IN THE 1986 SESSION

#### By Senator CODEY

An Act regulating the sellers of health club services and supplementing P. L. 1960, c. 39 (C. 56:8-1 et seq.).

1    BE IT ENACTED *by the Senate and General Assembly of the State*
2  *of New Jersey:*

1    1. As used in this act:
2    a. "Director" means the Director of the Division of Consumer
3  Affairs in the Department of Law and Public Safety.
4    b. "Health club" means an establishment which devotes or will
5  devote 40% or more of its square footage to providing services
6  or facilities for the preservation, maintenance, encouragement or
7  development of physical fitness or physical well-being. The term
8  includes an establishment designated as "reducing salon," "health
9  spa," "spa," "exercise gym," "health studio," "health club," or by
10  other terms of similar import.
11    c. "Health club services" means those services offered by a
12  health club for the preservation, maintenance, encouragement or
13  development of physical fitness or physical well-being.
14    d. "Health club services contract" means an agreement under
15  which the buyer of health club services purchases or becomes
16  obligated to purchase health club services.
17    e. "Operating day" means any calendar day on which patrons
18  may inspect and use the health club's facilities and services during
19  a period of at least eight hours, except holidays and Sundays.
1    2. Each person who sells or offers for sale health club services
2  in this State shall register with the director on forms the director
3  provides. The registration shall be renewed every two years. Upon
4  the sale of the health club facility or a change in the majority

App.181

2

5 ownership of the stock of the corporate owner, the health club
6 facility shall reregister with the director and shall pay the regis-
7 tration fee. The person shall provide the full name and address
8 of each business location where health club services are sold in the
9 State as well as any other information regarding the ownership
10 and operation of each health club that the director deems appro-
11 priate. The registration and renewal fees shall be established or
12 changed by the director and shall be fixed at a level to allow for
13 the proper administration and enforcement of this act, but shall
14 not be fixed at a level that will raise amounts in excess of the
15 amount estimated to be so required.

1    3. a. A person who sells or offers for sale health club services
2 shall maintain a bond issued by a surety authorized to transact
3 business in this State or maintain an irrevocable letter of credit by
4 a bank or maintain with the director securities, moneys or other
5 security acceptable to the director to fulfill the requirements of
6 this subsection. The principal sum of the bond, letter of credit,
7 or securities, moneys or other security shall be according to the fol-
8 lowing schedule: one location $25,000.00; two locations $50,000.00;
9 three locations $75,000.00; four or five locations $100,000.00; six
10 or seven locations $120,000.00; eight or nine locations $140,000.00;
11 and 10 or more locations $150,000.00. The bond, letter of credit, or
12 securities, moneys or other security shall be filed or deposited with
13 the director and shall be executed to the State of New Jersey
14 for the use of any person who, after entering into a health club
15 services contract, is damaged or suffers any loss by reason of
16 breach of contract or bankruptcy by the seller. Any person claim-
17 ing against the bond, letter of credit, or securities, moneys, or other
18 security may maintain an action at law against the health club
19 and the surety, bank or director, as the case may be. The aggregate
20 liability of the surety, bank, or the director to all persons for all
21 breaches of the conditions of the bond, letter of credit, or the
22 securities, moneys or other security held by the director shall not
23 exceed the amount of the bond, letter or credit, or the securities,
24 moneys or other security held by the director.

25    In the case of a bond, the health club, shall file a copy of the
26 bond with the director and a certificate by the surety that the
27 surety will notify the director at least 10 days in advance of the
28 date of any cancellation or material change in the bond.

29    b. The provisions of subsection a. of this section shall not be
30 applicable to a person who sells or offers for sale health club
31 services in which the buyer of the health club services purchases
32 or becomes obligated to purchase health club services to be rendered

3

33 over a period no longer than three months and in which the seller
34 of the health club services requires or collects no more than three
35 months' payment in advance. The person who sells or offers for
36 sale health club services under contracts provided for in this
37 subsection shall file with the director, within 30 days following
38 the effective date of this act and no later than January 15 of every
39 even-numbered year, a declaration, executed under penalty of per-
40 jury, stating he sells or offers for sale only health club services
41 under contracts which comply with this subsection. Any person
42 who has filed a declaration pursuant to this subsection and who
43 intends to sell or offer for sale health club services under contracts
44 with longer terms or greater payments in advance than those pro-
45 vided in this subsection shall comply with subsection a. of this
46 section.

1    4. a. Every contract for health club services shall be in writing.
2 A copy of the written contract shall be given to the buyer at the
3 time the buyer signs the contract.

4    b. A health club services contract shall specifically set forth in
5 a conspicuous manner on the first page of the contract the buyer's
6 total payment obligation for health club services to be received
7 pursuant to the contract.

8    c. A health club services contract of a health club facility which
9 maintains a bond, irrevocable letter of credit or securities, moneys
10 or other security pursuant to subsection a. of section 3 of this act
11 shall set forth that a bond, irrevocable letter of credit or securities,
12 moneys or other security is filed or deposited with the Director of
13 the Division of Consumer Affairs to protect buyers of these con-
14 tracts who are damaged or suffer any loss by reason of breach of
15 contract or bankruptcy by the seller.

16    d. Services to be rendered to the buyer under the contract shall
17 not obligate the buyer for more than three years from the date the
18 contract is signed by the buyer.

19    e. A contract for new or increased health club services may be
20 cancelled by the buyer for any reason at any time before midnight
21 of the third operating day after the buyer receives a copy of the
22 contract. In order to cancel a contract the buyer shall notify the
23 health club of cancellation in writing, by registered or certified
24 mail, return receipt requested, or personal delivery, to the address
25 specified in the contract. All moneys paid pursuant to the cancelled
26 contract shall be fully refunded within 30 days of receipt of the
27 notice of cancellation. If the customer has executed any credit or
28 loan agreement through the health club to pay all or part of health
29 club services, the negotiable instrument executed by the buyer

App.183

4

30  shall also be returned within 30 days. The contract shall contain
31  a conspicuous notice printed in at least 10-point bold-faced type
32  as follows:

"NOTICE TO CUSTOMER

33    You are entitled to a copy of this contract at the time you sign it.
34    You may cancel this contract at any time before midnight of
35  the third operating day after receiving a copy of this contract.
36  If you choose to cancel this contract, you must either:
37    1. Send a signed and dated written notice of cancellation by
38  registered or certified mail, return receipt requested; or
39    2. Personally deliver a signed and dated written notice of can-
40  cellation to:
41  .................................... (Name of health club)
42  .................................... (Address of health club)
43    If you cancel this contract within the three-day period, you are
44  entitled to a full refund of your money. If the third operating
45  day falls on a Sunday or holiday, notice is timely given if it is
46  mailed or delivered as specified in this notice on the next operating
47  day. Refunds must be made within 30 days of receipt of the can-
48  cellation notice to the health club.
49    'Operating day' means any calendar day on which patrons may
50  inspect and use the health club's facilities and services during a
51  period of at least eight hours, except holidays and Sundays."
52    f. A health club services contract shall provide that it is subject
53  to cancellation by notice sent by registered or certified mail, return
54  receipt requested, or personally delivered, to the address of the
55  health club specified in the contract upon the buyer's death or
56  permanent disability, if the permanent disability is fully described
57  and confirmed to the health club by a physician. In a cancellation
58  under this subsection, the health club may retain the portion of
59  the total contract price representing the services used plus re-
60  imbursement for expenses incurred in an amount not to exceed
61  10% of the total contract price.
62    g. A health club services contract shall provide that it is subject
63  to cancellation by notice sent by registered or certified mail, return
64  receipt requested, or personally delivered, to the address of the
65  health club specified in the contract upon the buyer's change of
66  permanent residence to a location more than 25 miles from the
67  health club or an affiliated health club offering the same or similar
68  services and facilities at no additional expense to the buyer. In a
69  cancellation under this subsection, the health club may require
70  proof of the new permanent residence and may retain a prorated
71  share of the total contract price based upon the date the notice

5

72 was received plus reimbursement for expenses incurred in an
73 amount not to exceed 10% of the total contract price.
74    h. A health club services contract shall provide that if a health
75 club facility is closed for a period longer than 30 days through
76 no fault of the buyer of the health club services contract, the buyer
77 is entitled to either extend the contract for a period equal to that
78 during which the facility is closed or to receive a prorated refund
79 of the amount paid by the buyer under the contract.
80    i. A health club services contract shall not obligate the buyer
81 to renew the contract.
82    j. If a health club facility is not in existence on the date the
83 contract is executed, the health club services contract shall provide
84 that a buyer of a contract may cancel the contract if the facility
85 is not open for business on a date which shall be set forth in the
86 contract and receive a full refund of any deposit or payment on
87 the contract.
1    5. a. A health club services contract shall not require the execu-
2 tion of any note or series of notes by the buyer which, if separately
3 negotiated, will cut off as to third parties any right of action or
4 defense which the buyer has against the health club.
5    b. A right of action or defense arising out of a health club
6 services contract which the buyer has against the health club shall
7 not be cut off by assignment of the contract whether or not the
8 assignee acquires the contract in good faith and for value.
1    6. A health club may not charge and accept a down payment
2 exceeding 25% of the total contract price prior to opening the
3 health club facility.
1    7. a. Any health club services contract entered into in reliance
2 upon any fraudulent or substantially and willfully false or mis-
3 leading information, representation, notice or advertisement of the
4 health club is voidable at the option of the buyer of the contract.
5 Any health club services contract which does not comply with the
6 applicable provisions of this act is voidable at the option of the
7 buyer of the contract.
8    b. Any waiver by the buyer of the provisions of this act is void.
1    8. It is an unlawful practice and a violation of P. L. 1960, c. 39
2 (C. 56:8–1 et seq.) to violate the provisions of this act.
1    9. The provisions of this act shall not apply to any nonprofit
2 public or private school, college or university; the State or any
3 of its political subdivisions; or any bona fide nonprofit, religious,
4 ethnic, or community organization.
1    10. The director shall adopt pursuant to the provisions of the
2 "Administrative Procedure Act," P. L. 1968, c. 410 (C. 52:14B–1

App.185

6

3   et seq.), rules and regulations necessary to effectuate the purposes
4   of this act.
1      11. This act shall take effect on the 120th day after enactment
2   and shall apply to all health club services contracts entered into
3   on or after the effective date.

---

### STATEMENT

This bill provides for the registration and regulation of health clubs. A health club is an establishment which devotes or will devote 40% or more of its square footage to providing services or facilities for the preservation, maintenance, encouragement or development of physical fitness or physical well-being.

---

App.186

ASSEMBLY HIGHER EDUCATION AND REGULATED
PROFESSIONS COMMITTEE

STATEMENT TO

SENATE COMMITTEE SUBSTITUTE FOR

## SENATE Nos. 1308, 913 and
## ASSEMBLY No. 1163

# STATE OF NEW JERSEY

### DATED: JUNE 22, 1987

The Assembly Higher Education and Regulated Professions Committee favorably reports the Senate Committee Substitute for Senate Bill No. 1308, Senate Bill No. 913 and Assembly Bill No. 1163.

This bill provides for the registration and regulation of health clubs. Under the bill's provisions, a health club is defined as an establishment which devotes 40% or more of its square footage to providing services or facilities for the preservation, maintenance, encouragement or development of physical fitness or physical well being.

The bill stipulates that any person who sells health club services must register with the Director of the Division of Consumer Affairs. Also, a health club must maintain a bond, letter of credit or securities, moneys or other security in an amount which represents 10% of the club's gross income for the previous fiscal year. The principal sum of the bond or other security shall be not less than $25,000.00 nor more than $50,000.00; except that for any period of time in which a person sells health club services prior to the opening of the facility, the principal sum shall be $50,000.00. The bond or security is to be filed with the Director of the Division of Consumer Affairs and is to be available for claims made by persons who suffer any loss as a result of a breach of contract or the bankruptcy of the seller of health club services. A bond or security would not have to be maintained, however, by a health club if the club does not sell health club services contracts that exceed three months in duration and require more than three months payment in advance.

This bill also provides the following consumer protection provisions:

1. A health club services contract must be in writing and a copy given to the buyer at the time of signature;

2. A buyer shall not be obligated under the contract for more than three years from the date of signature;

3. A buyer shall have three operating days from the date of receipt of the contract to cancel and is entitled to a full refund within 30 days of the club's receipt of the notice of cancellation;

App.187

2

4. A buyer may cancel the contract if he suffers a permanent disability which is confirmed by a physician or if he moves his permanent residence to a location more than 25 miles from the club or an affiliate which offers similar services;

5. If the health club is closed for a period longer than 30 days, the buyer is entitled to extend the contract or receive a prorated refund; and

6. A buyer may cancel the contract if the facility is not opened for business on the promised date.

Finally, the bill supplements the "consumer fraud act" (P. L. 1960, c. 39) and therefore makes violators of its provisions subject to the penalties in that law.

App.188

SENATE LABOR, INDUSTRY AND PROFESSIONS
COMMITTEE

STATEMENT TO

SENATE COMMITTEE SUBSTITUTE FOR

SENATE Nos. 1308, 913 and
ASSEMBLY No. 1163

# STATE OF NEW JERSEY

DATED: MAY 21, 1987

This bill, Senate Committee Substitute for Senate Bill Nos. 1308, 913 and Assembly Bill No. 1163, provides for the registration and regulation of health clubs. A health club is an establishment which devotes or will devote 40% or more of its square footage to providing services or facilities for the preservation, maintenance, encouragement or development of physical fitness or physical well-being.

Each health club must register with the Director of the Division of Consumer Affairs. Each health club would be required to maintain a bond, irrevocable letter of credit, or securities or moneys in the amount of 10% of the health club's gross income for the past fiscal year, except that the amount could not be less than $25,000.00, nor more than $50,000.00. However, the amount of the bond or other security would be required to be $50,000.00 during any period of sales prior to the opening of the health club facility. The bond or other security would be used to cover any loss or damage suffered by a buyer of a health club services contract as a result of breach of contract or bankruptcy. However, the bond or other security would not have to be maintained by a health club if the health club does not sell health club services contracts that exceed three months' duration or that require more than three months' payment in advance.

The bill contains other consumer protection provisions. Every contract for health club services must be in writing and the buyer must receive a copy when he signs the contract. These contracts cannot exceed three years' duration. The bill provides for a three-day cooling-off period during which the buyer of health club services may cancel the contract. Also, if the buyer of a contract dies, becomes permanently disabled or moves more than 25 miles from the health club or an affiliated health club, the contract may be cancelled and a refund made to the buyer or estate for the unused services less expenses incurred. Further, if for some reason the health club is closed for longer than

App. 189

2

one month through no fault of the buyer of a contract, the buyer is entitled to extend his membership for a period equal to that during which the facility was closed or to receive a prorated refund of the amount he has paid under the contract. A health club services contract may not obligate the buyer to renew the contract. Lastly, the buyer of a health club services contract that is executed before the health club facility is opened may cancel the contract and receive a refund of any deposit or payment on the contract if the facility is not open for business on the date promised in the contract.

A health club may not charge or accept a down payment exceeding 25% of the contract price prior to opening the health club facility. Also, a buyer of a health club services contract may void a contract entered into in reliance upon any fraudulent or substantially and willfully false or misleading information or representation of the health club.

The provisions of this bill do not apply to schools, colleges, or universities; the State or its political subdivisions or nonprofit, religious, ethnic, or community organizations.

The bill supplements the consumer fraud act (P. L. 1960, c. 39) and therefore makes violations of its provisions subject to the penalties and the other sanctions provided in that law.

———

App.190

# OFFICE OF THE GOVERNOR
## NEWS RELEASE

**CN-001**
**Contact:** JOHN SAMERJAN
609-292-8956 OR 292-6000 EXT. 207

**TRENTON, N.J. 08625**
**Release:** WED., AUG. 12, 1987

Governor Thomas H. Kean today signed legislation regulating the financial and contractual aspects of health club services.

The legislation, S-1308/913/A-1163, sponsored by Senator Richard Codey, D-Essex, Senator Lee Laskin, R-Camden and Assemblyman John Rocco, R-Camden, supplements the Consumer Fraud Act to protect consumers against fraudulent practices when health spas go out of business and fail to meet their obligations.

Among the provisions of the legislation is the requirement of sellers of health club services to maintain a bond to protect buyers of such services who suffer a loss by the breaching of the agreement by the health spa. The principle sum of this security shall be not less than $25,000 nor more than $50,000.

Further, every contract for health club services is required to be in writing, shall not obligate the buyer for more than three years, and shall set forth in a clear manner the buyer's total payment obligation.

The Division of Consumer Affairs in the Department of Law and Public Safety will implement the legislation.

The legislation is effective in 120 days.

Governor Kean today also signed legislation expanding the types of claims the New Jersey Surplus Lines Guaranty Fund covers to include claims arising out of the insolvency of the Northeastern Fire Insurance Company.

-more-

App.191



NJ-Consumer

# Health club regulations

## become law

SL 8/13/87

Gov. Thomas Kean signed legislation yesterday that imposes stringent regulations on health clubs and provides customers with protection from unscrupulous club operators.

The measure, signed by Kean without comment, requires health club operators to register with the Office of Consumer Affairs and post a security bond. In addition, customers would have a three-day review period to back out of any membership contract and the club could not offer any contract that exceeds three years.

The legislation (S-1308/A-1163) was sponsored by Sen. Richard Codey (D-Essex), Sen. Lee Laskin (R-Camden) and Assemblyman John Rocco (R-Camden).

Among other things, the law would require new health clubs to post a $50,000 security bond if any memberships are sold before the facility opens. Clubs already in operation would have to post a security bond of up to 10 percent of the gross income from the previous year. The minimum would be $25,000 and the maximum $50,000.

In addition, clubs could not collect more than a 25 percent down payment on contracts before opening.

"Too many people have found out the hard way that so-called lifetime memberships are only good for the lifetime of the corporation—not the lifetime of the health club member," said Codey.

Laskin noted that a few years ago there was a sudden rash of health club closings, after thousands of consumers had joined.

"In many instances these individuals paid substantial advance membership fees which they lost when the club they had joined suddenly vanished in the middle of the night or was forced into bankruptcy," Laskin said.

Rocco echoed these statements saying many "fly-by-night" health club operators have no assets to liquidate if the business fails.

"This left members and other creditors out in the cold with no recourse to recoup their money," he added.

The law also calls for a prorated refund if a member dies, is disabled or moves more than 25 miles away from the facility.

The Division of Consumer Affairs will implement the law which will become effective in 120 days.

App.192

**U.S. District Court**
**District of New Jersey [LIVE] (Trenton)**
**CIVIL DOCKET FOR CASE #: 3:23-cv-23076-MAS-TJB**

FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC. v. PLATKIN
Assigned to: Judge Michael A. Shipp
Referred to: Magistrate Judge Tonianne J. Bongiovanni
Case in other court:  Third Circuit, 24-01111
Cause: 42:1983 Civil Rights Act

Date Filed: 12/13/2023
Date Terminated: 01/12/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2024 | 33 | TEXT ORDER: This matter comes before the Court upon Plaintiff's emergent motion for a preliminary injunction pending appeal. (ECF No. 31 .) In its recent Memorandum Opinion (ECF No. 28 ), this Court explained why it lacks subject-matter jurisdiction over this matter. Crucially, "[w]ithout jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). Therefore, for the same reasons outlined in the Court's recent Memorandum Opinion (ECF No. 28 ), Plaintiff's emergent motion for a preliminary injunction pending appeal (ECF No. 31 ) is **DENIED**. So Ordered by Judge Michael A. Shipp on 1/22/2024. (jdb) (Entered: 01/22/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/22/2024 13:47:12 | | | |
| | | | |
| | | | |
| | | | |

App.193